# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RALPH PAUL DEPUTY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 10874-VCZ |
| | ) | |
| JAY CHRISTIAN DEPUTY, individually and as Trustee of the Revocable Trust of Lillian K. Deputy under Agreement dated 01/21/03; and as Trustee of the Revocable Trust of Lillian K. Deputy under Agreement dated 03/10/05; and as Trustee of the Amended and Restated Lillian K. Deputy Revocable Charitable Trust under Agreement dated 02/21/08; and as Trustee of the One Flintlock Trust Irrevocable Trust under Agreement dated 09/15/03; and as Trustee of Unknown Trust, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 18, 2019
Date Decided:  March 2, 2020

Sharon Oras Morgan, Beth B. Miller, and E. Chaney Hall, FOX ROTHSCHILD LLP, Wilmington, Delaware, *Attorneys for Petitioner Ralph Paul Deputy.*

Christopher M. Coggins, COGGINS LAW LLC, Wilmington, Delaware, *Attorney for Respondent Jay Christian Deputy.*

**ZURN, Vice Chancellor.**

Strife between brothers, particularly over the apportionment of resources like money or affection, is a familiar aspect of the human condition. According to the Bible, the first set of brothers on the earth suffered such conflict. In the book of Genesis, Cain was jealous of his brother Abel's relationship with the Lord.

> Then the Lord said to Cain, "Why are you angry? Why is your face downcast? If you do what is right, will you not be accepted? But if you do not do what is right, sin is crouching at your door; it desires to have you, but you must rule over it.[1]

So cautioned, Cain took Abel out to a field and killed him. When the Lord asked Cain where Abel was, Cain replied, "I don't know. Am I my brother's keeper?"[2] As punishment for his crime, the Lord made Cain a restless wanderer of the earth.

This case follows the same narrative arc. Paul and Jay Deputy are brothers; strife has existed between them for decades, in part due to the fact that Paul is adopted, and in part due to Jay's difficulty in doing what is right.[3] Jay is, in fact, his brother's keeper: he is the trustee of two family trusts, of which both Jay and Paul are beneficiaries. Paul placed his full confidence in Jay and relied on him to keep what was Paul's and act in Paul's best interest. But sin crouched at Jay's door, and he failed to rule over it.

---

[1] *Genesis* 4:6–7.

[2] *Genesis* 4:9.

[3] In this family dispute, I use the parties' preferred first names in pursuit of clarity. I intend no familiarity or disrespect. Paul's full name is Ralph Paul Deputy; he prefers to be called Paul.

Jay's actions with respect to each trust followed the same pattern: charm a vulnerable settlor, persuade the settlor to adopt Jay's suggested estate plan for his benefit and ease of manipulation, and ultimately disenfranchise Paul and take the whole for himself, all the while creating a paper trail to justify and obscure his fiduciary misdeeds.

Originally, both trusts named Jay as successor trustee after the original trustee. Integral to Jay's scheme, both settlors executed a durable power of attorney naming Jay as attorney-in-fact. Purportedly acting under the authority of that durable power of attorney, Jay drafted and executed an amendment to each trust that included a no-contest provision. Both amendments granted Jay, as trustee, the authority to revoke the beneficiary status of any trust beneficiary when Jay concluded the beneficiary had contested the trust or related documents. Jay never provided Paul with a copy of either amendment, failed to promptly inform Paul that he had amended the trusts, and did not explain the amendments' material effects on Paul's interests.

Neither of the "amendments" are valid. And both amendments were executed under suspicious circumstances. Little suggests that either settlor was aware that Jay executed the amendments, or authorized him to do so. Each amendment was a departure from each settlor's estate plan. Jay executed these amendments in the shadows while each settlor's well-being hung in the balance. Knowing that each

2

settlor would have likely protested his efforts, Jay did so in order to take control of the trusts and secure their benefits for himself.

Satisfied he had laid sufficient groundwork, Jay confidently proceeded as though both amendments were legally operative. Much suggests that Jay keenly awaited the moment at which he could exercise his revocation powers to excise Paul from both trusts. Eventually, Paul asked enough questions that Jay pounced and told Paul that his interests were revoked under the amendments. Jay's "revocations," if valid, would have the effect of transferring 100% of the interest in each trust to Jay.

But Jay did not clearly inform Paul of the supposed revocations. Rather, Jay sent his brother mixed messages about his beneficial interest, allowing Paul to proceed under the assumption that Jay's revocations were merely empty threats and that Jay was maintaining Paul's interests. Paul operated under this assumption for a number of years, despite a number of red flags to the contrary, such as not receiving distributions or information about the trusts. At different junctures, Paul even sought the advice of counsel, but with his focus elsewhere, Paul did not act to protect himself against Jay.

Now, over ten years after this saga began, Paul contends that Jay, as trustee, breached his fiduciary duties to inform, of loyalty, and of care, and was unjustly enriched by those alleged breaches. Paul seeks inventories and accountings for the trusts, damages, removal of Jay as trustee of the trusts, and attorneys' fees. In his

3

defense, Jay contends that Paul's claims are barred by the equitable doctrine of laches. Based on the preponderance of the evidence presented at trial, Paul must prevail in this action. My findings of fact—of biblical proportions due to the complexity and extent of Jay's sins—and reasoning follow.

And based on those findings, Paul is entitled to relief. Cain's misdeeds led the Lord to sentence him to be a restless wanderer of the earth: "Now you are under a curse and driven from the ground, which opened its mouth to receive your brother's blood from your hand. When you work the ground, it will no longer yield its crops for you."[4] The trusts at issue will no longer yield their assets to Jay. Jay is removed as trustee of both trusts and replaced by Paul. Jay must give Paul and this Court an inventory and accounting of both trusts. And Jay must disgorge his ill-gotten gains, and pay Paul's attorneys' fees.

## I. BACKGROUND[5]

In this breach of trust action, Petitioner Ralph Paul Deputy claims that Respondent Jay Christian Deputy, as trustee of certain trusts, breached his fiduciary duties to inform, of loyalty, and of care, and was unjustly enriched by those alleged fiduciary duty breaches. In particular, Paul contends that his brother Jay has

---

[4] *Genesis* 4:11–12.

[5] Citations in the form of "[Name] Tr. —" refer to witness testimony from the trial transcripts. Citations in the form of "[Name] Dep. —" refer to deposition transcripts in the record. Citations in the form of "PTO ¶ —" refer to stipulated facts in the pre-trial order. *See* Docket Item ("D.I.") 118. Citations in the form of "JX — at —" refer to a trial exhibit.

4

attempted to divest Paul of his interests in two trusts: (1) the One Flintlock Trust by Agreement dated September 15, 2003, as amended, established by the parties' aunt, Georgene Castor (the "One Flintlock Trust"); and (2) the Amended and Restated Lillian K. Deputy Revocable Charitable Remainder Trust under Agreement dated February 21, 2008, as amended, established by the parties' mother, Lillian K. Deputy (the "Deputy Trust" and with the One Flintlock Trust, the "Trusts"). Paul now seeks inventories and accountings for the trusts, damages, removal of Jay as trustee of the trusts, and attorney's fees.[6] Jay maintains that the doctrine of laches bars Paul's claims.[7]

Paul initiated this action in 2015,[8] and the case proceeded through discovery. Paul filed his Amended Petition in January 2018.[9] Count I asserts a claim for breach of Jay's duty to inform. Count II asserts a claim for breach of Jay's duties of loyalty and care. Count III asserts a claim for unjust enrichment. In December 2018, the parties filed cross motions for summary judgment.[10] I denied the motions for reasons

---

[6] D.I. 51 at 7–8 ("prayer for relief").

[7] *See generally* D.I. 132.

[8] D.I. 1; JX 125.

[9] D.I. 51.

[10] D.I. 73, 74.

associated with the laches analysis, concluding outstanding issues of fact remained as to when Paul was on inquiry notice of his claims.[11]

The case proceeded to trial on June 19 and 20, 2019.[12] At trial, the parties presented three witnesses: Paul Deputy, Jay Deputy, and Thomas Fairchild. In addition, the parties submitted 174 exhibits. These are my findings of fact based on the preponderance of the evidence.

### A.    The Deputy Family History And The Court's Credibility Determinations

Paul lives and works in Hagerstown, Maryland.[13] He has very little accounting experience, no background in investment management, and no training in estate administration.[14] As such, he has relied on Jay's advice regarding investments and family assets.[15] Paul attended college for three years, and eventually opened his own restaurant in Hagerstown.[16] He has operated that restaurant for nearly nineteen years.[17] Paul suffered a stroke in 2014 and has been

---

[11] *Deputy v. Deputy*, 2019 WL 2452550, at *4 (Del. Ch. June 10, 2019) (ORDER). In July 2019, Respondent requested the Court refer the action to mandatory mediation. D.I. 123. I ultimately denied the request. D.I. 129.

[12] D.I. 126 (Trial Transcript Vol. I); D.I. 127 (Trial Transcript Vol. II).

[13] Paul Tr. 5:20–21.

[14] Paul Tr. 5:6–16.

[15] *See, e.g.*, Paul Tr. 19:3–20:12, 22:12–16.

[16] Paul Tr. 4:18–5:5.

[17] Paul Tr. 6:20–24; *see also* Paul Tr. 5:1–2; Paul Dep. 25:12–18 (Paul stating at his deposition that he did not file suit in 2008 because he "ha[d] a restaurant . . . , so [he]

6

cognitively impaired since.[18]  As a result, Paul has "problems speaking every once in awhile," and "every once in awhile [his] numbers don't come out right, but [he] knows them in [his] brain."[19]  Despite this setback, he remains devoted to his restaurant.[20]

Jay is a resident of Wilmington, Delaware, but sometimes stays at the home that belonged to his mother, located at 6744 North Circle, Seaford, Delaware (the "North Circle House").[21]  Prior to settling in Delaware around 2008, Jay split his time between Delaware and New York, New York, where his spouse, John Walton, owned a loft.[22]  Jay is very educated, has substantial market experience, and touts his education and experience to others.[23]  Jay has a bachelor's degree from Salisbury

---

couldn't give [his] time to this [dispute] until [he] finally got [himself] together with the restaurant"); JX 97 at RDEPUTY_000007 ("[T]he restaurant is taking a lot of time these days.").

[18] Paul Tr. 5:17–22.

[19] Paul Tr. 5:23–6:2.

[20] *See* Paul Tr. 5:1–2.

[21] Jay Tr. 335:17–18, 336:1–9, 344:15–345:20.

[22] Jay Tr. 335:19–24, 396:13–15.

[23] *See, e.g.*, JX 78 at JDEPUTY_00791 ("Prior to returning to Delaware, I was a real estate broker and investor in the Twin Cities for 15 years.  As well, I was real estate developer of historic properties.  At present, I am writing a doctoral dissertation from Columbia University in real estate development and local economic development involving university communities.  I am, therefore, very familiar with both a seller's and buyer's perspective in real estate transactions . . . ."); JX 97 at RDEPUTY_000024 (Jay writing: "Things are certainly tough . . . .  It really seems to be part of the capital markets correction(s) that is taking place.  Almost a survival of the fittest . . . so to speak."), REPDUTY_000021 (Jay writing:  "The trust is in bonds, which when the stock market goes down, bonds go up (an inverse relationship).  Again, it is my understanding we're

7

University; a master's degree in urban planning and real estate from the University of Michigan; and additional postgraduate degrees in landscape architecture, horticulture, interior design, and American art history from the University of Minnesota.[24] He earned his doctorate from Columbia University in 2008,[25] and is currently pursuing an MFA in painting at the University of Delaware.[26] For the past ten years, Jay has been "just a house husband."[27]

Jay and Paul are brothers.[28] Lillian K. Deputy and her late husband, A. John Deputy, were Jay's biological parents.[29] They adopted Paul when he was a young boy.[30] Paul's adoption has been a source of animosity between the brothers for some

---

somewhat sheltered by the recent turn of events in the stock market, but until there is confidence in the market, who knows what will happen."); JX 99 at JDEPUTY_00792–94 (Jay writing: "The purchase of real property is predicated on present facts and rationale of both the national residential real estate market's collapse as well as other financial markets' collapse at the beginning of the Great Recession in mid-2008. . . . *It is the Trustee's opinion, and based on his professional experience*, this was not a time to sell the house at a greatly reduced price in order to simply place monies in trust. . . . Therefore, *it is my educated and informed opinion as a former real estate broker and developer as well as an urban real estate market academic* that the real estate market will continue to be non-performing for the next five to eight years . . . . The financial and lending markets full recovery remains uncertain." (emphases added)).

[24] Jay Tr. 334:17–335:10.

[25] Jay Tr. 335:11–12.

[26] Jay Tr. 533:2–3.

[27] Jay Tr. 335:13–16.

[28] PTO ¶ 14.

[29] PTO ¶ 16.

[30] PTO ¶ 15; Paul Tr. 6:6–10.

time.[31]  Lillian and John treated Paul as their biological son, and Lillian resolved to have her assets distributed to her sons equally after her death.[32]

Throughout adulthood, Paul and Jay maintained close relationships with their mother, as well as her sister and their aunt, Georgene Castor.[33]  As Lillian and Georgene grew older, the brothers visited and helped care for them.[34]  Memorializing the importance of these relationships, both Lillian and Georgene adopted estate plans favoring Jay and Paul through trusts for the settlors' benefit during their lifetimes and for the benefit of Jay and Paul after the settlors' deaths.[35]

These trusts, as well as their amendments and restatements, are the foundation of this case.  Each trust named Jay as trustee.  But as I expressed at trial, Jay used his trustee positions to misappropriate his brother's interests in both Georgene's

---

[31] *See* Jay Tr. 429:2–430:5.

[32] *See* JX 58 at 8–9 (noting that Lillian was "becoming convinced that 'outright, equally' [was] the best method of disposition" and that "she agree[d]" that "[o]utright to each leaves Jay the option of reserving principal, but trust for total removes flexibility from [Paul]").

[33] PTO ¶ 20; *see* Paul Tr. 6:22–7:4 ("My aunt was my favorite aunt of all, and we had a good relationship.  We – we'd go to her house, help her out, and things like that."); Jay Tr. 361:5–362:1 (Jay describing his frequent visits to his aunt's house in New Jersey while he lived in New York).

[34] Jay Tr. 362:9–368:17.

[35] *See generally* JX 1, JX 7.  As discussed below, Georgene's original trust document has not been provided.  The first of Georgene's trust documents names both Jay and Paul as beneficiaries.  *See* JX 7.

estate and Lillian's estate.[36] Before explaining my findings of fact that led to this conclusion, I will first explain my underlying credibility determinations.

While much of the dispute between Jay and Paul requires my evaluation of their conflicting testimony, this endeavor is aided by the credible testimony of Lillian's financial advisor, Thomas Fairchild.[37] Fairchild owns an Ameriprise Financial Services, Inc. ("Ameriprise") branch that provides private wealth services to retired individuals, and has been a financial advisor with Ameriprise for twenty-six years.[38] Through Ameriprise, Fairchild served as Lillian's financial advisor from 1996 until her death in 2008; until her death, he met with her in person at least two times per year and communicated with her frequently.[39] He advised her on account management, general planning regarding required retirement plan distributions, and general estate planning.[40] Fairchild also served as Jay's financial advisor from 2001 to 2007.[41] He began acting as Paul's financial advisor in 1998, and still acts in that

---

[36] Tr. 539:22–540:2.

[37] Fairchild earned his B.A. from University of Delaware in 1981. Fairchild Tr. 200:21–24. He has also earned four certifications: Certified Financial Planner, Certified Investment Management Analyst, Certified Private Wealth Advisor, and Certified Trust Financial Advisor. *Id.* 201:2–6.

[38] Fairchild Tr. 201:13–16.

[39] Fairchild Tr. 205:2–18.

[40] Fairchild Tr. 205:23–206:4.

[41] Fairchild Tr. 204:1–5.

capacity today.[42]  By virtue of these roles, Fairchild has developed an intimate knowledge of the Deputy family's assets and Lillian's intended estate plan, as well as the events that occurred with respect to Georgene's estate.

At trial, I found Fairchild to be objective and fair, with a strong fiduciary aptitude.  He cared deeply for his long-time client, Lillian.[43]  According to Fairchild, Lillian "was a dear.  She was lovely, and she traveled and was very good at shorthand.  And so . . . I always thought about what I said, because I knew she would know after the fact."[44]  As a fiduciary, he always had Lillian's wishes and intent in mind.[45]  Even if he was unhappy with the means of distributing Lillian's assets, he was satisfied if the ultimate end was consistent with her wishes.[46]  Fairchild contemporaneously recorded his dealings with the Deputy family, and cataloged his reactions to events as they unfolded in real time.[47]  His testimony was entirely

---

[42] Fairchild Tr. 203:17–21.

[43] Paul Tr. 52:3–9 (noting Fairchild visited Lillian in the hospital); Fairchild 266:2–7 (noting Fairchild attended Lillian's funeral).

[44] Fairchild Tr. 205:19–22.

[45] *See, e.g.*, Fairchild Tr. 206:20–24, 208:24–210:24, 212:16–23, 223:16–21, 234:11–235:1, 237:14–24, 259:5–15, 276:23–277:14.

[46] *See, e.g.*, Fairchild Tr. 259:7–15 (expressing displeasure over how Ameriprise corporate handled forgery claims, but noting he was happy the ultimate outcome accorded Lillian's wishes); JX 58 at 1 (Fairchild noting in April 2008 his displeasure with the estate plan's tax structure but his belief that he could "restore most of the tax-deferred value while keeping much of the intended control").

[47] Fairchild Tr. 208:17–23 ("Q. Is it your regular practice to keep notes of your meetings with clients?  A. Yes, of course.  Q. How do you record those notes?  A. During meetings,

consistent with the documentary record and corroborated by it. Therefore, much of

his testimony serves as the objective touchpoint for my findings of fact.

Fairchild testified, "I think Jay is dishonest, and I think Jay is vindictive."[48]

He explained:

> From a dishonesty standpoint, from my perspective, things like asking a member of my staff to notarize a document after the fact is dishonest. Forging signatures is dishonest. Creating documents after the fact, post-hoc documents, to create a story is dishonest. Not reporting his mother's death on a retirement account, and accepting four or five years worth of required distributions payable to his mother, I think is dishonest.[49]

Fairchild's impressions of Jay are consistent with my impressions at trial. I did not

find Jay's testimony credible or sincere. To effectuate his misappropriations, Jay

has created an extensive fraudulent paper trail, which I will describe in detail below.

Jay regularly doctors stories and documents for his own benefit. At trial, Jay evaded

direct answers and had difficulty explaining discrepancies in his story. His

explanations were predominantly consistent only with the inauthentic paper record

that Jay himself manufactured.

In contrast, I found Paul's testimony to be sincere and credible. He answered

questions directly and truthfully. His testimony was consistent with reliable,

---

with handwritten notes on a meeting page. During telephone calls, on a computer log."); *see generally* JX 58; JX 102.

[48] Fairchild Tr. 204:7–8.

[49] Fairchild Tr. 204:10–18.

authentic exhibits. Communications between Paul and Jay corroborate Paul's understanding of the facts as they unfolded. Further, Paul's story is consistent with Fairchild's contemporaneous business records. To the extent that Paul could not accurately recall events from many years ago, the documentary record neatly fills the gaps. He only relies on one self-drafted document to support his timeline of events: one handwritten list, which he prepared on Fairchild's advice in March 2008.[50] Even Paul's handwritten list bears many indicia of reliability, including Fairchild's corroborative testimony and business records. With these credibility determinations, I make the following factual findings.

## B. The 2003 Agnes Pfeiffer Estate

Jay's misdealings with family assets began as early as 2003, when Lillian and Georgene's aunt, Agnes Pfeiffer, passed away.[51] Agnes's trust was the first trust Jay "had any relationship with."[52] Jay, acting as agent of Agnes's estate, took everything from Agnes' estate; Lillian received nothing.[53] Lillian told Fairchild she was suspicious of Jay's intentions at that time.[54] Lillian "felt that Jay had insinuated

---

[50] JX 52; *see* Paul Tr. 61:23–62:10.

[51] Fairchild Tr. 216:2–4.

[52] Jay Tr. 369:20–21.

[53] Fairchild Tr. 216:10–17.

[54] *See* JX 58 at 4–5 (entries dated 2/22/2005 at 2:21 PM, 2/22/2005 at 2:30 PM, and 3/7/2005 at 10:07 AM).

himself into her estate and inherited against Agnes's original wishes,"[55] and "felt that Jay inherited away from her."[56]

Lillian considered contacting an attorney in hopes of reopening Agnes's estate, and she made an appointment with the Pennsylvania Bar Association to discuss the "Agnes situation."[57] Paul remained unaware of Jay's actions with respect to Agnes's estate for many years.[58] Once he learned of Jay's actions, he was "angry" and "behind the effort to re-open the estate."[59] Lillian ultimately decided not to pursue that course. Instead, in July 2005, Jay visited Lillian, and they resolved the issue by agreeing Jay would pay Lillian $500 per month toward her share of Agnes's estate.[60] While that resolved Jay's dispute with Lillian over Agnes's estate, Paul was "not convinced yet that Jay is genuine."[61]

Indeed, Jay continued to try to manipulate Agnes's estate. In August 2005, Jay contacted Fairchild and informed him that "[h]e wanted[ed] to give his mother a copy of the Agnes trust to demonstrate that she was not included in the estate," and

---

[55] Fairchild Tr. 215:20–23.

[56] Fairchild Tr. 216:2–4.

[57] JX 58 at 4–5 (entries dated 3/7/2005 at 10:07 AM and 3/4/2005 at 1:10 PM).

[58] JX 58 at 5 (entry dated 2/22/2005 at 2:21 PM).

[59] JX 58 at 4 (entry dated 3/7/2005 at 10:49 AM).

[60] JX 58 at 4 (entry dated 7/28/2005 at 9:04 AM).

[61] JX 58 at 4 (entry dated 7/28/2005 at 9:04 AM).

asked whether Fairchild's employee "could notarize a copy as authentic."[62] Fairchild informed Jay that "the notary stamp only confirms that a signer's signature, not the authenticity of a document," and told Jay "[h]e could write and sign that the copy is authentic and have his signature notarized."[63] Fairchild recorded that he "would not have notarized copy as it may have mislead [sic] others . . . Notary stamp simply says signature is his, nothing more. No reason to validate his signature in this case."[64] Jay never followed up.

### C. Georgene's 2003 One Flintlock Trust

The brothers' aunt and Lillian's sister, Georgene Castor, was a resident of Warren, New Jersey.[65] After her husband passed away in 2000, Georgene lived alone with her four small dogs.[66] When Jay moved to New York City in 2000, he and Georgene would regularly have lunch or dinner together.[67] Because he was nearby in New York City, he parked his car at her house, and would see his aunt at

---

[62] JX 102 at 1 (entry dated 8/1/2005 at 10:30 AM).

[63] JX 102 at 1 (entry dated 8/1/2005 at 10:30 AM).

[64] JX 102 at 1 (entry dated 8/23/2005 at 1:01 PM).

[65] Jay Tr. 360:2–3.

[66] Jay Tr. 360:10–14, 362:18–23.

[67] Jay Tr. 361:8–362:1.

least every other weekend when he retrieved his car to travel to Wilmington.[68] He visited often enough that he had a key her home.[69]

In September 2003, at nearly seventy-one years old, Georgene was in relatively good health.[70] But that month, on September 14, Georgene fell while home alone and broke her hip.[71] Jay discovered Georgene had fallen after visiting her at her home.[72] She was hospitalized and admitted to a rehabilitation center that same day.[73]

The next day, while under medical care, Georgene executed a General Durable Power of Attorney appointing Jay as her attorney-in-fact.[74] That document was executed under seal.[75] The parties stipulated that Georgene established the One Flintlock Trust by executing the One Flintlock Trust "by Agreement dated September 15, 2003" (the "2003 OFT Agreement") with the assistance of counsel.[76]

---

[68] Jay Tr. 361:8–362:1.

[69] Jay Tr. 362:2–8.

[70] Jay Tr. 364:8–14.

[71] Jay Tr. 362:9–363:11.

[72] Jay Tr. 362:9–363:11.

[73] Jay Tr. 363:12–364:7.

[74] JX 5. Paul has not challenged the validity of the power of attorney.

[75] JX 5 at WF_000407.

[76] PTO ¶ 25. This stipulation is not supported by the record. The document itself was not submitted to the Court. The first One Flintlock Trust document appearing in the record is a "restated agreement of trust" dated November 21, 2003. *See* JX 7. Jay did not testify as to why the 2003 OFT Agreement is absent from the record.

The 2003 OFT Agreement named Georgene as trustee.[77] The 2003 OFT Agreement

was not submitted to the Court.[78] According to Jay, the 2003 OFT Agreement

disinherited Paul and named only Jay and Lillian as beneficiaries.[79] Jay testified that

Georgene decided that Jay would have 51% of the Trust, Lillian would have 49% of

the Trust, and Paul would have nothing.[80] This was inconsistent with what Georgene

---

And Jay's testimony about its execution is inherently confusing. He testified that Georgene's financial advisor, John Brady, "visited her fairly frequently" while she was in rehab after her fall, and that they then began "talking about wills and trusts and those sorts of things." Jay Tr. 369:4–8. Jay testified:

> [M]y aunt knew a couple of her neighbors had charitable remainder trusts. So John Brady arranged for a man named Ian Richard Ploss . . . to talk to my aunt, see if this was something she wanted to do, how she wanted to do it, and the like. And this was a bit of a process, actually. And my aunt thought about it, discussed things with Ploss initially, and once she had a sense in her mind of what she wanted to do, she asked me if this made any sense. I had no experience with trusts per se. I mean, you know, my Aunt Agnes's trust was the first trust I had any relationship with. But anyway, my aunt and Mr. Ploss worked out what my aunt wanted.

*Id.* 369:9–23. If true, these frequent visits and the "process" must have occurred after Georgene was hospitalized on September 14, but before she signed the 2003 OFT Agreement on September 15. This is not credible. But Paul stipulated to the purported fact that the 2003 OFT Agreement was created on September 15.

More globally, Jay contends that this stipulation, and others like it, mean that Paul concedes the document thereunder is a valid and legally binding document. *See* D.I. 133 at 40–41. I do not read Paul's stipulations to concede more than the fact that the document was purportedly executed on the stated date.

[77] PTO ¶ 26.

[78] *See supra* note 76.

[79] Jay Tr. 368:18–369:2, 369:4–371:4.

[80] Jay Tr. 370:1–4.

told Paul and Lillian: both believed that Georgene intended for her estate to be distributed in equal thirds.[81]

## 1. Georgene's 2003 OFT Amendment

Georgene remained in a medical facility from September 14 until the second week of November, when she returned home.[82] From Georgene's fall through the end of November, Jay travelled to New Jersey each evening to care for Georgene's dogs and to visit her.[83] During that time, Georgene executed a will, a document naming Jay as her power of attorney, and an amendment to the One Flintlock Trust.[84]

Georgene had already named Jay as her attorney-in-fact on September 15.[85] But, as the parties stipulated, on November 21, assisted by legal counsel, Georgene executed a General Durable Power of Attorney appointing Jay as her attorney-in-fact ("Georgene's POA").[86] Georgene's POA enumerates the attorney-in-fact's powers; it omits the authority to amend Georgene's established trusts, and it limits Jay's ability to make gifts.[87]

---

[81] *See* Paul Tr. 125:1–128:19; JX 58 at 5 (entry dated 2/22/2005 at 2:21 PM).

[82] Jay Tr. 363:24–364:7.

[83] Jay Tr. 363:24–364:7.

[84] *See* JX 7, JX 8, JX 9.

[85] JX 5.

[86] PTO ¶ 29.

[87] JX 9, ¶¶ 17–22.

The parties also stipulated that Georgene, assisted by legal counsel, executed an amendment and restatement of the One Flintlock Trust, dated November 21 ("Georgene's 2003 OFT Amendment").[88] This document was signed under seal.[89] Georgene's 2003 OFT Amendment named Georgene and Jay as co-trustees and Lillian as successor co-trustee of the One Flintlock Trust.[90] At trial, when explaining that he served as trustee of the One Flintlock Trust since Georgene executed this amendment, Jay was surprised to learn that the amendment actually named him as co-trustee.[91]

Georgene's 2003 OFT Amendment explicitly states that the settlor reserved the right to amend or revoke the trust: only Georgene had these powers.[92] Georgene's 2003 OFT Amendment also limits a trustee's ability to make gifts to himself during the Settlor's lifetime.[93] Reading the terms of Georgene's POA and Georgene's 2003 OFT Amendment together—especially considering that Georgene executed the documents on the same day with counsel's assistance—it is clear that only Georgene, and not Jay, had the authority to amend the One Flintlock Trust.[94]

---

[88] PTO ¶ 27.

[89] JX 7 at 31.

[90] PTO ¶ 28.

[91] Jay Tr. 359:9–20.

[92] JX 7, § 2.

[93] JX 7, § 3(2).

[94] *See* JX 9, ¶¶ 17–22; JX 7, § 2.

Under Georgene's 2003 OFT Amendment, Georgene was the sole beneficiary of the One Flintlock Trust during her life.[95] Georgene's 2003 OFT Amendment permits the co-trustees to distribute trust principal to Georgene as they, in their sole discretion, deem appropriate.[96] The trustee need not treat all beneficiaries equally.[97] Contrary to Jay's testimony at trial, Georgene's 2003 OFT Amendment does not contain a similar provision permitting the trustee to make discretionary distributions of principal after Georgene's death.[98] Upon Georgene's death, Georgene's 2003 OFT Amendment strictly requires the trust principal to be distributed to three sub-trusts: 51% to Jay, 25% to Lillian, and 24% to Paul.[99] Jay is named as trustee of both Lillian's and Paul's sub-trusts.[100] The trustee does not have the discretion to distribute principal.[101] Rather, Georgene's 2003 OFT Amendment mandates that the trustee distribute net income semi-annually to each beneficiary from their respective sub-trust.[102]

---

[95] PTO ¶ 33; JX 7, §§ 2(a)(1–2).

[96] JX 7, §§ 3(A)(2), 3(B)(1).

[97] JX 7, § 7(F).

[98] *Compare* Jay Tr. 379:24–380:13, *with* JX 7, §§ 3(A)(2), 3(B)(1), *and* JX 7, §§ 5–8.

[99] PTO ¶ 36; JX 7, § 5(A).

[100] JX 7, §§ 6, 7.

[101] JX 7, §§ 6, 7, 8.

[102] PTO ¶ 36; JX 7, § 5.

Upon Lillian's death, her share of the One Flintlock Trust would pass to Jay.[103] Thus, once Lillian passed away and her share was added to Jay's sub-trust, his sub-trust would hold 76% of the trust principal, and he would continue to receive income distributions.[104] If both Lillian and Paul predeceased Jay, Jay would receive everything.[105] But Paul's share only increases if both Lillian and Jay predecease him.[106] Finally, upon the death of the last surviving beneficiary, the principal is distributed to the urban planning program at Columbia University—Jay's alma mater.[107]

### 2. Jay's OFT Amendment

Jay continued to play an active role in Georgene's recovery as her medical needs increased. Georgene required occupational and physical therapy.[108] In December 2003 and January 2004, her health deteriorated rapidly.[109] Toward the end of her life, Georgene required round-the-clock care.[110] Jay initially arranged for

---

[103] PTO ¶ 38; JX 7, § 6.

[104] Jay Tr. 375:22–376:21.

[105] JX 7, § 7.

[106] JX 7, §§ 6, 8.

[107] PTO ¶ 40; JX 7, § 9 ("Ultimate Gift-Over").

[108] Jay Tr. 364:23–365:4.

[109] Jay Tr. 365:5–366:9.

[110] Jay Tr. 365:21–23.

the Visiting Nurse Association to come in daily to assist Georgene, but she grew uncomfortable with different individuals coming to her home each day.[111]

Jay arranged what he believed to be a more comfortable situation for Georgene. While in the hospital, Georgene befriended a nursing student, Paula Munoz.[112] Knowing that Paula had given Georgene her contact information, Jay reached out to Paula and her partner, Pilar Sanchez, whom Jay did not know at the time.[113] He inquired as to whether they would be interested in helping Georgene, and they were.[114] But because they lived nearly one hour away from Georgene, Jay suggested that Paula and Pilar move into Georgene's home.[115] Jay continued to visit Georgene "maybe three times a week."[116]

During this time, Jay amended the One Flintlock Trust,[117] even though neither Georgene's 2003 OFT Amendment nor Georgene's POA empowered Jay to do so.[118] Purportedly under Georgene's POA, Jay prepared and executed an amendment to

---

[111] Jay Tr. 367:1–8.

[112] Jay Tr. 367:9–11.

[113] Jay Tr. 367:11–21.

[114] Jay Tr. 367:11–21.

[115] Jay Tr. 367:22–368:8.

[116] Jay Tr. 368:9–17.

[117] JX 10.

[118] *See* JX 9, ¶¶ 17–22; JX 7, § 2.

the Flintlock Trust, dated September 14, 2004 ("Jay's OFT Amendment").[119]  Jay's

OFT Amendment is signed by Jay as Georgene's attorney-in-fact[120] and witnessed

by Paula Munoz and Pilar Sanchez,[121] the individuals who Jay arranged to tend to

Georgene while living in her home.[122]  Jay executed Jay's OFT Amendment under

seal.[123]

Jay's OFT Amendment authorizes him to revoke Paul's or Lillian's interest

in the One Flintlock Trust if either "legally challenges, threatens to challenge,

contests or attempt to overturn through legal action or any other means at any time

and for any reason" Georgene's 2003 OFT Amendment, Jay's OFT Amendment,

Georgene's will, or Georgene's POA.[124]  It further provides that revocation is at

Jay's "sole discretion" and that he "shall be held harmless for any actions taken while

acting in his full capacity as trustee."[125]  Jay agreed that Jay's OFT Amendment

makes substantial changes to his powers as trustee.[126]  Yet Jay never provided Paul

---

[119] PTO ¶ 30.

[120] JX 10 at 13.

[121] JX 10 at 13.

[122] Jay Tr. 449:11–24.

[123] JX 10 at 13.

[124] PTO ¶ 31; *see also* JX 10 at 3.

[125] PTO ¶ 31; *see also* JX 10 at 3.

[126] Jay Tr. 450:1–12.

with a copy of Jay's OFT Amendment; Paul did not receive a copy until this litigation.[127]

At trial, Jay testified that "a lawyer who was a friend of [Georgene]" prepared Jay's OFT Amendment during the summer of 2004, without providing the name of the attorney or the circumstances under which that attorney drafted the document.[128] He also testified that he was not provided with a copy of the document until its signing.[129] Jay further testified that Georgene elected to have the document prepared:[130]

> She was having discussions with my mother, and my mother kept saying, "I want you to change your documents. I want you to leave equal shares to all three of us." And so my aunt, who had no intention of doing so, simply because it was my aunt's money and not my mother's, my aunt put a provision in her trust through this attorney for challenge.[131]

I do not find Jay's testimony credible. His testimony is inconsistent with Lillian and Paul's understanding that Georgene intended to divide her assets evenly among Lillian, Paul, and Jay.[132] Jay's statements are also inconsistent: Jay signed the

---

[127] Paul Tr. 191:7–192:3.

[128] Jay Tr. 440:2–10.

[129] Jay Tr. 440:11–15.

[130] Jay Tr. 441:5–6.

[131] Jay Tr. 440:16–24.

[132] Paul Tr. 125:1–11 ("A. The conversations for a long time were always a third, a third, a third. Q. The conversations between who? A. Jay and my mom. Jay, my mom, and myself. Q. Okay. So the conversations -- I want to make sure I understand you -- that you just described would be between you and Jay, you and your mom, or your mom and Jay,

24

document, but when referring to the document in later communications, Jay told Paul that Georgene signed Jay's OFT Amendment.[133] Jay contends that his statement to Paul was a "mistake."[134] I believe it is only a mistake in covering his own tracks.

---

or maybe all three of you. . . . A. All three of us."); *id.* 125:12–15 ("Q. So your Aunt Gene was not included in those conversations about a third, a third, a third. Is that correct? A. Aunt Gene talked to my mom."); *id.* 126:7–12 ("Q. Okay. So the basis of one-third -- your belief, and it sounds like your mom's belief, of one-third, one-third, one-third between you, Jay, and your mom was from conversations your mom had with her sister, Georgene Castor? A. When she was alive, yes."); *id.* 126:24–128:12 ("Q. . . . You had never had a conversation with your Aunt Gene where she told you her estate or trust corpus was going to be divided a third, a third, a third. Is that correct? A. Let's say it's hearsay, but yes. Q. Well, it's not hearsay if you tell me she never told you. So that was my question. So she never told you that it would be divided? A. No, she told us. Q. She told you? A. Yes. Q. You specifically? Not just your mom? A. (Witness nods head in the affirmative.) Q. When did she tell you that? A. When we went to her house to help her out with her -- Q. Did you go to her house more than once? A. Yes. Q. Okay. So which specific time when you went to her house, or specific times that you went to her house that she told you a third, a third, a third? A. Maybe 2003 and 2004. Q. So that's after she had fallen and broken her hip and was trapped in the bathroom, I understand, numerous hours until Jay found her. Is that correct? A. I have no idea. Q. Well, had your Aunt Gene broken her hip at the times you recall her telling you that it was a third, a third, a third? A. Before that. Q. Okay. So it was before September 2003, because that's when I understand she fell."); *see also* JX 58 at 5 (entry dated 2/22/2005 at 2:21 PM) ("Mrs. Deputy remembers Jean saying two or three years ago that house was to be divided by thirds to Jay, Paul, and Lillian (Paul perhaps a witness to this declaration). Also remembers Jean saying few years ago 'the stock all goes to you, Lil' (stockbroker might be a witness to this discussion).").

[133] JX 126 at JDEPUTY_00339 (referencing "the 'No Contest and Revocation Clauses' of the One Flintlock Irrevocable Trust *under the signature of Mrs. Georgene E. Castor*" (emphasis added)).

[134] Jay Tr. 450:13–452:3.

25

I find that Jay drafted and executed Jay's OFT Amendment without Georgene's knowledge or consent, without any power or authority via her estate planning documents, and in contravention of her wishes.

### 3. Georgene's 2004 OFT Amendment

The One Flintlock Trust was amended again on October 22, 2004. The parties stipulated that Georgene, assisted by counsel, executed that amendment ("Georgene's 2004 OFT Amendment").[135] Jay witnessed this document under seal.[136] Georgene's 2004 OFT Amendment does not mention Jay's OFT Amendment.[137]

With regards to Jay's powers, Georgene's 2004 OFT Amendment gives and takes away.[138] It overrides her exclusive amendment power and grants Jay, as co-trustee, limited authority to amend the One Flintlock Trust:[139]

---

[135] PTO ¶ 32.

[136] JX 11 at 3.

[137] JX 11; Jay Tr. 452:4–453:4.

[138] Jay contends that Jay's OFT Amendment reflects Georgene's wishes, but she executed another Amendment with conflicting terms just one month later. Jay, the only witness with knowledge of the circumstances under which Georgene allegedly directed both amendments, has offered no explanation about the discrepancies and time between the documents.

[139] *Compare* JX 11 at 1, *with* JX 9, ¶¶ 17–21, *and* JX 7, § 2.

> This Agreement of Trust and the trusts created hereby are irrevocable. The Trustees acting unanimously may amend any portion of this Agreement of Trust in writing from time to time in any manner that the Trustees deem necessary or advisable. In exercising such power to amend the provisions of this Agreement of Trust, the Trustees shall observe the general fiduciary duties of loyalty, good faith, fairness and due care.[140]

Further, this provision states that the Trust is irrevocable.[141]

But Georgene's 2004 OFT Amendment limits Jay's powers with regards to Lillian and Paul's sub-trusts; it names him "Administrative Trustee" with specifically enumerated duties and powers and "shall have no other duties, obligations, or authority."[142] The enumerated list does not grant Jay revocation power.[143] In particular, Georgene amended the One Flintlock Trust to include an additional provision relating to trustees.[144]

### 4. The Castor Estate Challenge

Georgene passed away "much sooner than expected" on January 14, 2005.[145] Georgene was a trustee and the sole beneficiary of the One Flintlock Trust until her

---

[140] JX 11 at 1.

[141] JX 11 at 1.

[142] *Compare* JX 11 at 2–3 ("The following subsection L is hereby added to Section FOURTEENTH of the Trust Agreement . . . ."), *with* JX 7, § 14.

[143] JX 11 at 2–3.

[144] JX 11 at 2–3.

[145] PTO ¶ 23; JX 58 at 6 (entry dated 1/25/2005 at 10:32 AM).

death.[146] Upon her death, the One Flintlock Trust, as amended by Georgene's 2003 and 2004 OFT Amendments, divides the trust corpus into three beneficiaries' sub-trusts: Paul (24%), Jay (51%), and Lillian (25%) with net income to be distributed semi-annually to each from their respective sub-trust.[147] Jay became the sole trustee of the One Flintlock Trust upon Georgene's death, as well as the executor of her estate.[148]

Lillian and Paul always understood that Georgene intended to divide her estate in one-third shares equally among Lillian, Paul, and Jay.[149] After Georgene's death, according to Paul, Jay initially assented to this understanding.[150] But then Jay claimed that the will was "private" and began distributing Georgene's assets in a different manner.[151] As of March 7, 2005,

> Jay took everything (physically), including the Mercedes; the house is empty; the coin collection has been removed from the safe deposit box. Will, made 9-13-03, says house is in trust and distributes probate assets 51% Jay, 24% Paul, 25% Mrs. Deputy. She['s] unsure of estate value, but thinks $500M for house.[152]

---

[146] PTO ¶¶ 23, 28, 33.

[147] PTO ¶¶ 34, 36.

[148] PTO ¶ 35; JX 8 at RDEPUTY_000089.

[149] *See, e.g.*, Paul Tr. 9:14–15; *id.* 122:17–129:10.

[150] *See* Paul Tr. 125:1–19 (describing conversations after Georgene's death between Paul, Jay, and Lillian regarding the equal payout structure of Georgene's trust).

[151] JX 58 at 6 (entry dated 2/17/2005 at 3:40 PM); *see* Paul Tr. 9:10–17.

[152] JX 58 at 4–5 (entry dated 3/7/2005 at 10:07 AM).

Then on May 19, 2005, Jay sold Georgene's personal residence for $525,000.[153]

Until Georgene's death, Lillian and Paul were completely unaware that Georgene's plan was no longer to distribute one-third to each beneficiary.[154] Lillian eventually received a copy of the One Flintlock Trust and shared the news with Paul;[155] "[s]he was angry, and she said, 'I want to show you this, what Aunt Gene did.'"[156] When the One Flintlock Trust did not reflect the equal-thirds division, Lillian blamed Jay.[157] She believed "Jay had inherited assets away from her from her sister's estate."[158] Lillian believed Jay had exercised undue influence over his great aunt, Agnes, and now over Georgene's estate.[159] Lillian told Fairchild, "Jay has us skunked again."[160] Jay's actions are unsurprising to those who have come to know Jay and watch his schemes unfold over time.[161]

---

[153] PTO ¶ 39.

[154] JX 58 at 5 (entries dated 3/7/2005 at 10:07 AM and 2/22/2005 at 2:21 PM); Paul Tr. 7:5–8:5. When asked about his understanding of the One Flintlock Trust, Paul stated "[t]hat Jay's the executor; and the distribution points, he has 51 percent, my mom had 25 percent, and I have 24 percent." Paul Tr. 8:1–5. I interpret Paul's use of the word "executor" to refer to Jay in his fiduciary capacity as trustee.

[155] Paul Tr. 123:7–124:15.

[156] Paul Tr. 124:12–13.

[157] JX 58 at 4–6; Paul Tr. 9:8–12.

[158] Fairchild Tr. 213:7–9.

[159] JX 58 at 4; Fairchild Tr. 298:21–24 ("I had seen what I was told by Paul and Mrs. Deputy was undue influence by Jay on his great aunt and his aunt's estate . . . .").

[160] Fairchild Tr. 216:10–17; JX 58 at 4.

[161] *See* Fairchild Tr. 204:7–18, 215:14–216:17.

As a result, Lillian made three decisions. First, she decided to seek recompense from Jay for lost inheritance from Agnes's estate.[162] Second, because she was "infuriated" with Jay, Lillian decided to disinherit him.[163] I describe this more in connection with the Deputy Trust, *infra*.

Finally, Lillian sued Jay to contest Georgene's estate on May 19, 2005.[164] Among other things, Lillian alleged that Jay asserted undue influence over Georgene and fraudulently converted her assets.[165] But the lawsuit was short-lived.[166] Jay approached Paul and Lillian to talk about dropping the lawsuit and reparations for Agnes' estate.[167] So the three met at Lillian's home in Seaford in July 2005.[168] Jay admitted to being a "jerk."[169]

---

[162] JX 58 at 4–5.

[163] Fairchild Tr. 213:7–10 ("In 2005, Mrs. Deputy's sister died, and she felt that Jay had inherited assets away from her from her sister's estate. And that infuriated her, so she wanted to disinherit Jay."); *id.* 215:5–6 ("[W]hatever happened infuriated Lillian to the point that she disinherited a son."); JX 58 at 6 (entry dated 2/17/2005 at 3:40 PM) ("Mrs. Deputy is removing Jay as POA and beneficiary.").

[164] JX 20; Paul Tr. 8:23–9:17, 11:3–24.

[165] JX 20 at RDEPUTY_000111, 000115, 000116.

[166] Fairchild Tr. 216:23–24 ("[T]hat challenge lasted about five months before she abandoned it.").

[167] Jay Tr. 387:18–19, 388:20–23, 453:5–13.

[168] Paul Tr. 12:2–13:3; JX 22 at ASFI0000402.

[169] JX 22 at AFSI0000403.

"Jay basically said that [he] did it for the family."[170] Paul understood Jay's comment to mean "he was protecting the three of [them] against, like, cousins and stuff like that" but did not understand why they would need such protection.[171] Lillian was pleased by Jay's turnaround and grateful he was back in her life after the past two years with little communication.[172] Lillian decided to dismiss the case.[173]

"Jay [] distributed [Georgene's] personal items among the three of them fairly,"[174] and Lillian "was to relinquish her ¼ of [Georgene's] estate to Paul."[175] As a result, Lillian expected to change her will to include Jay again, to change the account beneficiaries to include Jay again, and to drop the lawsuit despite an upcoming court date.[176] Jay "agreed to pay Lillian $500/mo toward her $150M share of Agnes estate."[177]

On July 28, Lillian informed Fairchild that she was contacting her attorney, David Baker, Esq., to return Jay to her estate, and she instructed Fairchild "to send

---

[170] Paul Tr. 12:3–7 (internal quotation marks omitted); *see also id.* 148:11–22.

[171] Paul Tr. 12:8–13.

[172] Fairchild Tr. 218:10–15.

[173] Paul Tr. 12:17–19.

[174] JX 22 at AFSI00004043. Ultimately, this never happened. *See* JX 80.

[175] JX 22 at AFSI0000403.

[176] Fairchild Tr. 219:7–15; JX 22 at AFSI 0000403.

[177] JX 58 at 4 (entry dated 7/28/2005 at 9:04 AM).

beneficiary change forms for sons, equally."[178]  Lillian then officially withdrew the New Jersey lawsuit.[179]

Despite the fact that Lillian legally challenged the validity of the One Flintlock Trust documents,[180] Jay did not exercise the power Jay's OFT Amendment purportedly granted him to disinherit Lillian because of the New Jersey litigation.[181] This, too, supports my finding that Jay's OFT Amendment was fraudulently executed and my suspicion that it was likely backdated.

### D.    The Deputy Trust

I turn now to the story of Lillian's estate plan, which begins before the litigation about Georgene's.  Lillian executed a basic will many years before she first met Fairchild.[182]  As he did with many new clients, Fairchild advised Lillian to get her estate up-to-date.[183]  "[H]er plan was to distribute everything equally to her two sons outright."[184]  Fairchild encouraged her to see an attorney to develop an estate

---

[178] JX 58 at 4 (entry dated 7/28/2005 at 9:04 AM).

[179] PTO ¶ 42.

[180] Jay Tr. 453:1–18.

[181] PTO ¶ 43; Jay Tr. 453:14–454:3.

[182] Fairchild Tr. 206:5–207:12.

[183] Fairchild Tr. 206:5–19; *see also* JX 58 at 9 (entry dated 10/9/2002 at 9:25 AM).

[184] Fairchild Tr. 206:20–24.

plan.[185]  Lillian hired David Baker,[186] who was her estate attorney from 2003 to at least 2005.[187] With Baker's assistance, Lillian established a trust.[188]  Before she did so, Lillian spoke with Jay and Paul.[189]  Paul testified that "[s]he automatically said to the two of us, that it's 50-50 no matter what."[190]

But Jay pressured his mother to deviate from this plan.[191]  Jay was eager to see Lillian establish a trust but wanted her to do so on his terms.[192]  Lillian recognized that Jay was "strong willed and concerned that money not leave the family," and "insistent upon" her adopting his preferred estate plan.[193]  On January 7, 2003, Fairchild recorded that Lillian was "[very] troubled with disposition of the estate:"[194]

---

[185] Fairchild Tr. 206:5–19.

[186] Fairchild Tr. 206:16–19; Jay Tr. 459:17–19;

[187] Paul Tr. 37:33–38:2.

[188] Fairchild Tr. 206:8–207:12.

[189] Paul Tr. 35:17–36:6.

[190] Paul Tr. 35:22–23.

[191] *See* JX 58 at 8–9 (entries dated 1/7/2003 at 2:00 PM, 1/7/2003 at 9:16 AM, and 1/6/2003 at 3:39 PM).

[192] *See* JX 58 at 8–9 (entries dated 1/7/2003 at 2:00 PM, 1/7/2003 at 9:16 AM, and 1/6/2003 at 3:39 PM).

[193] JX 58 at 8–9 (internal quotation marks omitted).

[194] JX 58 at 8 (entry dated 1/7/2003 at 9:16 AM).

Jay insistent upon full estate in trust with income to him and [Paul]. [Paul] wants his share outright. She['s] not inclined to place restrictions and favors outright disposition but Jay urging strongly otherwise, claiming "power in numbers" (perhaps thinking that the income generated by the whole is somehow more than twice the income generated by each half), suggesting that outright transfers will be taxed, and questioning whether acceptable for [Paul's] portion to end up with his partner. I noted that transfers in trust most common when parents worried about spendthrift children (she['s] not). V. important to her that the boys be treated equally. Urged she continue with living trust and PoA's (with outright disposition to both boys), recognizing that she can change ultimate disposition if desired in the future.[195]

Jay preferred that Lillian establish "some sort of continuing trust."[196] Although Jay was "strong willed," Lillian was convinced that "outright equally" was the "best method of disposition."[197] She revised her estate plan to reflect this decision.[198]

Lillian executed several documents on January 21, 2003. First, she executed a Durable Power of Attorney appointing Jay and Paul as her attorneys-in-fact.[199] Lillian intended for both Jay and Paul to serve thereunder.[200]

Second, Lillian executed the Revocable Trust Agreement of Lillian K. Deputy, which Baker prepared (the "2003 Deputy Trust Agreement").[201] The 2003

---

[195] JX 58 at 8–9 (entry dated 1/7/2003 at 9:16 AM).

[196] Fairchild Tr. 210:2–8.

[197] JX 58 at 8–9 (entry dated 1/7/2003 at 2:00 PM).

[198] Paul Tr. 35:17–36:6.

[199] JX 2 at AFSI0000711; Fairchild Tr. 211:8–12.

[200] Paul Tr. 34:19–35:16; Fairchild Tr. 211:8–15.

[201] PTO ¶ 48; JX 1.

Deputy Trust Agreement named Lillian as trustee and named Paul and Jay as substitute co-trustees.[202] Thereunder, Lillian established a "standard revocable trust that leaves everything to her two sons equally outright."[203]

Lillian transferred the majority of her Ameriprise accounts to the Deputy Trust.[204] But she also had annuity and IRA accounts that were not transferred, but rather were governed by beneficiary designations.[205] These would be distributed to Jay and Paul, "equally outright."[206]

After Lillian executed the 2003 Deputy Trust Agreement, Baker and Lillian informed Jay and Paul that the new estate planning documents treated them equally.[207] She anticipated that Jay would be unhappy with this structure because Jay "was pressuring her to change the dispositive provisions from the boys outright

---

[202] PTO ¶¶ 49, 50. Neither Jay nor Paul served as trustee of the Deputy Trust under the 2003 Deputy Trust Agreement. PTO ¶ 54.

[203] Fairchild Tr. 208:11–12.

[204] JX 3; Fairchild 211:24–212:13. Her regular brokerage account, which had been owned by her individually, was owned by the Deputy Trust after she requested that it be transferred. Fairchild Tr. 212:6–23.

[205] Fairchild Tr. 212:6–23.

[206] Fairchild Tr. 212:6–23.

[207] Paul Tr. 38:10–12 ("In 2003 we had a telephone call with Jay involved and saying that everybody -- it was 50-50 between us, me and Jay.").

to some sort of continuing trust."[208] Lillian's estate plan reflected her wishes, not Jay's.[209]

### 1. Lillian Revises The Deputy Trust In 2005.

In 2005, Lillian's relationship with Jay took a dramatic turn, which spurred her to revise her estate plans.[210] Jay was unhappy with the 2003 Deputy Trust Agreement because Lillian did not do what Jay wanted.[211] Lillian and Jay scarcely communicated for roughly two years.[212] Lillian and Jay's relationship worsened with Georgene's death in January 2005, Jay's management of Georgene's estate, and Lillian's subsequent lawsuit against Jay. Lillian repeatedly referred to this series of events as a "crisis."[213]

---

[208] Fairchild Tr. 210:3–5; *see also* JX 58 at 8.

[209] *See* Fairchild Tr. 210:12–24; JX 58 at 8.

[210] Fairchild Tr. 303:20–304:7. Fairchild testified that, in his twenty-six years of advising, rarely do individuals change the general dispositive provisions in their estate plans: "[P]eople's estate plans develop and remain fairly consistent over time" and "the patterns of an estate plan don't vary dramatically." *Id.* 300:2–6, 301:9–11. When they do occur, significant changes in estate plans are typically the result of some "dramatic change" in the testator's life. *Id.* 300:2–6 ("The instances I can think of are where there was some dramatic change of drug addiction, a terrible divorce, things like that. Otherwise, my experience is that people's estate plans develop and remain fairly consistent over time.").

[211] Fairchild Tr. 303:20–24.

[212] Fairchild Tr. 303:20–24; *see also* JX 22 at AFSI 0000403.

[213] *See* JX 22 at AFSI0000403; JX 58 at 8.

36

As a result of that crisis, Lillian decided to disinherit Jay.[214]  On February 17, 2005, Lillian informed Fairchild that she was "removing Jay as POA and beneficiary."[215]  On March 10, 2005, again assisted by Baker, Lillian amended and restated the Deputy Trust by Revocable Trust Agreement, dated March 10, 2005 (the "2005 Deputy Trust Agreement").[216]  That same day, Lillian assigned all of her tangible personal property and personal residence into her Trust.[217]

The 2005 Deputy Trust Agreement left "all to Paul, none to Jay."[218]  Article III(B) names Paul as the sole beneficiary of the Deputy Trust upon Lillian's death.[219]  Article III(C) explicitly disinherits Jay and includes a no-contest clause.[220]  The 2005 Deputy Trust Agreement named Lillian as the sole trustee and named Paul as substitute trustee.[221]

After executing the 2005 Deputy Trust Agreement, Lillian contacted Ameriprise to complete her revised estate plan.[222]  Ameriprise completed new

_____

[214] Fairchild Tr. 304:1–7.

[215] JX 58 at 6 (entry dated 2/17/2005 at 3:40 PM).

[216] PTO ¶ 51.

[217] JX 15, JX 16.

[218] Fairchild Tr. 22:6–9; JX 13 at AFSI0000686.

[219] JX 13 at AFSI0000687.

[220] JX 13 at AFSI0000687.

[221] PTO ¶¶ 52, 53; JX 13 at AFSI0000686.

[222] *See* JX 17.

37

beneficiary forms naming Paul as the sole primary beneficiary of assets not owned by the Deputy Trust.[223] Lillian also submitted the Ameriprise forms to retitle her trust assets, including her investment account, in the name of the 2005 Deputy Trust Agreement.[224] Fairchild received this form, along with a copy of the 2005 Deputy Trust Agreement, on March 11, 2005.[225] Ameriprise produced its copy of the 2005 Deputy Trust Agreement in this litigation, marked as Joint Exhibit 13 ("JX 13").[226]

A different copy of the 2005 Deputy Trust Agreement, marked as Joint Exhibit 14 ("JX 14"), was produced by Jay's former counsel, Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols").[227] JX 13 and JX 14 have several differences.[228] The first page of JX 13 bears Fairchild's handwritten note, whereas the first page of JX 14 bears a handwritten note that reads "JAY HAS ORIGINAL."[229]

Article III, the dispositive provision, appears on the second page of both documents.[230] In JX 13, Article III leaves "all to Paul, none to Jay."[231] But in JX

---

[223] Fairchild Tr. 224:19–225:1.

[224] Fairchild Tr. 225:2–15; JX 17.

[225] JX 58 at 4 (entry dated 3/11/2005 at 12:13 PM).

[226] *See* JX 13.

[227] JX 14.

[228] JX 13.

[229] JX 14 at MNAT000052. *Compare* JX 14 at MNAT000052, *with* JX 13 at ASFI0000686.

[230] *Compare* JX 14 at MNAT000053, *with* JX 13 at ASFI0000687.

[231] JX 13 at ASFI0000687 (Art. III(B), (C)); Fairchild Tr. 222:6–9.

14, Article III states that after Lillian's death, the Trust property "shall be distributed equally to the Grantor's sons."[232]  Paul and Fairchild testified that JX 14 is not consistent with Lillian's 2005 wishes for her estate plan.[233]  As Lillian's financial advisor, Fairchild likely would have known about a revision to the Deputy Trust and would have seen the proper document.[234]  He did: JX 13.[235]  Fairchild never received a copy of JX 14.[236]  He explained, "To the best of my knowledge, [JX 14] is not a copy of the original trust."[237]  Accordingly, the preponderance of the evidence suggests that Jay prepared JX 14 and provided it to Morris Nichols under the guise that it was a true and correct copy of the 2005 Deputy Trust Agreement.[238]  I find JX 13, not JX 14, is the authentic copy of the 2005 Deputy Trust Agreement.  Pursuant to JX 13, Lillian disinherited Jay in 2005 in light of the actions he took with respect to Georgene's estate and the One Flintlock Trust.

---

[232] JX 13 at ASFI0000687 (Art. III(B)).

[233] *See* Paul Tr. 41:13–42:3; Fairchild Tr. 223:16–224:16.

[234] Fairchild Tr. 224:7–12.

[235] Fairchild Tr. 222:6–9.

[236] Fairchild Tr. 224:2–6.

[237] Fairchild Tr. 224:15–16.

[238] Jay Dep. 72:1–24.  Jay did not testify at trial regarding JX 14.  But at his deposition, he testified that he produced the 2005 Deputy Trust Agreement to Morris Nichols without having read it because he respected his mother's privacy.  *Id.* 72:7–13.  Jay's ignorance is unconvincing.  To the contrary, both Paul and Fairchild testified at trial that JX 13 is a true and correct copy of the 2005 Deputy Trust Agreement.  Fairchild confirmed that Lillian provided this copy to Ameriprise, as required, when she submitted a beneficiary change form.

As discussed, Jay extinguished Lillian's qualms when he extended an olive branch to Paul and Lillian in July 2005. She decided to abandon the 2005 lawsuit and change her estate plan, including the beneficiary designations of her accounts and the Deputy Trust, to once again include Jay.[239] She did not take any immediate steps to effectuate these changes.

### 2. Lillian Falls Ill, And The Deputy Trust Is Revised Again.

A number of documents exist that purportedly revised the Deputy Trust in 2008. Jay drafted and executed these documents for his own benefit while acting as Lillian's power of attorney. Jay did so shortly before Lillian passed away on March 5, 2008.[240] I have reservations about the authenticity of these documents, which are integral to this action.

During the 2007 Christmas season, Lillian visited Jay and his husband in New York.[241] On December 26, 2007, Lillian was admitted to the emergency room of St. Vincent's Hospital in New York.[242] Lillian was diagnosed with congestive heart

---

[239] *See* JX 24 at AFSI0000399; JX 58 at 4 (entry dated 7/28/2005 at 9:04 AM) ("She [left message] with Jeff Berezni (sp?) to drop lawsuit. We to send beneficiary change forms for sons, equally WROS. She will call atty Baker to return Jay to her estate. [Paul] not convinced yet that Jay is genuine. . . . She thanked us for everything we did during the crisis.").

[240] PTO ¶¶ 24, 58.

[241] Paul Tr. 44:23–45:4.

[242] PTO ¶ 21.

40

failure.[243]  In February 2008, Lillian was admitted to the emergency room in Milford, Delaware.[244]  Doctors informed Lillian that she required a quadruple bypass surgery.[245]  The surgery was scheduled for February 26, 2008.[246]

According to Jay, Lillian was adamant that she revise her estate documents.[247] When the surgeon informed Lillian that she needed surgery as soon as possible, she allegedly responded, "No; I have to finish my documents."[248]  Paul testified differently.[249]  According to Paul, Lillian was "very frightened" by her health and did not discuss any changes to her estate plan at that time.[250]  Lillian was a Christian Scientist, so according to Paul, her beliefs had kept her out of hospitals until this surgery.[251]  Paul testified that in the days between finding out that she needed surgery and actually undergoing the surgery, Lillian did not discuss any changes to her trust despite meeting with her two sons together for dinner on February 25, 2008.[252]  I believe Paul.

---

[243] Paul Tr. 44:23–45:14; *see also* JX 58 at 1 (entry dated 1/30/2005 at 3:36 PM).

[244] JX 55 at Bayhealth00003.

[245] Paul Tr. 45:11–17; *see* JX 55 at Bayhealth00003.

[246] Paul Tr. 45:11–17; *see* JX 55 at Bayhealth00003.

[247] Jay Tr. 387:10–389:17.

[248] Jay Tr. 389:11–12.

[249] *See* Paul Tr. 45:18–46:22.

[250] Paul Tr. 45:22–23.

[251] Paul Tr. 45:23–46:4.

[252] Paul Tr. 46:5–49:19.

While Lillian's health was failing, Jay reached out to his attorney, Thomas Pulsifer, Esq. of Morris Nichols, to revise Lillian's 2005 trust and estate plan.[253] Lillian, though, had relied on Baker for her estate planning for years and had not met Pulsifer.[254] On January 17, 2008, Jay wrote Pulsifer:

> My mother has asked me to carry out her requests to have her will and trust amended. She originally asked me to do this in August, 2007, and I have neglected to get this underway. The original documents which were prepared by a lawyer in Georgetown, David W. Baker, have been in my possession since September, 2007. She chooses not to employ Mr. Baker to undertake the amendments. She has asked me numerous times within the last couple of months if I have gotten the process underway. The amendments to her will and trust reflect her desires to retain her monies, in trust, within her immediate family, (between my brother and me) and without any outside influences. As well, she does not want her monies to pass on to people outside the family once either brother has passed on, but rather to support the surviving brother until his passing when the trust will pass onto the charity she has chosen. My mother's sister employed a "pour over" will that allowed her trust's invested assets to benefit my mother, my brother and I. (Through your amending my aunt's trust, the situs of the trust moved from the State of New Jersey to the State of Delaware). My mother would like to do the same, however, with only two beneficiaries.[255]

---

[253] *See* JX 30; JX 35.

[254] *See* JX 30 at MNAT000001.

[255] JX 30 at MNAT000001. This excerpt suggests that Pulsifer aided Jay with the One Flintlock Trust. But the parties offered no testimony as to Pulsifer's participation with Georgene's estate and the One Flintlock Trust.

Jay dictated the terms of Lillian's 2008 trust revision.[256] Neither Paul nor Fairchild knew that Pulsifer and Jay were working on a revised trust and estate plan.[257]

Fairchild first learned of the 2008 Deputy Trust revisions shortly before they were purportedly executed.[258] On January 30, 2008, Jay contacted Fairchild and informed him of Lillian's poor health and her purported desire to change the beneficiary designations on her Ameriprise accounts to a revised trust.[259] Fairchild told Jay he needed a beneficiary change form signed by Lillian, along with a full copy of the latest Deputy Trust document.[260] Jay responded that Jay and Lillian were amending the Deputy Trust and that it was "not 'ready yet.'"[261] When Fairchild asked whether the new Deputy Trust documents were being prepared by an attorney, Jay became defensive, but informed Fairchild that he was working with a Morris Nichols attorney.[262]

Pulsifer drafted revisions to the Deputy Trust, as well as Lillian's then-existing will and power of attorney, and sent them to Jay for his review on February

---

[256] *See* JX 30, JX 31, JX 35, JX 36. Nothing in the record suggests that Lillian herself informed Pulsifer of her desired changes to her estate plan.

[257] *See* Paul Tr. 46:8–22; Fairchild Tr. 226:5–7.

[258] Fairchild Tr. 227:1–7.

[259] JX 58 at 2 (entry dated 1/30/2008 at 3:36 PM).

[260] JX 58 at 2 (entry dated 1/30/2008 at 3:36 PM).

[261] JX 58 at 2 (entry dated 1/30/2008 at 3:36 PM).

[262] JX 58 at 2 (entry dated 1/30/2008 at 3:36 PM).

19, 2008.[263] Pulsifer suggested that, if the drafts were satisfactory, he meet with Lillian and Jay so he could explain the changes to her and assess her capacity, and so she could execute the documents.[264] On February 20, Jay responded with a number of proposed changes that *he* wanted, to address potential issues *he* wished to avoid.[265] Jay asked whether Lillian's revised will and trust would contain a provision directing the assets from "any outstanding bank accounts, policies of insurance, and so forth, where the beneficiaries have not been changed from [Paul] and [Jay]"[266] to be poured over into the Deputy Trust, and whether there was "language that can be included which directs the Trust to be the recipient of these sums replacing or superceding [sic] [Paul] and [Jay]."[267] Pulsifer replied that the beneficiary designations on those assets would govern and must be changed into the

---

[263] *See* JX 35 at MNAT000007.

[264] JX 35 at MNAT000007.

[265] *See* JX 36 at MNAT000010 ("*I've taken* the opportunity to read through the drafts, and they are fine and are in good order. *I have* just a few questions. . . . The Trust's amendments are also fine with a couple of minor questions/points. On page 2, *I'm not really comfortable* with the ability for the Successor Trustee having the ability to reduce the principal or corpus of the Trust, but rather to merely receive net income from the corpus. Is the ability to reduce principal standard in case of some dire emergency? *I don't want* [Paul] to sue the Trust just to have the supposed ability to gain access to his portion of the principal. . . . The 'Spendthrift Clause' allows [Paul] and me to have the right to receive income. [Paul] and I are not married (but who knows what the future holds with respect to civil unions). *I don't want* [Paul's] partner declaring he has the right to receive income from the Trust (and I think that is somewhat clear in Section IV)." (emphases added)).

[266] JX 36 at MNAT000010.

[267] JX 36 at MNAT000010.

name of the revised Deputy Trust,[268] consistent with what Fairchild's January 30 statement.[269]

Jay also asked Pulsifer about "the ability for the Successor Trustee having the ability to reduce the principal or corpus of the Trust."[270] In particular, Jay expressed concern that Paul would sue: "I don't want [Paul] to sue the Trust just to have the supposed ability to gain access to his portion of the principal."[271] Pulsifer informed Jay that "language permitting invasions of the trust principal for health, education, support and maintenance is common as it protects against emergencies but is not necessary," and stated that they could "take out the principal invasion provisions if your mother wishes."[272] In fact, Pulsifer's response emphasized that the documents should be drafted in accordance with Lillian's wishes, despite Jay's personal concerns: "[Y]our mother can write the agreement in any manner she wishes."[273]

The next day, February 21—five days before Lillian's scheduled open heart surgery—Jay took Lillian to meet Pulsifer for the first time.[274] During that meeting, Lillian executed (i) a pour-over Last Will and Testament dated February 21, 2018

---

[268] JX 36 at MNAT000009.

[269] JX 58 at 2 (entry dated 1/30/2005 at 3:36 PM).

[270] JX 36 at MNAT000010.

[271] JX 36 at MNAT000010.

[272] JX 36 at MNAT000009.

[273] JX 36 at MNAT000009.

[274] *See* JX 35 at MNAT000007–08.

(the "2008 Will");[275] (ii) a Durable Power of Attorney (the "2008 Deputy POA");[276] and (iii) the Agreement amending and restating the Deputy Trust titled the "Amended and Restated Lillian K. Deputy Revocable Charitable Remainder Trust" dated February 21, 2008 (the "2008 Deputy Trust Agreement").[277] Pulsifer prepared each document.[278]

These documents recast the estate to the format that Jay had pressured his mother to adopt before she first established the Deputy Trust.[279] The 2008 Will and 2008 Deputy Trust Agreement name Jay as the executor and successor trustee, respectively.[280] The 2008 Deputy Trust Agreement reinstates Jay as a 50% beneficiary.[281] But instead of dividing Lillian's estate outright equally to her sons, as she had always intended, the 2008 Deputy Trust Agreement distributes income to the brothers during their lives and leaves the remainder of the trust to two charities.[282] In addition, the 2008 Deputy Trust Agreement requires the Trustee "to pay to [Paul

---

[275] PTO ¶ 56; JX 37.

[276] PTO ¶ 56; JX 38.

[277] PTO ¶ 56; JX 39.

[278] PTO ¶ 57.

[279] Fairchild Tr. 240:20–241:2.

[280] JX 37, Art. I; JX 39 § VII(1)(b).

[281] *See* JX 39, § IV(1).

[282] PTO ¶¶ 62, 65; JX 39, § IV(1)–(2). Following the death of the survivor of Jay and Paul, the remaining trust corpus of the Deputy Trust is to be distributed outright in 50/50 shares to Lynn House of Potomac Valley, Inc. of Alexandria, Virginia, and the Department of Education at Principia College, Elsah, Illinois.

and Jay] or either of them, in equal or unequal shares, so much of the principal of the trust, as Trustee in its sole discretion deems advisable, considering the property available to them from other sources, to provide for their health, education, support and maintenance.[283] A non-liability clause also provides that "[u]pon the delivery of the trust property to a successor Trustee," the predecessor trustee is not liable for future liability, and the successor "shall have responsibility only with respect to the property actually delivered to it by its predecessor trustee."[284]

The 2008 Deputy Trust Agreement provides that with respect to revocation, "[a]t all times during her life, Trustor shall have the right by an instrument executed by her . . . to amend or terminate this agreement."[285] Thus, only Lillian, as trustor, has the authority to amend the Deputy Trust during her life.[286] But the 2008 Deputy POA empowers Jay, as Lillian's attorney-in-fact, to establish and amend trusts on Lillian's behalf:

> I, Lillian K. Deputy; of Sussex County, Delaware, hereby appoint my son, Jay C. Deputy, my attorney-in-fact . . . [t]o establish trusts on my behalf, on terms which my attorney-in-fact shall to his or her belief understand to be my wishes for my estate, and to amend trusts which I may have heretofore executed.[287]

---

[283] JX 39, Art. IV(1); PTO ¶ 63.

[284] JX 39, Art. VII(1)(C); PTO ¶ 66.

[285] JX 39, § VIII(6).

[286] JX 39, § VIII(6).

[287] JX 38, § 5.

This language empowering Jay to establish and amend Lillian's trusts is broadly permissive, but the 2008 Deputy POA does not empower Jay to make gifts to himself absent written consent of all of Lillian's "then living adult issue."[288]

The 2008 Deputy Trust surprised Fairchild, who testified that "it was contrary to everything [he] had seen for 12 years."[289] He added that he was concerned about Jay's undue influence because

> after 12 years of hearing one thing repeatedly from Mrs. Deputy, days before her death, after Jay returned to her life, there is suddenly a big change in her estate plan along the lines that Jay had been interested in for some time for Mrs. Deputy and, in fact, for Mrs. Deputy's sister, Georgene.[290]

Fairchild first learned of Lillian's decision to revise the Deputy Trust during his January 30 conversation with Jay, during which Jay informed Fairchild that the "new trust is going to be like Aunt Gene's."[291] He learned of her decision to revise her power of attorney at the same time or shortly thereafter.[292] He never saw or received a copy of the 2008 Deputy POA or 2008 Will.[293] Jay provided Fairchild with a copy

---

[288] JX 38, §§ 10–11.

[289] Fairchild Tr. 296:19–297:1.

[290] Fairchild Tr. 240:20–241:2.

[291] Fairchild Tr. 226:23–227:7; JX 58 at 2 (entry dated 1/30/2008 at 3:36 PM); *see also* JX 90 at AFS0000673 (entry dated 02/19/2008).

[292] Fairchild Tr. 227:15–24; JX 58 at 2 (entry dated 1/30/2008 at 3:36 PM); *see also* JX 90 at AFS0000673 (entry dated 02/19/2008).

[293] Fairchild Tr. 228:1–4, 291:5–14.

of the 2008 Deputy Trust Agreement just a few days before Lillian's surgery in February 2008.[294]

Lillian did not consult Fairchild about the changes to the Deputy Trust,[295] which deviated from their usual course of dealing.[296] Fairchild suspected that the sudden changes in Lillian's estate plans were the result of Jay's influence.[297] In the past, Jay had admitted to Fairchild that he had a "controlling nature" and that "he was not happy with his mother because she didn't do what he wanted her to do."[298] Fairchild testified: "I had seen what I was told by Paul and Lillian was undue influence by Jay on his great aunt and his aunt's estate, and this seemed to be consistent with that pattern."[299]

Concerned, Fairchild resolved to discuss the changes "being so different" with Lillian "to make sure that [he] understood what she had in mind."[300] Fairchild and Lillian had intended to meet on February 26, but on February 22, Lillian called Fairchild to reschedule in light of her surgery.[301] She referred to herself as a

---

[294] Fairchild Tr. 227:11–14.

[295] Fairchild Tr. 226:5–7.

[296] *See generally* JX 58.

[297] Fairchild Tr. 291:23–292:18.

[298] Fairchild Tr. 291:23–293:11.

[299] Fairchild Tr. 296:19–297:1; *see also id.* 314:2–315:8, 316:7–14.

[300] Fairchild Tr. 226:14–17.

[301] Fairchild Tr. 226:17.

"walking time bomb."[302]  Lillian was "rattled" by the sudden need for surgery.[303]

Unfortunately, Fairchild was never able to meet with Lillian.[304]

While Paul has not challenged the 2008 Deputy Trust as the product of undue influence, I note that the circumstances surrounding its execution are suspect, and Jay's testimony is not credible.  Jay testified that Lillian wanted to revise the Deputy Trust because "after reading [his] aunt's trust quite carefully, she wanted that money to go further than just [Paul] and [Jay]."[305]  She thought establishing a trust similar to the One Flintlock Trust was a "wonderful idea."[306]  To support this testimony, Jay relies on what he calls "transcripts" of conversations he purportedly had with his mother about her estate.[307]  He testified:  "[I]n the transcripts, she – or the notes of our meetings specifically notes that she doesn't want lump sums of money to be distributed."[308]

These "transcripts" are marked as Joint Exhibit 112 ("JX 112").[309]  Jay drafted the 99-page document, which includes summaries of purported conversations

---

[302] JX 90 at AFSI000672 (entry dated 2/22/2008); Fairchild Tr. 236:4–10.

[303] Fairchild Tr. 236:11–16.

[304] Fairchild Tr. 226:20–22.

[305] Jay Tr. 419:1–12.

[306] Jay Tr. 428:14–22.

[307] Jay Tr. 419:1–12; *see* JX 112.

[308] Jay Tr. 419:1–12

[309] JX 112.

between Jay and Lillian.[310] He likens JX 112 to "board minutes or meeting minutes."[311] The document itself is dated June 4, 2019.[312] Within the document, summaries are dated from July 24, 2007 to February 27, 2008, one day after Lillian's surgery.[313] The most recent entry—a cover letter Jay drafted—is dated September 15, 2011, over three years after Lillian's death.[314] That letter states, in relevant part:

> As Trustee of the Lillian K. Deputy Charitable Remainder Trust, it is my desire to give to this Trust, and through this memorandum, the working documents/transcript papers to become part of the record and property of this Trust. This gift is to protect the historical and present record and integrity of the trust and Mrs. Deputy's thought process in the creation of the Lillian K. Deputy Charitable Remainder Trust. *It is my intention for these documents to support and, if needed, to be used in defense of the Trust.*
>
> It is intended for these documents to have a neutral purpose, and to be greater than any self-serving interests. The documents' core purpose is to demonstrate a continuity of thought surrounding the trust's creation and establishment as well as the explanation of an open and honest discussion of ideas related to a greater purpose beyond its beneficiaries.[315]

This exhibit contains nearly 100 pages of typewritten notes of conversations involving Jay regarding changes to the Deputy Trust.[316]

---

[310] JX 112.

[311] Jay Tr. 429:15–16.

[312] JX 112.

[313] JX 112.

[314] JX 112 at 2.

[315] JX 112 at 2 (emphasis added).

[316] JX 112.

Jay only has one copy of this document.[317]  He testified that Lillian recorded their conversations with a tape recorder, and he then drafted the summaries in either typed or handwritten form.[318]  He has not produced any tapes and testified that those tapes—which he "held" through 2012—no longer exist.[319]  I find this peculiar given the stated "purpose" of the "transcripts" and the fact that, according to Jay, Paul had allegedly mounted a "legal challenge" to the Deputy Trust as early as 2008.[320]  It seems odd that Jay would dispose of the tapes when they might "be used in defense of the Trust" in a potential lawsuit.[321]  Jay also claims he emailed these summaries once drafted to Lillian.[322]  Jay has not produced these emails in this action, and he conveniently testified that he no longer has them:  "I can certainly say to you that, you know, the files were just kind of purged one after the other.  I should have saved them, but I didn't.  My fault."[323]

Further, each entry was purportedly "signed" by Lillian and "witnessed" by Mary Swanson, Lillian's friend who has since passed away.[324]  Jay's testimony on

---

[317] *See* Jay Tr. 428:1–7.

[318] Jay Tr. 431:3–17.

[319] Jay Tr. 431:18–432:2.

[320] *See* JX 112 at 2; JX 123 at JDEPUTY_00347.

[321] JX 112 at 2.

[322] Jay Tr. 432:3–24.

[323] Jay Tr. 434:10–17.  Jay apparently does not have these emails, but he has produced other emails from the same email address in this action.  *See* Jay Tr. 468:14–22.

[324] JX 112.

this point is extraordinary:  he claims that Swanson "purposefully" witnessed each document and made a point to meet Jay and Lillian to watch them sign each entry.[325] I do not find his testimony regarding the supposed process of drafting and signing JX 112 to be credible.

I find that Jay prepared JX 112 to create a paper trail that justifies his actions and that he likely drafted the document after Lillian's passing.  I believe that Jay forged the signatures of Lillian and Swanson.  This behavior is consistent with Jay's history of similar misdeeds, recited herein.  Jay cannot use JX 112 to bolster his claims that Lillian thought revising the Deputy Trust to mirror the One Flintlock Trust was a "wonderful idea."[326]  Consequently, I do not find Jay's testimony on that point to be credible.

More generally, Paul objected to JX 112 as hearsay not subject to any relevant exception.[327]  I conclude JX 112 must be excluded as hearsay for which no exception applies.[328]  "Hearsay is a statement made by a declarant outside the courtroom that

---

[325] Jay Tr. 437:8–24.

[326] Jay Tr. 428:14–22.

[327] Jay Tr. 419:14–420:16.  It was unclear at trial if JX 112 was ever produced during discovery, since Paul's counsel represented that the only version of JX 112 produced in discovery included a bates stamp, and JX 112 does not.  Jay Tr. 424:18–22

[328] Jay contends that JX 112 falls within the following hearsay exceptions:  D.R.E. 803(3), Then-Existing Mental, Emotional, or Physical Condition; D.R.E. 803(5), Recorded Recollection; and D.R.E. 807(a), Residual Exception.  *See* D.I. 133 at 61–62.  Aside from a conclusory allegation that these exceptions apply, Jay offers no substantive argument as to why JX 112 should not be excluded by the rule against hearsay.  *See id.*  For the reasons

is offered to prove the truth of the contents of the statement,"[329] and unless the statement is offered for a nonhearsay purpose or falls within a hearsay exception, it is inadmissible.[330]  Jay kept these notes "to support and, if needed, to be used in defense of the Trust."[331]  Further, I find that Jay prepared JX 112 recently in the face of Paul's claims against him, and that JX 112 lacks the necessary degree of trustworthiness to overcome a hearsay challenge.[332]  JX 112 is inadmissible.

### 3.      Jay Purports to Amend the 2008 Deputy Trust.

Jay contends that the day before Lillian's surgery, Jay, as her attorney-in-fact under the 2008 Deputy POA, prepared and executed an amendment to the Deputy Trust, dated February 25, 2008 ("Jay's Deputy Trust Amendment," and together with Jay's OFT Amendment, "Jay's Amendments").  Jay's Deputy Trust Amendment purportedly gives Jay the power to remove and exclude a beneficiary as a recipient of trust income and as a successor trustee if that beneficiary "legally challenges, contests, or registers complaint or through written instrument attempts

---

set forth in Paul's post-trial reply brief, D.I. 134 at 27–28, I do not agree that these exceptions apply and conclude that JX 112 is inadmissible hearsay.

[329] *Brown v. Liberty Mut. Ins. Co.*, 774 A.2d 232, 238 (Del. 2001) (citing D.R.E. 801(c)).

[330] D.R.E. 802.

[331] JX 112 at 2.

[332] *See, e.g.*, *Smith v. State*, 647 A.2d 1083, 1088 (Del. 1994) ("A hearsay declaration is admissible, usually under a specific exception, only where the declaration has some theoretical basis making it inherently trustworthy.  Thus, absent some special indicia of reliability and trustworthiness, hearsay statements are inadmissible." (citations omitted)).

to overturn" any of Lillian's February 21 estate documents.[333]  And it specifies that the trustee has no duties to, and need not provide an accounting to, a revoked beneficiary.[334]  The Amendment simply requires notice of revocation to be mailed to the beneficiary's last known address.[335]  The Amendment also purports to relieve the trustee of any obligation to provide an accounting to this Court, to the beneficiaries, or to any other representative.[336]  The language of Jay's Deputy Trust Amendment tracks the language of Jay's OFT Amendment; Jay testified that he used Jay's OFT Amendment when drafting Jay's Deputy Trust Amendment.[337]

The 2008 Deputy POA gave Jay the authority to amend the Deputy Trust, but Jay has failed to authenticate any instrument implementing that power.[338]  The

---

[333] JX 45 at 2; PTO ¶ 59.  Jay's Deputy Trust Amendment further provides, in part:

> Trustee shall hold the trust fund in further trust for the benefit of the unrevoked beneficiary (either "Jay" or "[Paul]") as is then and at any time during his lifetime.  During the lifetime of the unrevoked or survivor beneficiary, Trustee shall distribute all of the net income, in convenient installments but not less frequently than annually to beneficiary. In addition, during lifetime of the beneficiary, Trustee shall pay to him, so much of the principal of the trust, as Trustee in its sole discretion deems advisable, considering the property available to him from other sources, to provide for his health, education, support and maintenance.

JX 45 at 2; *accord* PTO ¶ 64.

[334] JX 45 at 5.

[335] JX 45 at 5.

[336] JX 45 at 5.

[337] *Compare* JX 45, *with* JX 10; Jay Tr. 441:12–442:4.

[338] *See* D.R.E. 901 ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *Hardy v. Hardy*, 2014 WL 3736331, at *14 & n.114

circumstances surrounding the execution of Jay's Deputy Amendment are suspect at best. Jay testified that, after the 2005 lawsuit, Lillian asked Jay to be trustee of the Deputy Trust three times, and each time he refused.[339] Finally, according to Jay, he agreed:

> I said to my mom, "Look, if you want me to be trustee, I shall consider it, but I needed revocation powers, and I needed sole authority in the trust. And those are my two conditions." And those conditions were talked about and mulled over for two months, maybe three months.[340]

Jay claims that the 2008 Deputy Trust Agreement was prepared rather quickly due to Lillian's insistence on revising her estate plan before her surgery in February 2008.[341] The 2008 Deputy Trust Agreement did not address Jay's revocation powers.[342] Jay testified that he tried to put the "revocation aspect of it" on "hold" because he was "concerned,"[343] and that Lillian agreed "[to] hold off on even talking

---

(Del. Ch. July 29, 2014) (excluding documents under D.R.E 901 where the Court determined they "d[id] not constitute reliable evidence").

[339] Jay Tr. 387:17–24. Jay claims "this is all in the transcripts," *id.* 387:21, but as stated, JX 122 is inadmissible, so I do not consider it here.

[340] Jay Tr. 388:4–14. Jay's testimony on this point was inconsistent. He testified that revocation powers were not a condition precedent to him assuming the role of trustee, but rather to assuming responsibility under the 2008 Deputy DPA. *Id.* 462:5–24. He also testified, "I had decided that revocation was something I didn't want to handle. I was scared of it." *Id.* 388:19–23.

[341] Jay Tr. 388:21–389:17.

[342] Jay Tr. 389:13–17, 464:10–17.

[343] Jay Tr. 389:13–17.

further about revocation" until after her surgery.[344]  But the 2008 Deputy Trust Amendment does give the trustor the right to amend or terminate the trust.[345]

Jay testified that he began drafting his amendment on February 22, 2008, the day after Jay, Lillian, and Pulsifer met to execute the 2008 revisions.[346]  Jay never asked Pulsifer to review Jay's Deputy Trust Amendment, and he never spoke to Pulsifer about revocation.[347]

Rather, Jay testified that after they had "just finished with Pulsifer," Lillian became "panicked" and said, "I made this promise to you, and you need to get the document done."[348]  Jay believed he had the power to execute an amendment as her attorney-in-fact.[349]  According to Jay, "[s]he read the power of attorney, and through that discussion and her agreement to put this in place as a promise to me, as a protective measure to the trust, she said, 'Please do this.'  So that's what happened."[350]

---

[344] Jay Tr. 389:19–23.

[345] JX 39, § VIII(6); Jay Tr. 463:1–5.

[346] Jay Tr. 387:11–12.

[347] *See* Jay Tr. 390:19–23.

[348] Jay Tr. 390:1–9.

[349] Jay Tr. 390:10–17.

[350] Jay Tr. 390:13–17.  But Paul's testimony about his mother's concerns prior to her surgery are inconsistent with Jay's testimony.  Paul testified that in his discussions with Lillian before her surgery, she was "very frightened" by her health and did not discuss any changes to her estate plan at that time.  Paul Tr. 45:18–46:22.  I believe Paul.

Jay then prepared the Deputy Trust Amendment between February 22 and 24,[351] purportedly "at [his] mother's request."[352] Curiously, Jay produced three versions of Jay's Deputy Trust Amendment, marked as Joint Exhibit 44 ("JX 44"), Joint Exhibit 45 ("JX 45"), and Joint Exhibit ("JX 46"); they are substantively identical but contain different handwritten markings and signature pages.[353] The documents are not notarized or otherwise authenticated, but they are sealed.[354]

According to Jay, JX 44 is a copy that Lillian initialed. Jay testified that Lillian reviewed Jay' Deputy Trust Amendment on February 24, but did not sign it at that time.[355] Jay claims he emailed Jay's Deputy Trust Amendment to his mother around February 24, and she then returned a hard copy that she had marked up by herself, appearing as JX 44.[356] JX 44 is initialed "LKD" and bears check marks, but no signature or date.[357] Paul testified the initials are not in Lillian's handwriting.[358] The back of JX 44 bears Jay's handwritten note: "signed at BH on 2/27/08 12:05

---

[351] Jay Tr. 467:6–7.

[352] Jay Tr. 387:7–17.

[353] *Compare* JX 44 at JDEPUTY_00659, *with* JX 45 at JDEPUTY_006667, *and* JX 46 at JDEPUTY_00674.

[354] JX 44 at JDEPUTY_00659; JX 45 at JDEPUTY_006667; JX 46 at JDEPUTY_00674.

[355] Jay Tr. 467:9–18.

[356] Jay Tr. 394:12–395:15. This email was not produced.

[357] JX 44 at JDEPUTY_00659.

[358] Paul Tr. 193:21–23. Fairchild could not confirm whether Lillian made the initials. Fairchild Tr. 235:5–13.

p.m."[359] At that time, Lillian was resting in her hospital bed after her surgery.[360] I do not accept JX 44 as being initialed or signed by Lillian.

JX 46 was purportedly signed by Jay as Lillian's attorney-in-fact, and witnessed by Mary Swanson, on February 25.[361] Jay signed JX 46 without an accompanying indicator that he did so as Lillian's attorney-in-fact. Swanson's purported signature appears as "Mary Swason."[362] At trial, Jay could not explain why Swanson would have misspelled her own name.[363] JX 46 contains no initials or handwritten note. In his deposition, Jay testified that he, Lillian, and Swanson met in the afternoon of February 25 at Lillian's house.[364] At trial, Paul credibly testified that on that day (the day before Lillian's surgery), Paul spent the entire day with Lillian beginning at approximately 9 a.m., and that Jay was never alone with Lillian.[365] After Jay heard Paul testify that Paul was with Lillian beginning at 9 a.m., Jay changed his testimony to claim that he and Swanson met with Lillian at 7 a.m.[366] Jay testified that he and Swanson signed JX 46 on February 25 in the sunroom of

---

[359] JX 44 at JDEPUTY_006600; Jay Tr. 397:7–13.

[360] Paul Tr. 53:5–55:18; Fairchild Tr. 235:24–236:3; Jay Tr. 471:4–18.

[361] Jay Tr. 467:9–18.

[362] JX 46 at JDEPUTY_00674; Jay Tr. 399:17–23.

[363] Jay Tr. 472:24–473:4.

[364] Jay Dep. 123:16–124:24.

[365] Paul Tr. 47:1–50:7.

[366] *See* Jay Tr. 400:2–13, 473:3–16.

Lillian's North Circle House, at around 7:00 a.m., before going to Bayhealth "for pre-op sorts of things."[367] I do not accept JX 46 as being witnessed by Swanson, nor do I believe Jay's testimony that she met with Jay and Lillian at any time on February 25.

The third version of the amendment, JX 45, is signed by "Jay Deputy, DPOA" and witnessed by John Walton (Jay's husband), but it contains no initials or handwritten note.[368] JX 45 is also dated February 25.[369] At trial, Jay confirmed that he backdated this document.[370] Referring to his handwritten note on JX 44, Jay testified that he and John signed JX 45 on February 27, at noon in the hospital lobby—not in front of Lillian, who was in her hospital bed.[371] JX 45 does not bear Lillian's purported initials present on JX 44.

I do not believe JX 45 was signed at that time. On February 27 at 9:30 a.m., Paul arrived at Kent General to visit his mother.[372] He spent the morning by her side, comforting her while she was in immense pain.[373] Paul was the only person

---

[367] Jay Tr. 400:5–10.

[368] JX 45 at JDEPUTY_00667.

[369] JX 45 at JDEPUTY_00667.

[370] Jay Tr. 397:1–398:17; JX 45 at JDEPUTY_00667.

[371] Jay Tr. 397:1–398:17.

[372] Paul Tr. 52:18–23.

[373] Paul Tr. 52:18–53:6.

with Lillian at noon on February 27.[374]  Paul testified that Jay arrived at Bayhealth after 1 p.m. on February 27, just minutes before Paul had to leave to work at his restaurant.[375]  This was the first time Paul saw Jay that day.[376]  Paul's testimony on this point is detailed and credible.  Jay did not sign JX 45 at the hospital at noon.

Under the 2008 Deputy POA, Jay has the authority to amend the Deputy Trust. But Jay has failed to authenticate any document implementing that power.  He produced three different versions, all of which present plain authentication problems, and all of which inspired conflicting testimony.  JX 44, JX 45, and JX 46 have not been authenticated under Delaware Rule of Evidence 901, and so they are not admissible.[377]

Paul first learned that changes had been made to Lillian's estate plan shortly after her death.[378]  Paul would not see any of the revised estate planning documents

---

[374] Paul Tr. 54:3–8.

[375] Paul Tr. 53:9–11.

[376] Paul Tr. 53:12–14.

[377] D.R.E. 901.  Jay has failed to "produce evidence sufficient to support a finding that the item is what the proponent claims it is," even in the face of the low burden to do so.  His testimony, often inconsistent, as well as the documents themselves, fail to substantiate Jay's claims that these are legally valid and binding documents.  *See Hardy*, 2014 WL 3736331, at *14 & n.114.

[378] *See* Paul Tr. 67:18–68:4.  Lillian never told Paul she had revised her estate plan.  *See* Paul Tr. 138:3–6; Fairchild Tr. 235:2–4.  Jay testified that Lillian told Paul about the revisions the night before her surgery, when she and the brothers met for dinner at Peggy's Diner in Harringon, Delaware.  Jay Tr. 473:20–474:4.  Paul testified that neither Lillian nor Jay mentioned any amendments or revisions to Lillian's estate plan or trust during the dinner.  Paul Tr. 49:4–19.  Jay's testimony is undermined by an October 13, 2009, email

until 2017.[379]  Jay never informed Paul of Jay's Deputy Trust Amendment,[380] and Paul never saw a copy of it until this litigation. [381]

Likewise, Fairchild was unaware of Jay's Deputy Trust Amendment.[382] Lillian never mentioned any further amendment to the Deputy Trust to Fairchild.[383] Jay's Deputy Trust Amendment was not consistent with Fairchild's understanding of Lillian's estate plans.[384]  According to Fairchild, "these amendments go to great length, as I read them, to prepare to remove Paul as a beneficiary of the trust."[385]  I agree.

### 4. Lillian Dies, Fairchild Raises The Alarm, And Paul Begins To Investigate.

On the morning of February 26, Paul drove Lillian to the hospital for her surgery.[386]  Before the surgery, Paul asked his mother whether she had a power of

---

from Jay to Paul, suggesting that Lillian did not discuss any changes with Paul at Peggy's Diner.  Jay wrote Paul, "I'm sorry you probably feel left out of all of the changes to the documents.  Mom had intended to go over the changes with you after her recovery."  JX 97 at RDEPUTY_000006.  I find Paul's testimony credible and conclude that the trio did not discuss Jay's Deputy Trust Amendment on February 25 and that Paul was unaware of Jay's Deputy Trust Amendment.

[379] *See* Paul Tr. 69:5–18.

[380] Jay Tr. 467:19–21.

[381] *See* Paul Tr. 138:3–6.

[382] Fairchild Tr. 233:17–23.

[383] Fairchild Tr. 234:8–13.

[384] Fairchild Tr. 234:14–235:1.

[385] Fairchild Tr. 234:23–235:1.

[386] Paul Tr. 49:21–50:1.

attorney, and Lillian said that she did not.[387]  Paul stayed with his mother all day.[388]

When Lillian emerged from surgery, she could hardly speak because she was in so

much pain.[389]  That day, Fairchild came to visit Lillian in the hospital, but Paul

informed him that "she's not up to that."[390]  Jay did not visit his mother in the hospital

on February 26.[391]  As stated, Paul spent the morning with Lillian on February 27,

and Jay visited her that afternoon.[392]  When Paul left on February 27, Lillian was in

pain, so the nurses brought her pain medication.[393]  When Paul called Lillian that

evening, "she was groggy because of the medicines."[394]

The next morning, Paul called the hospital to check on Lillian.[395]  Lillian "was

complaining about pain" and told Paul, "I think there's something wrong.  I feel it.

I think there's something wrong."[396]  A few days later, on March 4, Paul called the

hospital to check on Lillian.[397]  A nurse informed him that she could not speak to

---

[387] Paul Tr. 50:12–14.

[388] Paul Tr. 51:10–52:17.

[389] Paul Tr. 51:10–52:1.

[390] Paul Tr. 52:3–9.

[391] Paul Tr. 52:10–14.

[392] Paul Tr. 54:3–55:18.

[393] Paul Tr. 54:3–55:18.

[394] Paul Tr. 55:1–3.

[395] Paul Tr. 55:19–23.

[396] Paul Tr. 56:1–4.

[397] Paul Tr. 56:9–14.

him because Jay, as power of attorney, had not added Paul's name to the list of authorized individuals.[398] This was a surprise to Paul, as Lillian told him days earlier that she did not have a power of attorney.[399] At that time, Paul concluded that Lillian must have appointed Jay as her medical power of attorney for the duration of her time at the hospital.[400] Paul immediately called Jay.[401] Jay said he "forgot" to add Paul's name to the list.[402] Jay added Paul's name to the list after their conversation.[403]

Also on March 4, Fairchild called Paul.[404] Paul informed him that Lillian's bypass was successful, but she was "still weak" and "in lots of pain and uncomfortable" due to gastrointestinal side effects from the surgery and medications.[405] Fairchild asked whether Paul was aware of the recent changes to Lillian's estate plan.[406] Aside from recently learning that Jay was named as his mother's power of attorney, Paul responded that he was not and that "they don't tell

---

[398] Paul Tr. 56:15–57:5.

[399] Paul Tr. 57:6–8; 50:12–14.

[400] Paul Tr. 57:9–16.

[401] Paul Tr. 57:20–23.

[402] Paul Tr. 58:6–8.

[403] Paul Tr. 58:9–10.

[404] JX 90 at AFSI0000672 (entry dated 03/04/2008).

[405] JX 90 at AFSI0000672 (entry dated 03/04/2008).

[406] JX 90 at AFSI0000672 (entry dated 03/04/2008).

[him] anything anymore."[407] Fairchild asked Paul to inform him as to when Lillian would be strong enough to discuss her estate plan.[408]

That same day, Fairchild left a message with his registered principal and compliance supervisor.[409] He stated, "I believe Jay [is] exerting undue influence over Lillian and her estate plan at the expense of Paul," and noted that he has "lots of notes in file to back up feeling."[410] He was uneasy, asked what was required of him as an advisor in this situation, and wanted to know whether he could simply resign the accounts.[411] The Ameriprise compliance team instructed Fairchild to "take good notes and be sure to respect the confidentiality of the different parties."[412]

When Paul contacted the hospital again on March 4, they informed him that Lillian required an emergency surgery for a blockage in her intestines.[413] The next day, March 5, Lillian passed away.[414] Jay called Paul at 8:30 a.m. to share the sad news.[415] Paul was devastated.[416]

---

[407] JX 90 at AFSI0000672 (entry dated 03/04/2008).

[408] JX 90 at AFSI0000672 (entry dated 03/04/2008).

[409] JX 90 at AFSI0000672 (entry dated 03/04/2008); Fairchild Tr. 240:7–17.

[410] JX 90 at AFSI0000672 (entry dated 03/04/2008); Fairchild Tr. 240:18–241:2.

[411] JX 90 at AFSI0000672 (entry dated 03/04/2008); Fairchild Tr. 240:7–241:2.

[412] Fairchild Tr. 241:3–13.

[413] Paul Tr. 58:11–15.

[414] PTO ¶ 24.

[415] Paul Tr. 58:17–19.

[416] Paul Tr. 58:24–59:7.

That day, Paul called Fairchild to tell him of Lillian's death.[417] Fairchild was surprised that Jay, as agent of Lillian's estate, did not contact Ameriprise.[418] He testified: "I think Jay knew we were on to him, and I think he didn't want to talk to us."[419] On that same call, Paul asked about the recent changes to Lillian's estate plan.[420] In another call on that same day, Paul asked Fairchild which trust document governed the estate, and Fairchild explained that it was the 2008 Deputy Trust Agreement.[421] Because Paul was unaware of the changes, Fairchild explained the new Deputy Trust structure and even had to inform Paul of the nature of the two charitable beneficiaries.[422] Paul was "adament [sic] that she wanted everything simply split equally."[423] Paul said he would consider contesting the estate, but decided to postpone his decision until after the funeral.[424] Fairchild advised Paul to

---

[417] Paul Tr. 60:15–20; Fairchild Tr. 265:22–266:1; JX 90 at AFSI0000672 (entry dated 03/05/20078).

[418] JX 66 at AFSI0000045 ("[W]e find it curious that Jay, as trustee of the 2008 trust that is either the owner or beneficiary of Mrs. Deputy's Ameriprise assets, has not notified us of her death.").

[419] Fairchild Tr. 266:8–13.

[420] JX 90 at AFSI0000672 (entry dated 03/05/2008).

[421] JX 90 at AFSI0000671 (entry dated 03/05/2008).

[422] JX 90 at AFSI0000671 (entry dated 03/05/2008).

[423] JX 90 at AFSI0000672 (entry dated 03/05/2008).

[424] JX 90 at AFSI0000672 (entry dated 03/05/2008).

make a careful record of the events leading up to Lillian's death, and Paul followed Fairchild's advice.[425]

Fairchild also encouraged Paul to contact an attorney, and on March 7, Paul hired James Deakyne, Esq.[426] On March 12, Ameriprise sent a copy of the 2008 Deputy Trust Agreement to Deakyne at Paul's request,[427] and on March 17, Fairchild sent Deakyne copies of the 2003 Deputy Trust Agreement and the 2005 Deputy Trust Agreement.[428] Fairchild did not include a copy of Jay's Deputy Trust Amendment because he did not know about it at that time. He would not see it until this litigation.[429]

At this juncture, readers may appreciate a summary of the ownership of Lillian's assets. Upon Lillian's death, her share of the One Flintlock Trust was transferred to Jay's One Flintlock sub-trust. Jay, as trustee, remained obligated to pay himself 76% and Paul 24% of the One Flintlock Trust's income. Upon the death of the last surviving beneficiary, the remaining principal was to be distributed to Columbia University. Jay also became the successor trustee of the Deputy Trust,

---

[425] Paul Tr. 61:4–6, 61:20–62:10; Fairchild Tr. 319:10–16. Paul's record of the events leading up to Lillian's death is admitted as JX 52.

[426] Fairchild Tr. 268:6–18, 323:4–12.

[427] JX 63 at AFSI0000052.

[428] PTO ¶ 72.

[429] Fairchild Tr. 269:15–24; *see also* JX 62 at AFSI0000648 ("To the best of my knowledge, you mother did not establish any other trust agreements that pertain to the situation.")

which was not divided into sub-trusts. He was obligated to pay himself and Paul each 50% of the Deputy Trust's income. Principal was to be distributed according to the trustee's discretion to provide for the recipient's health, education, support, and maintenance. The North Circle House was an asset of the Deputy Trust. Some of Lillian's Ameriprise accounts were titled in the name of the Deputy Trust. Others passed outright via beneficiary designations; by 2008, Lillian had reinstated Jay as a beneficiary on some of those accounts, equally with Paul. Lillian also held one money market account jointly with Paul, and to the exclusion of Jay.[430]

Jay wreaked havoc on this state of affairs, doing whatever he could to ensure Lillian's assets were disposed of consistent with his demands and for his personal benefit.

### 5.      Jay Forges Ameriprise Change Forms.

Lillian owned 20 shares of AT&T stock in an Ameriprise account.[431] She had always intended the stock to pass to Jay.[432] By letter dated February 21, 2008, Lillian asked Fairchild to change the transfer on death provision of her AT&T stock, then owned by the Deputy Trust, to Jay's name.[433] Fairchild knew that those shares of

---

[430] *See* Fairchild Tr. 332:7–333:14; Paul Tr. 79:23–80:11.

[431] *See* JX 90 at AFSI0000672 (entry dated 02/22/2008).

[432] *See* JX 90 at AFSI0000672 (entry dated 02/22/2008). The stock was originally held by Lillian's husband, as custodian for Jay. PTO ¶ 17.

[433] JX 41; *see also* JX 90 at AFSI0000672 (entry dated 02/22/2008).

stock had been "earmarked" for Jay.[434]  On February 22, 2008, Fairchild spoke with Lillian and confirmed that he received her letter.[435]

The letter alone was not sufficient to place the AT&T shares in Jay's name.[436] Ameriprise needed three forms to make that change.[437]  "If Mrs. Deputy had died with that AT&T stock in the account owned by her trust, it would have been split according to the dispositive provisions of the trust," even if she intended otherwise.[438]

On March 6, 2008, Fairchild received the three necessary forms.[439]  They were postmarked March 5, the day that Lillian died.[440]  Jay told several stories about these forms.  In one version, Lillian signed the forms on March 1.[441]  In a February 17, 2010 letter to Ameriprise, Jay wrote, "My mother understood the form she was to sign, and signed it seated upright in her hospital bed with intervenes tubes taped to

---

[434] Fairchild Tr. 237:14–24.

[435] JX 90 at AFSI0000672 (entry dated 02/22/2008).

[436] Fairchild Tr. 241:14–24.

[437] Fairchild Tr. 242:1–9.  Fairchild testified that Ameriprise would need to create a new account to transfer the stock into; Ameriprise would then add a transfer on death provision, which is a beneficiary designation.  *Id.* 242:3–9.

[438] Fairchild Tr. 243:1–7.

[439] JX 74 at 1.

[440] JX 74 at 1; Fairchild Tr. 249:18–250:5.

[441] JX 47 at AFSI0000173, AFSI0000179; JX 49 at 7; JX 50 at 4.

her right hand."[442]   In an October 13, 2009 email to Paul, Jay also wrote:  "While she asked me to sign the document on her behalf (which I could as Durable Power of Attorney) I asked her to sign it which she did.  There is a third party document that attests and witnessed her signature."[443]

Fairchild believed Jay forged Lillian's signature on the three documents.[444] He believed the signatures did not look like known signatures Ameriprise had in Lillian's file and was concerned that the signing date was between her surgery and death, during a period in which she was known to be very uncomfortable; he believed the signatures were "remarkably clear" to have been signed during that time.[445]

On March 7, 2008, Fairchild signed the two forms that required his signature but noted that he was doing so "with doubt about client signatures herein."[446]  He was not required to sign the third form, but he noted his suspicions about Lillian's signature on it as well.[447]  The same day, Fairchild reported the suspicious signatures to Ameriprise, as he is required to do.[448]  Fairchild also contacted Paul to ask if he

---

[442] JX 100 at AFSI0000017.

[443] JX 97 at RDEPUTY_000006.

[444] Fairchild Tr. 245:11–14, 246:15–17.

[445] *See* JX 57; *see also* JX 51; JX 65 at AFSI0000057.

[446] JX 47 at AFSI0000179; JX 49 at 7.

[447] *See* JX 50 at 4.

[448] Fairchild Tr. 248:8–249:5; *see also* JX 66.

could verify his mother's signature.[449] Paul, familiar with his mother's signature, agreed.[450] Ameriprise sent Paul a set of two signatures: a top verified signature above a bottom suspicious signature.[451] Paul identified the top signature as his mother's and the bottom signature as inauthentic.[452]

Fairchild contacted Jay about the forged signatures.[453] Although inconsistent with other statements indicating that Lillian was unable to sign forms at that time due to tubes in her hand,[454] Jay was insistent that he "watched Mrs [sic] Deputy sign the form in the hospital."[455] Jay was "adament [sic] that the AT&T stock was always meant to be his," and Fairchild agreed.[456] While acknowledging his suspicions about the forged signatures, Fairchild submitted the change forms.[457] Because Lillian had

---

[449] JX 56; Paul Tr. 63:4–6; Fairchild Tr. 250:20–251:16.

[450] Paul Tr. 34:4–6, 63:9–10.

[451] JX 56; JX 57.

[452] JX 65 at AFSI00000056; Paul Tr. 63:9–11.

[453] JX 71 (entry dated 04/18/2008).

[454] JX 51 at JDEPUTY_00619; JX 97 at RDEPUTY_000006; Jay Tr. 492:10–493:4.

[455] JX 71 (entry dated 04/18/2008).

[456] JX 71 (entry dated 04/18/2008). Jay also expressed his willingness to send Paul to "jail" because he felt that Paul had stolen one of his mother's money market accounts. *Id.* Paul, in fact, jointly owned those accounts with Lillian at the time of her death. *See* Fairchild Tr. 332:7–333:14; Paul Tr. 79:23–80:11. Fairchild was not surprised that Jay said these things because it was "consistent with Jay's nature. He was surprised that there was an account owned jointly, and he didn't like that. His nature is vindictive . . . ." Fairchild Tr. 332:7–333:14.

[457] Fairchild Tr. 258:22–259:2.

died and could not contest the signatures, Ameriprise did not act on the forgeries.[458]

Ameriprise ultimately transferred the stock to Jay by way of the company's estate settlement process.[459] The forged forms did not effectuate the transfer.[460] Fairchild was "completely satisfied" that the AT&T stock ended up with Jay because that was Lillian's "long-term intention": "the outcome was what everybody wanted."[461]

In addition to the three forms Fairchild received from Jay, Jay claims that he sent Fairchild one "revised" stock transfer form dated March 2, 2008, under a cover letter dated March 3 (the "Revised Form").[462] Jay produced this Revised Form at trial. He signed the Revised Form himself, as "Lillian K. Deputy jd/dpoa."[463] Lillian did not sign the Revised Form.[464] The form bears Jay's handwritten note: "resigned at [sic] DOPA and re-sent to TF[,] same w/ last page."[465] According to the note and Jay's trial testimony, Jay signed the Revised Form because Lillian was "unable to

---

[458] Fairchild Tr. 289:18–22, 290:5–12. Fairchild continued to contact Ameriprise's home office about the forgeries. *See, e.g.*, JX 74; JX 65; JX 90 at ASFI00000667 (entry dated 08/01/2008).

[459] Fairchild Tr. 224:22–2, 285:6–10, 286:10–24, 288:20–289:22, 290:3–291:4.

[460] Fairchild Tr. 224:22–2, 285:6–10, 286:10–24, 288:20–289:22, 290:3–291:4.

[461] Fairchild Tr. 259:7–15.

[462] *See* JX 48 (revised form); JX 51 (cover letter); Fairchild Tr. 261:20–22, 263:6–8.

[463] JX 48 at JDEPUTY_00611, JDEPUTY_00617. My own observation is that Jay's "revised" signature, bearing his mother's name and his initials, looks as though it was made to look remarkably similar to Lillian's own, verified signature. *Compare* JX 56 (top signature), *with* JX 48 at JDEPUTY_00611, JDEPUTY_00617.

[464] *See* Jay Tr. 492:10–493:4.

[465] JX 48 at JDEPUTY_00610.

sign as she has tubes in her hand," and did so in Lillian's presence.[466] Jay also produced a handwritten letter to Fairchild stating that Jay "resigned this document to include JD/POA," which he "forgot" to include while being "hurried" in the hospital.[467]

The Revised Form bears Fairchild's signature, dated March 7, 2008.[468] But Fairchild never received the Revised Form, the purported cover letter, or the later handwritten letter, so he could not have signed the Revised Form after Jay signed it.[469]

Jay provided a Revised Form to replace only one of the three necessary Ameriprise forms.[470] Fairchild believes that Jay created a doctored stock transfer form bearing Fairchild's signature recently, and that Jay simply forgot that three forms were required to effect the beneficiary change:

---

[466] JX 51 at JDEPUTY_00619; Jay Tr. 492:10–493:4.

[467] JX 51 at JDEPUTY_00619.

[468] JX 48 at JDEPUTY_00617.

[469] Fairchild Tr. 261:20–22, 263:6–8. Fairchild testified that Ameriprise sends forms to the client without signatures. That form is then returned to Ameriprise with the client's signature. Then Fairchild signs the document and sends it to the corporate office, where it typically becomes "trapped." *Id.* 264:17. So, Jay must have doctored these forms after he saw the original signed copies at his deposition. *Id.* 264:24–265:3.

[470] Fairchild Tr. 265:4–20.

And I think what happens is that Jay creates a fun house of mirrors so that he can reflect any story later that he wants. And in this time, understandably, ten years later, he forgot that there were three forms that he needed to re-sign. He only re-signed this one, I think only about a year ago, when he realized he got caught in his own house of mirrors. And then to cover himself, he created JX 51, which we had also never signed. And I think that, understandably, because it was ten years before, Jay wouldn't remember there were three documents. So in his little handwritten note that I'm convinced is post hoc, he says he's re-signed the document, instead of documents. If they had been contemporaneous, a day or so later, he would have remembered there were all three. And unfortunately, I think he caught himself up.[471]

Fairchild further explained, "I can only surmise that somehow Jay realized that he tripped himself up when, during depositions a year ago, he saw this document with my notes about the questionable signatures."[472] I agree. Like many other documents produced in this matter, Jay recently wrote the letter and created the Revised Form to evidence his false narrative. They are inauthentic and inadmissible.[473]

In addition to the forged AT&T stock forms, Jay also produced false documents purporting to change the beneficiaries on Lillian's Ameriprise accounts from the brothers outright to the Deputy Trust. At trial, Jay produced three copies of a letter written to Fairchild dated February 21, the same date as Lillian's authentic letter to Fairchild regarding the stock.[474] The letters request an "immediate" transfer

---

[471] Fairchild Tr. 265:4–20.

[472] Fairchild Tr. 264:24–265:3.

[473] D.R.E. 901; *Hardy*, 2014 WL 3736331, at *14 & n.114.

[474] *See* JX 40, JX 42, JX 43.

of the beneficiary designations on Lillian's accounts to the Deputy Trust, rather than to Jay and Paul equally outright.[475] They bear different signatures and subject lines.[476] All three refer to a memorandum purportedly sent to Fairchild on February 10, 2008, which Fairchild never received.[477]

Jay contends he sent these letters to Fairchild, but Fairchild never saw or received them.[478] Fairchild testified he would have remembered and recorded receipt of the letters, and the purported memorandum, because "being aware of Jay's nature, we were highly sensitive to anything to do with the Deputy family and case."[479] If any of the produced letters were sent to Fairchild's office, they would have been carefully logged via Ameriprise's correspondence system: they were not.[480] I find that Jay's February 21 letters, as well as the memorandum referred to therein, are disingenuous post hoc documents that Jay drafted to mirror the genuine letter Lillian sent to Fairchild on February 21, 2008.[481] These letters are inauthentic and inadmissible.[482]

---

[475] *See* JX 40, JX 42, JX 43.

[476] *Compare* JX 40, *with* JX 42, *and* JX 43.

[477] Fairchild Tr. 230:12–20.

[478] *See, e.g.*, JX 40 at JDEPUTY_00061 (bearing handwritten note reading "faxed to THF"); Fairchild Tr. 230:21–232:12.

[479] Fairchild Tr. 228:16–18.

[480] *See* Fairchild Tr. 228:5–229:5.

[481] *Compare* JX 41, *with* JX 40, *and* JX 42, *and* JX 43.

[482] D.R.E. 901; *Hardy*, 2014 WL 3736331, at *14 & n. 114.

75

**E.** **Jay Administers The One Flintlock Trust And The Deputy Trust.**

After Lillian and Georgene died, Jay assumed his role as trustee of both of their trusts. In that capacity, Jay administered those trusts to his benefit and to Paul's detriment.

**1.** **Paul Receives Distributions From The One Flintlock Trust From 2006 To 2009.**

While Lillian was alive, she received distributions of 25% of the One Flintlock Trust in accordance with Georgene's 2003 OFT Amendment.[483] Jay also testified that he provided his mother with information about her sub-trust that she requested.[484] Initially, he provided her with both annual K-1 forms and statements from Wachovia, the bank that held the One Flintlock Trust's assets.[485] But after they settled the 2005 lawsuit and Jay provided the One Flintlock Trust agreement to Lillian, "she wasn't as much interested in the statements. She just was interested in the K-1. So she declined, actually, statements from Wachovia."[486] When Lillian died, her 25% interest in the One Flintlock Trust was added to Jay's sub-trust.[487]

---

[483] JX 7, § 6; Jay Tr. 373:7–10.

[484] Jay Tr. 373:23–374:24.

[485] Jay Tr. 373:23–374:24.

[486] Jay Tr. 374:5–9.

[487] *See* PTO ¶¶ 37, 38.

When Jay became trustee of the One Flintlock Trust, he did not give Paul complete copies of the One Flintlock Trust documents, including Jay's OFT Amendment. Jay reassured Paul that his interest in the One Flintlock Trust was secure. On November 30, 2008, Jay sent a letter to Paul confirming that Paul's "portion [of the One Flintlock Trust] will remain at 24-percent, and will always remain so as long as I'm alive."[488] Paul received monthly distributions and bank statements, and annual K-1 forms for the One Flintlock Trust until 2009.[489]

In late 2009, Jay contacted Paul to discuss the One Flintlock Trust. Jay explained that the market was in turmoil and that they should defer distributions and reinvest any dividends.[490] Although Paul had some knowledge of the stock market, he felt that Jay was more knowledgeable and, therefore, trusted Jay's advice and believed Jay was correct.[491] Accordingly, Paul agreed with Jay's recommendation to stop distributions.[492] Paul received his last distribution from the One Flintlock Trust on December 3, 2009.[493] Paul "figured the stock market's going to be crashing

---

[488] JX 80 at RDEPUTY_000093.

[489] *See* PTO ¶¶ 44, 77; Paul Tr. 17:11–23, 18:9–19:2, 151:3—152:6; Jay Tr. 374:5–21.

[490] Paul Tr. 19:3–10; *see generally* JX 97.

[491] Paul Tr. 19:24–20:12.

[492] Paul Tr. 19:9–10.

[493] PTO ¶ 44; Paul Tr. 18:24–19:2.

for a long time," so he did not inquire as to whether and when distributions would resume.[494]

Paul also stopped receiving statements for the One Flintlock Trust.[495] He did not press Jay for information despite the fact that he stopped receiving trust statements: "we didn't have distributions, I didn't get a statement."[496] Paul has received no further distributions from the One Flintlock Trust.[497] Despite a number of potential red flags, Paul claims he did not suspect Jay's wrongdoing resulting in the lack of distributions for many years.[498]

### 2. Jay Mismanages The Deputy Trust.

Lillian served as the sole trustee of the Deputy Trust until her death.[499] Jay became trustee of the Deputy Trust, as well as executor of Lillian's estate, on March 5, 2008.[500] Jay collected the 2008 Will from Pulsifer, and recorded it with the Sussex County Register of Wills.[501] He filed a Small Estate Affidavit, stating that Lillian's

---

[494] Paul Tr. 20:18–19.

[495] Paul Tr. 20:20–23.

[496] Paul Tr. 21:2–3.

[497] PTO ¶ 44.

[498] Paul Tr. 21:19–22:16 (Paul testifying that he did not question Jay in 2011 because he "trusted him"), 24:8–10 (Paul testifying that he emailed with Jay in 2011 for an update), 27:18–28:17 (Paul confirming that in April 2013, he "didn't believe that Jay had any authority to revoke [his] interest in the trust").

[499] PTO ¶ 60.

[500] JX 39 § IV(1); Jay Tr. 337:8–14.

[501] *See* JX 72.

probate estate was less than $30,000.[502]  Accordingly, no estate was probated.[503]  At trial, Jay testified that the combined value of Lillian's estate and the Deputy Trust totaled $644,000.[504]  Relying on that value, in 2008, Jay calculated a commission of roughly $18,000, purportedly for his services as executor of Lillian's estate, and contends he paid himself roughly $14,000 or $15,000.[505]  The Deputy Trust requires its trustee to serve without compensation.[506]

After Lillian died, Jay and Paul went through Lillian's house and belongings and discussed selling or renting the North Circle House home.[507]  After combing through Lillian's home and personal property, Jay turned to the financials.[508]  Jay testified that since the stock market crashed in 2008, "it was incumbent upon [him] . . . to put the house on the market as quickly as [he] could."[509]

Beginning in December 2009, Jay moved the Deputy Trust's assets from Ameriprise to Wells Fargo.[510]  Jay invested the trust funds in stocks, bonds,

---

[502] JX 72.

[503] JX 72.

[504] Jay Tr. 477:12–13.

[505] Jay Tr. 477:8–24.

[506] JX 39, Art. VII(2).

[507] Paul Tr. 71:2–9.

[508] Jay Tr. 338:7–11.

[509] Jay Tr. 338:12–18.

[510] PTO ¶ 78; Jay Tr. 339:1–15.

securities, and money market funds.[511] He also invested the Deputy Trust's money in two Florida properties sometime in 2010 or 2011.[512] Jay later sold those properties and deposited the proceeds into to the Deputy Trust.[513]

The Deputy Trust owned Lillian's personal residence, the North Circle House.[514] Shortly after Lillian's death, Jay testified that he began using the North Circle House as his "residence,"[515] but he did not pay rent to the Deputy Trust.[516] In fact, Jay proudly displayed his "residence" in a *Delaware Today* article, which touted Jay as a "collect[or of] homes and their furnishings."[517] In that article, Jay

---

[511] Jay Tr. 339:19–340:2.

[512] Jay Tr. 340:2–21. At the time, the properties cost roughly $70,000, and $30,000, respectively. *Id.* 340:22–341:6, 381–383. Jay also purchased a property in the name of the One Flintlock Trust. *Id.* 381:7–382:17. Jay says he did not use the properties personally, but rented them full-time on an annual basis. *Id.* 341:11–342:9. Jay did not handle the leases, and hired a management company. *Id.* 342:10–344:4. That company then deposited funds directly into the trust accounts after they took their fee from the rent. *Id.* 344:5–14.

[513] Jay Tr. 380:14–382:5. Jay sold the Deputy Trust properties sometime in 2010, generating a total profit of roughly $110,000. *Id.* 381:3–13. At the same time, he sold the One Flintlock Trust property and deposited the profits into the One Flintlock Trust. *Id.* 381:14–17.

[514] *See* JX 15, JX 16.

[515] Jay Tr. 338:6.

[516] *See* Jay Tr. 480:9–21. Jay testified that he paid rent for one year in 2010. However, the *Delaware Today* article touting the North Circle House as Jay's personal getaway was published in 2017. *See* JX 134. I do not find Jay's testimony convincing and find that personally he used the North Circle House more frequently than he let on at trial. And in accordance with his testimony, he did not pay rent for those many years of personal use.

[517] JX 134.

claimed that he inherited the North Circle House.[518] The North Circle House "struck [Jay] as the right place for a downstate getaway" where he could "comfortably" entertain.[519] Jay stated that, after the death of a loved one, "[p]art of moving on is making a house one's own," and that he was renovating the home to "be more intimate" for entertaining.[520]

But at trial, Jay retreated from his statement that the North Circle House was his "residence" and insisted that he simply visited the North Circle House on occasion for "logistical reasons."[521] According to Jay, it was "logistical[ly]" convenient to stay at the North Circle House while restoring the property and preparing it for a future sale.[522] Jay completed a number of improvements to the North Circle House by 2012 and 2013, using Deputy Trust funds.[523] He claims he

---

[518] JX 134.

[519] JX 134.

[520] JX 134.

[521] Jay Tr. 338:6.

[522] Jay Tr. 344:19–347:12. *But see* JX 99 at JDEPUTY_00796.

[523] Jay Tr. 351:14–354:8.

still has more to do.[524]  In addition to certain necessary repairs,[525] Jay made multiple cosmetic and unnecessary updates.[526]

In 2010, shortly before the majority of the North Circle House improvements were completed, Jay granted himself an option to purchase the North Circle House.[527]  Jay signed the option in his personal capacity and in his capacity as Trustee.[528]  He testified that he carefully drafted the option for "the potential purchase of the house if [he] chose to purchase it, or, actually [his] partner chose to purchase it."[529]  But the option lists "Jay Deputy as the purchaser."[530]  Paul never approved the option.[531]

In the option contract, Jay purports to value the North Circle House at $140,000 based on the 2008 market crash, prices of comparable homes in Seaford,

---

[524] Jay Tr. 351:14–354:8.

[525] *See* Jay Tr. 351:14–354:8.  Jay remedied termite damage; installed a new roof, new air conditioner, and new ceilings; fixed water leaks in the attic; repaired floors; and removed sick trees from the property.  *See* JX 99 at JDEPUTY_00806.

[526] *See* Jay Tr. 351:14–354:8. Among other things, Jay painted; purchased rugs; put in new light fixtures, including two chandeliers; had draperies made and installed curtain rods; installed skylights; and re-landscaped the property.  According to Jay, he brought "harmony of design . . . back to materials, and the visuals of the house."  *Id.* 353:9–11.

[527] JX 99.

[528] JX 99 at JDPEUTY_00805.

[529] Jay Tr. 347:23–348.

[530] JX 99 at JEPUTY_00795

[531] *See* JX 99.

and "known improvements" to the property.[532]  Two years before Jay drafted the option contract, in October 2008, Jay valued the North Circle House at $280,000 in a letter offering to sell the property.[533]  Contradicting the terms of the 2010 option, the October 2008 letter favorably frames the North Circle House and Seaford real estate market despite the market crash.[534]

Under the option contract, even if Jay chooses not to exercise the option, "Jay Deputy has the right to furnish the house and to use the house as a residence conducive with the full rights of ownership, either permanently or from time to time without any issue or outside interference."[535]  The contract gave him the right to be fully reimbursed for the North Circle House's improvements and keep all furnishings and decorations.[536]  Ultimately, as trustee, Jay gave himself an option to purchase the North Circle House in the future, after substantial improvements had been made and paid for with Deputy Trust funds, at a price much lower than fair

---

[532] JX 99 at JDEPUTY_00792–94; *see also* Jay Tr. 348:16–349:21.

[533] JX 78 at JDEPUTY_000790.

[534] JX 78 at JDEPUTY_000790–91.

[535] JX 99 at JDEPUTY_00796; *see also* JX 99 at JDEPUTY_00795 ("Jay Deputy as the purchaser or who holds the option for purchase have shall full rights of ownership and use of the property and without restrictions.  Full rights of ownership shall include keeping and maintaining the property while it is vacant as well as during the pre and post- renovation and restoration periods, and at the sole discretion of Jay Deputy.  Full rights of ownership further include the use of Jay Deputy's money to restore and renovate the house as he sees fit based on his design, professional experience, and informed opinion and knowledge of the local real estate market.").

[536] JX 99 at JDEPUTY_00796–97.

market value; and ensured he could enjoy the property without exercising the option under the guise that he was improving it for the benefit of the Deputy Trust.

Jay still uses the North Circle House[537] and believes it is worth substantially more today.[538] However, Jay has chosen not to exercise the option because the North Circle House is two hours away from his home in Wilmington.[539] He further claims that he refrained from exercising the option for the best interest of the Deputy Trust.[540] Even if that is the case, Jay secured for himself the entire upside of the bargain: he reaps all benefits of ownership without having to pay rent or make a purchase.[541]

According to Jay, he never sold the North Circle House because "[t]he real estate market in Seaford is still fairly soft."[542] But the house is currently listed for "quiet" or "soft sale" because "there's no one living there full time" and he does not "want to draw attention to the house."[543] I find that Jay has retained the North Circle

---

[537] Jay Tr. 346:19–21.

[538] Jay Tr. 354:15–21.

[539] Jay Tr. 354:22–3. Jay also included a requirement that he exercise the option within one year of selling his Manhattan property. JX 99 at JDEPUTY_00795. Further, despite drafting and executing the agreement, Jay testified that he "can't answer if the option is still available or not." Jay Tr. 355:3–14.

[540] Jay Tr. 356:3–21.

[541] *See* JX 99 at Section J.

[542] Jay Tr. 344:15–18.

[543] Jay Tr. 344:19–347:12.

House—held in limbo due the 2008 option—in order to enjoy it for himself, to the exclusion of Paul, and at the expense of the Deputy Trust.

Finally, Jay paid himself distributions from the Deputy Trust but failed to pay Paul.[544] The Deputy Trust, as amended, requires the trustee to distribute net income to Jay and Paul in equal shares at least annually, and does not allow distributions of principal.[545] As discussed in more detail below, Jay never provided Paul financial statements for or an inventory or accounting of the Deputy Trust.[546] Paul has received no distributions from the Deputy Trust.[547]

### 3. Jay Siphons Funds Out Of The Trusts.

Jay repeatedly transferred funds from both Trusts' accounts[548] to his personal account ending in 6576 ("Jay's Account"),[549] his dog rescue fund called Casey's Fund,[550] and to other accounts, some of which Jay was unable to explain.[551]

---

[544] *See generally, e.g.*, JX 107, JX 108, JX 110, JX 111, JX 113, JX 114, JX 116, JX 158, JX 159, JX 160, JX 161, JX 162, JX 162, JX 164, JX 165, JX 166, JX 167, JX 168, JX 169, JX 170, JX 171, JX 172, JX 173, JX 174.

[545] PTO ¶ 62; JX 39 § IV(1).

[546] PTO ¶ 69.

[547] PTO ¶ 70.

[548] *See generally* JX 158, JX 159, JX 160, JX 161, JX 162, JX 162, JX 164, JX 165, JX 166, JX 167, JX 168.

[549] Jay Tr. 506:23.

[550] Jay Tr. 497:13–14

[551] *See, e.g.*, Jay Tr. 504:16–505:2.

The One Flintlock Trust is the sole beneficiary of the Flintlock IRA ("Flintlock IRA").[552] Thus, only the One Flintlock Trust should have received any distributions from the Flintlock IRA. As of April 30, 2007, the Flintlock IRA had a portfolio value of $327,855.50.[553] By October 2010, the Flintlock IRA's value had fallen to $213,075.53.[554]

On October 20, 2010, a distribution of $22,945.59 was made from the Flintlock IRA to an unidentified account at Region's Bank.[555] Jay testified that the One Flintlock Trust only had bank accounts at Wells Fargo, née Wachovia.[556] Jay could not explain this distribution.[557] Despite Jay's feigned ignorance, I suspect Jay took this distribution for himself. In April 2012, the Flintlock IRA made two more distributions.[558] One was to Paul's sub-trust for the One Flintlock Trust ("Paul's Flintlock Account") and the other was to Jay's personal account.[559] Paul did not receive a distribution to his personal account after December 2009.[560]

---

[552] JX 29 at WF_006866.

[553] JX 29 at WF_006865.

[554] JX 107 at WF_007147.

[555] JX 107 at WF_007155.

[556] Jay Tr. 497:3–5.

[557] *See* Jay Tr. 504:16–505:2.

[558] JX 113 at WF_007588.

[559] JX 113 at WF_007588.

[560] Paul Tr. 18:24–19:2; PTO ¶ 44.

Beginning in 2013, Jay drained funds out of Paul's Flintlock Account into various accounts controlled by Jay.[561] Jay intensified his efforts in 2018. In July 2018, two months after Jay's deposition in this matter, Jay took over $86,000 from Paul's Flintlock Account.[562] As of the end of July 2018, there was $115.97 left in Paul's Flintlock Account.[563] Between 2013 and 2018, Jay's withdrawals from Paul's Flintlock Account totaled over $133,000.[564] Jay represented to Paul that the brothers must forego distributions due to poor market conditions at the end of 2009. Paul took Jay at his word and trusted Jay's superior knowledge and experience. Unbeknownst to Paul, Jay continually siphoned off funds from the One Flintlock Trust to Paul's exclusion.

Jay took a similar approach with the Deputy Trust. Beginning in May 2008, and continuing at least through July 2018, Jay slowly siphoned funds out of the Deputy Trust into accounts controlled by Jay.[565] Jay's withdrawals from the Deputy

---

[561] *See generally* JX 169, JX 170, JX 171, JX 172, JX 173, JX 174.

[562] JX 174 at WF_006493.

[563] JX 174 at WF_006486.

[564] *See* D.I. 130, Ex. A (collecting JXs).

[565] *See* JX 158, JX 159, JX 160, JX 161, JX 162, JX 163, JX 164, JX 165, JX 166, JX 167, JX 168. July 2018 is simply the date of the most recent statement that Paul received in discovery. Jay's siphoning may have continued.

Trust account total approximately $224,023.69.[566] Jay continued this course of conduct even after this litigation was filed.

### F. Jay And Paul Communicate About The Status Of The Trusts.

After Lillian died, Jay and Paul communicated about both Trusts. As stated, Paul received One Flintlock Trust distributions from late 2005 through December 2009. During that same timeframe, Jay and Paul grappled over the Deputy Trust. From 2009 on, the brothers disputed the status of both Trusts. Ultimately, Jay took the position that Paul had mounted a legal challenge against the Deputy Trust, and so, under Jay's OFT Amendment and Jay's Deputy Trust Amendment, he purportedly revoked Paul's interest in the Trusts. Although Paul was suspicious about Jay's motives as early as 2005,[567] he believed Jay's words were empty threats. Many years went by without Paul receiving distributions or statements from both Trusts, while Paul was preoccupied with other things. Eventually, Paul filed this action.

---

[566] *See* D.I. 130, Ex. B (collecting JXs).

[567] *See* JX 58 at 4 (entry dated 7/28/2005 at 9:04 AM) ("She [left message] with Jeff Berezni (sp?) to drop lawsuit. We to send beneficiary change forms for sons, equally WROS. She will call atty Baker to return Jay to her estate. Ralph not convinced yet that Jay is genuine. . . . She thanked us for everything we did during the crisis.").

### 1. Jay Delays Distributions from the Deputy Trust.

In the year after Lillian died, Paul repeatedly asked Jay for information regarding the Deputy Trust.[568] Paul requested updates from Jay every month or two.[569] For example, in the fall of 2008, Paul asked about the Deputy Trust, and Jay told Paul he needed more time.[570] On August 7, 2008, Jay sent Paul an email stating, "I've been concentrating on the house, so no other movement with monies has yet happened . . . probably won't for another month or two."[571] Then, on October 2, 2008, in response to Paul's inquiry, Jay again stated that he had just finished working on the house and it would be another month before he could turn to the estate's other holdings.[572] Jay explained that the estate administration was "involved" and told Paul to trust him.[573]

Paul believed Jay,[574] and he was glad that Jay contacted him with an update about the status of the Deputy Trust.[575] Paul explained at trial, "I knew that was

---

[568] PTO ¶ 68; *see, e.g.*, JX 97.

[569] Paul Tr. 77:23–78:1.

[570] *See* JX 97 at RDEPUTY_000023.

[571] JX 97 at RDEPUTY_000023.

[572] JX 97 at RDEPUTY_000021.

[573] Paul Tr. 78:–8.

[574] Paul Tr. 77:15–17.

[575] Paul Tr. 77:5–6.

going to be taking so long to do. . . . Aunt Gene's took a really long time, too."[576]

Paul had no experience in trust administration, but he knew that Jay did. Accordingly, Paul deferred to Jay's superior knowledge and experience.

## 2. Jay Threatens to Revoke Paul's Interest In The Deputy Trust And Warns That His Interest In the One Flintlock Trust Is In Jeopardy.

After Paul learned about the forged AT&T documents, he approached his attorney, Deakyne, for assistance.[577] On March 17, 2008, Deakyne wrote a letter to Fairchild regarding the beneficiary designations on Lillian's Ameriprise accounts, focusing on the AT&T stock (the "March 2008 Letter").[578] It does not mention or question the 2008 Deputy Trust Agreement, any Deputy Trust amendments, or Paul's status as a Deputy Trust beneficiary. The March 2008 Letter states that "[Paul] questions the validity of the [2008 Deputy POA] given the medical crisis his mother was struggling with on the date the document purportedly signed by her," but proceeds presuming the 2008 Deputy POA is valid.[579] It further explains that, under the 2008 Deputy POA, Jay did not have the authority to transfer a 100% interest in the stock to himself, and that Paul remains entitled to receive a share of

---

[576] Paul Tr. 76:22–24.

[577] Paul Tr. 64:7–9.

[578] PTO ¶ 73; JX 65.

[579] JX 65 at AFSI0000057.

Lillian's Ameriprise accounts.[580]  The March 2008 Letter requested that Ameriprise refrain from taking any action contrary to Lillian's previously stated intentions.[581]

Thereafter, Jay and Paul communicated about both the One Flintlock and Deputy Trusts.  During summer 2008, Jay and Paul exchanged a number of emails about distribution checks from the One Flintlock Trust.[582]  In August 2008, Jay informed Paul that "the [North Circle House] is coming along okay," and mentioned that he was considering renting the property because "mom was thinking long term investment strategies for the trust."[583]  Jay further explained that "no other movement with monies has yet happened . . . probably won't for another month or two."[584]

After the stock market crashed, Paul was concerned about the One Flintlock Trust and contacted Jay on October 2, 2008.[585]  Jay and Paul then communicated about One Flintlock Trust distributions and one of Georgene's assets, a Lennox Spring Garden set.[586]  Jay informed Paul that it was Paul's "responsibility to provide a correct inventory" as a One Flintlock Trust beneficiary, and asked that he provided

---

[580] JX 65 at AFSI0000057.

[581] JX 65 at AFSI0000058.

[582] JX 97 at RDEPUTY_000022–24.

[583] JX 97 at RDEPUTY_000023.

[584] JX 97 at RDEPUTY_000023.

[585] JX 97 at RDEPUTY_000022.

[586] JX 97 at RDEPUTY_000019–20.

an updated and correct inventory,[587] and reassured Paul that the One Flintlock Trust was mainly invested in bonds.[588]  Jay also addressed the Deputy Trust, stating that "[i]t will be at least another month before I can get the financial stuff underway," and "[Deputy] trust monies are to be invested for the long term; these were [Lillian's] wishes."[589]

On November 18, 2008, Jay wrote to Paul "upon the advice of [Pulsifer], the attorney for mom's trust and estate," to dispute Paul's withdrawal of funds from a money market account Lillian had held jointly with Paul (the "November 2008 Letter").[590]  Jay claimed that, although Paul's understanding of the account's ownership was "accurate on the surface," Paul actually had no right to that money.[591] Jay stated that although the account was not a Deputy Trust asset, "it was to be part of the Trust."[592]  In that letter, Jay proposed that he would

---

[587] JX 97 at RDEPUTY_000019.

[588] JX 97 at RDEPUTY_000019.

[589] JX 97 at RDEPUTY_000019, RDEPUTY_000020.

[590] JX 79 at JDEPUTY_00421.

[591] JX 79 at JDEPUTY_00421–22.  Jay even goes as far as to claim that Paul unduly influenced Lillian into executing the 2005 Deputy Trust Agreement, disinheriting Jay and removing Jay from Lillian's accounts.  *Id.* at JDEPUTY_00422.  These claims are unsubstantiated.

[592] Jay Tr. 487:21–488:4.

use my legally granted powers as Trustee to escrow any net income from [Deputy] Trust until this money is returned. You would not receive any net income or benefit from the Trust until this money is remitted to the Trust. In an amendment to the restated trust, income is discretionary and not necessarily mandatory. As Trustee, net income distributions are at my discretion to try and accommodate certain types of investments . . . .[593]

He further explained that Paul "already compromised and jeopardized potentially [his] beneficiary status in the One Flintlock Trust" and that it was "not [his] intention for [Paul] to compromise [his] position in [the Deputy T]rust."[594] Jay gave Paul ten days to "substantiate" his claim to the money market account to "make the estate and [Deputy] Trust whole and to return the monies."[595]

Then, on November 30, Jay wrote Paul again to "correct" a statement Lillian made to Paul about her share of the One Flintlock Trust.[596] He informed Paul that, upon Lillian's death, the monies from her sub-trust were added to Jay's share and that "your portion will remain at 24-percent, and will always remain so as long as I'm alive."[597]

---

[593] JX 79 at JDEPUTY_00423.

[594] JX 79 at JDEPUTY_00423.

[595] JX 79 at JDEPUTY_00423–24.

[596] JX 80.

[597] JX 80 at RDEPUTY_000093.

On December 8, Jeanne Singer, Paul's then-counsel, sent a letter to Jay in response to the November 2008 Letter (the "December 8, 2008 Letter").[598] Singer wrote, "it is clear from your letter that you do not have a firm grasp of your responsibilities as Executor and Trustee:"[599]

> [Y]our threats to use your position as Trustee to coerce my client into returning money that rightfully belongs to him is a clear breach of your fiduciary duty as Trustee. If you continue with this course of action, we will be compelled to file suit to have you removed as Trustee and have an independent Trustee appointed.[600]

In closing, the December 8, 2008 Letter asked that Jay complete tax returns in a more timely fashion.[601]

Also on December 8, 2008, Jay learned of the March 2008 Letter in the process of transferring Lillian's accounts to Wells Fargo.[602] Jay believed the March 2008 Letter constituted a legal challenge to the 2008 Deputy Trust and 2008 Deputy POA under Jay's Deputy Trust Amendment, and therefore saw the letter as grounds

---

[598] PTO ¶ 74; JX 81 (responding to JX 80).

[599] JX 81 at JDEPUTY_00414.

[600] JX 81 at JDEPUTY_00414.

[601] JX 81 at JDEPUTY_00414.

[602] Jay Tr. 408:3–409:4 (referring to JX 65); JX 82 at JDEPUTY_00330 ("On or about 8 December I had a late-afternoon conversation with a Minneapolis representative from American Express' Death and Estates Department regarding Mrs. Deputy's estate and trust. I was informed by the representative, that through an attorney representing you (Mr. James Dykean [sic], although the spelling of the sir name may not be correct) a Letter of Challenge, on your behalf, had been received in their office at the end of March, 2008.").

to revoke Paul's beneficiary status.[603]  Jay called Paul on December 8 to ask about the March 2008 Letter.  Paul told Jay that it was "meant to protect my interests."[604]

On December 12, 2008, Jay wrote a letter to Paul threatening to revoke Paul's interest in the Deputy Trust if Paul did not talk to Jay (the "December 12, 2008 Letter").[605]  Paul received this letter.[606]  Jay characterized the March 2008 Letter as a "Letter of Challenge," claiming he was

> informed you were challenging and contesting the documents of Mrs. Lillian K. Deputy to include, at least, her Last Will and Testament and the Lillian K. Deputy Revocable Charitable Remainder Trust. This letter only presented a written statement towards challenge and contest, and no court order existed either impeding me from moving forward with the estate and trust or presenting a "full stop" to the financial administration of the estate and trust.[607]

The December 12, 2008 Letter further goes on to describe, in Jay's own words, Jay's Deputy Trust Amendment, which Paul did not know about and had never seen.[608]

---

[603] Jay Tr. 406:2–407:7.

[604] JX 82 at REDPUTY_00330.

[605] PTO ¶ 75; JX 82.

[606] PTO ¶ 75.

[607] JX 82 at JDEPUTY_00330.  As described above, the March 2008 Letter relates to the Ameriprise accounts with beneficiary designations; it does not relate to the terms of the Deputy Trust, and it does not formally challenge the 2008 Deputy DPA.  *See* JX 65.

[608] JX 82 at JDEPUTY_00330–31.  The December 12, 2008 Letter also references the alleged conversation about revocation that Jay, Paul, and Lillian had at Peggy's Diner before her surgery.  *Id.* at JDEPUTY_00332.  In a similar vein, the December 12, 2008 Letter repeatedly references the inadmissible transcripts, JX 112, which Jay prepared to bolster his story.  That conversation never happened, and those "transcripts" never existed when they were allegedly drafted.  These references are part of Jay's effort to continue gaslighting Paul.

Jay continued that Paul's behavior and the March 2008 Letter "forced [Jay] to become comfortable with the idea of revocation for the [Deputy Trust]."[609] He writes:

> For no other purpose, I believe the inherent action of the [March 2008 Letter] was meant directly to do harm to the trust, to disturb its peace and unity, and to directly attack me. . . . Emanating from the language of the trust, and your intent, I believe the presented legal arguments to be sound in support of revocation. My decision is NOT based upon self-enrichment. . . . Initiated, external legal action, therefore, becomes the single act and purpose of revocation.[610]

The letter does not claim that revocation has occurred. Rather, emphasizing that the "effect of revocation can be far-reaching," Jay gave Paul five days to respond to the December 12, 2008 Letter, stating that failure to respond would result in revocation from the Deputy Trust.[611]

---

Further, the December 12, 2008 Letter alleges that Paul and Fairchild "colluded together . . . to generate the [March 2008 Letter] through the Georgetown, Delaware attorney. The receipt of the [March 2008 Letter] at the principal office of [Ameriprise] has clear implications that these things occurred without you or Mr. Fairchild possessing a full set of documents." *Id.* at RDEPUTY_00331. These claims are unsubstantiated.

[609] JX 82 at JDEPUTY_00332–33 ("I have never been comfortable with the idea of revocation. This is well documented in the transcripts between mom and I. (It was a much discussed topic over a period of months). I believe it to be too much responsibility weighted in the decision as to how this will affect your life in ways for which I never want to be blamed. Your history, however, demonstrates that you cannot work cooperatively with me, and subsequently, has forced me to become comfortable with the idea of revocation . . . .").

[610] JX 82 at JDEPUTY_00333.

[611] JX 82 at JDEPUTY_00333.

Paul did not respond to the December 12, 2008 Letter.[612]  He did not believe Jay's revocation threat was credible because he did not believe Jay had the authority to revoke his interest in the Deputy Trust.[613]  Paul did not know about Jay's Deputy Trust Amendment, and Jay never gave Paul a copy of Jay's Deputy Trust Amendment.[614]  Rather, Paul believed that Lillian was the only person who could revoke a beneficiary's interest in the Deputy Trust.[615]  Because Paul believed that Jay's December 12, 2008 Letter was an empty threat, Paul did not immediately contact Jay to discuss the letter.[616]  Paul did not sue Jay in 2008 because he "ha[d] a restaurant . . . so [he] couldn't give [his] time to [this dispute] until [he] finally got [himself] together with the restaurant."[617]

### 3. Jay Continues to Treat Paul As A Beneficiary Of The Trusts.

The next time Paul and Jay communicated, on January 23, 2009, neither Jay nor Paul mentioned the December 12, 2008 Letter or revocation.[618]  In fact, after the December 12, 2008 Letter, Jay continued to treat Paul as a beneficiary of the Deputy

---

[612] PTO ¶ 76.

[613] Paul Tr. 27:20–28:1, 87:23–88:1.

[614] Paul Tr. 88:8–24.

[615] Paul Tr. 89:18–19.

[616] *See* Paul Tr. 27:20–28:1, 87:23–88:1.

[617] Paul Dep. 25:12–18; s*ee also* Paul Tr. 5:1–2; JX 97 at RDEPUTY_000007 ("[T]he restaurant is taking a lot of time these days.").

[618] *See* JX 97 at RDEPUTY_000015–16.

Trust.  On January 29, Jay provided an update on distributions, and he continued to update Paul on the renovation and potential sale of the North Circle House.[619] Throughout 2009, Jay continued to update Paul about the North Circle House.[620]

In March, Jay and Paul discussed when Paul would receive his K-1 statement for the One Flintlock Trust.[621]  In June, Jay again provided an update regarding the delayed distributions.[622]  In October, Paul again inquired about K-1 statements.[623] Jay responded that he had not attended to the matter, as he was continuing to work with the accountants on Lillian's estate tax matters.[624]  Jay also brought up the joint money market account again.[625]  Based on Jay's representations, Paul believed that Jay was working with the accountants to resolve tax matters with the estate before Deputy Trust distributions could be made.[626]  As Jay continued to provide updates

---

[619] JX 97 at RDEPUTY_000014–16.

[620] JX 97 at RDEPUTY_000015–16.

[621] JX 97 at RDEPUTY_000014.

[622] JX 97 at RDEPUTY_000013.

[623] JX 97 at RDEPUTY_000008.

[624] JX 97 at RDEPUTY_000008 ("I am meeting with David this Thursday or Friday when I'm next in Seaford to wrap up the estate tax stuff.  I'm trying to finish this as my schedule allows.  I'm also trying to finish a few loose ends with the estate which I've mentioned to you in previous e-mails.  You seemed to ignore these things.  First, I am waiting for the clothing inventory.  Second, I'm waiting for the resolve of the money market account and the extant power of attorney agreement which was never canceled at Wilmington Trust by mom, and therefore invalidated the name change to the account.  I'm the one who is ultimately responsible for these issues, and not you.").

[625] JX 97 at RDEPUTY_000008

[626] Paul Tr. 92:20–93:4; *see* JX 97 at RDEPUTY_000008.

regarding the property of the Deputy Trust, Paul believed that he remained a Deputy

Trust beneficiary.[627]  Nonetheless, at that time, Paul had never received a distribution

or statement from the Deputy Trust.[628]

Paul responded to Jay's email on October 13, 2009:

It is apparent that we need to meet up with each other.  This hatred or whatever it is towards me needs to stop.  I have forgiven you because mom is no longer here to fuel the fire that has put such a wedge in between us.  I say this because, you do not realize the anger and ill feelings that she put us both thru.  That is why I want to meet up with you to resolve all of this between us.  You need to know what I had gone thru also.  Stop the hatred and lets move on with this whole matter. I will get You the inventory as I said I would, but the restaurant is taking a lot of time these days.  Let's arrange a date and time.[629]

---

[627] Paul Tr. 91:3–7, 92:3–6.

[628] PTO ¶ 70.

[629] JX 97 at RDEPUTY_000007.

Jay responded that same day and raised a number of issues,[630] and proceeded to inform Paul about Jay's Deputy Trust Amendment:

> Fortunately, mom's trust contains an amendment which cannot be challenged to any internal or external challenge of any document. This was put into place because I refuse to go through what I did in 2005. Is it now that your challenge didn't hold up (and I'm assuming Mr. Fairchild mentioned the monies have been consolidated out of Ameriprise) that you want to meet to protect your interests in the trust? Again, whatever sincerity might exist on your part is suspect given the timing in all of this.[631]

Jay then acknowledged that this was the first time Paul learned of Jay's Deputy Trust Amendment.[632]

At the end of 2009, Jay explained that the market was in turmoil and advised that the brothers should stop distributions from the One Flintlock Trust.[633]  Jay

---

[630] JX 97 at RDEPUTY_000006 ("Let's start with the letter to Ameriprise mailed one week after mom was buried.  First, the signature isn't forged as the letter on your behalf claims. Mom had tubes in her hand and writing her signature was difficult.  While she asked me to do [sic] sign the document on her behalf, (which I could as Durable Power of Attorney) I asked her to sign it which she did.  There is a third party document that attests and witnessed her signature.  I'm not that 'green.'  As well, there are a few documents beyond Ameriprise's form which protect my interest [sic] the stock.  You don't realize very clearly, but I could have pursued (and still can) the fraudulent Lennox Garden inventory within the State of New Jersey, but I realized it would have potentially upset your life, and yet, in turn, and very underhandedly, you were willing and did to me what I refused to do to you.").

[631] JX 97 at RDEPUTY_000006.

[632] JX 97 at RDEPUTY_000006–07 ("I'm sorry you probably feel left out of all of the changes to the documents. Mom had intended to go over these changes with you upon her recovery.  I have e-mails dating back to August before her surgery in which she discusses the changes and asks me to handle them.  This wasn't done underhandedly or to undermine, yet again, what you think you deserve, but rather a living legacy beyond you and me.").

[633] Paul Tr. 19:3–10.

previously advised Paul that "[t]hings are certainly tough" due to the "market correction(s) that is taking place."[634]  Based on Jay's advice, Paul agreed that they would stop distributions from the One Flintlock Trust.[635]  Paul received his last One Flintlock Trust distribution on December 3, 2009.[636]

On September 26, 2010, Jay sent a letter to Paul providing an update as to their mother's estate (the "September 2010 Letter").[637]  Jay informed Paul that there was one final issue with an annuity outstanding, but that Jay would be turning back to his doctoral work, writing:

> Therefore, with this outstanding and last piece of business, I must return to my doctoral work.  I really have no other choice.  I will remind you that during the course of events beyond Mrs. Deputy's death, you have not offered to assist.  I understand your business is your first priority.  My doctoral degree is now my first priority.[638]

The September 2010 Letter calls Paul a beneficiary of the Deputy Trust.[639]

In 2011, Paul asked Jay about the status of One Flintlock Trust.[640]  Jay advised that the market still had not recovered and so distributions and statements could not

---

[634] JX 97 at RDEPUTY_000024.

[635] Paul Tr. 19:9–10; PTO ¶ 70.

[636] PTO ¶ 44.

[637] JX 106 at REDPUTY_00633.

[638] JX 106 at REDPUTY_00633.

[639] PTO ¶ 79; JX 106.

[640] Paul Tr. 21:19–22:3.

101

resume.[641]  Paul again trusted Jay's superior knowledge and experience.[642]  Paul

believed that Jay kept him informed of the status of the One Flintlock Trust.[643]

Even as late as 2017, Jay still treated Paul as if he were a beneficiary.[644]  By

letter dated October 17, 2017, Jay demanded reimbursement of $61,868 for upkeep

and maintenance of Lillian's home, which is a Deputy Trust asset.[645]

Paul was reassured by the regular contact with Jay regarding the Trusts.  Paul

explained at trial, "I still thought I was 50-50 with [the Deputy Trust] because we

are communicating back and forth every once in awhile."[646]

### 4. Paul Seeks Information About The Trusts And Jay Retaliates By Purporting to Revoke Paul's Interests In The Trusts.

In early 2013, Paul called the Trusts' Wells Fargo contact, John Brady, to

inquire about the Deputy Trust.[647]  Paul explained, "I contacted Mr. Brady and I said,

I have no problem with Aunt Gene's trust because I know what's going on, but I

---

[641] Paul Tr. 22:4–5.

[642] Paul Tr. 22:12–16.

[643] Paul Tr. 25:6–8.

[644] *See* JX 136.

[645] JX 136 at JDEPUTY_00568–70.

[646] Paul Tr. 96:24–97:2.

[647] Paul Tr. 27:2–5.

need to know what's going on with my mom's trust because I have no idea what is going on."[648]  Jay learned about this phone call.[649]

In reaction, on April 21, 2013, Jay, as Trustee of the One Flintlock Trust, sent a letter to Paul (the "April 2013 Letter").[650]  Jay claimed that Paul purportedly threatened to "instigate legal action" against him, and stated that "[y]our telephone calls, from time to time, to Mr. Brady constitute a direct challenge to my authority as Trustee as well as the investment, governance and administration decisions of the Trust."[651]  The April 2013 Letter informed Paul that Paul's interest in the One Flintlock Trust was revoked "effective immediately,"[652] and discusses at length Jay's

---

[648] Paul Tr. 25:6–10.

[649] JX 118 at RDEPUTY_000098.

[650] JX 118.

[651] JX 118 at RDEPUTY_000098.

[652] JX 118 at RDEPUTY_000099.

OFT Amendment and the reasons the phone call amounted to a "legal challenge."[653]

Jay concludes by stating:

> It is my principal duty to fulfill the terms and conditions set forth in the Trust, and to do so to through the best of my reasonable abilities as Trustee. Further, it is my duty to defend the Trust in the event of a challenge or legal action. My loyalty remains first with the Trust, and second to its protected, named beneficiaries. The removal of you as a beneficiary eliminates any potential and further legal disturbance of the Trust.[654]

Paul did not believe this letter actually revoked his interest in the One Flintlock Trust. Paul believed that this was another of Jay's idle threats, and believed that only Georgene had the authority to revoke a beneficiary's interest.[655] As Paul stated:

> I thought it was another smoking gun, basically, because he writes letters all – back – back in the day, before, and he'd always saying that "you're going to be revoked" and stuff like that. And I felt that he didn't have the power because my mom and my aunt had the power to revoke.[656]

---

[653] PTO ¶ 45; JX 118 at RDEPUTY_000098–100; *see also id.* at RDEPUTY_0000100 ("As Trustee, it is evident and has been again demonstrated you cannot exist peacefully with the terms of the One Flintlock Trust as set forth by the Settlor and original Trustee, Mrs. Georgene E. Castor, and any subsequent terms set forth and promulgated by the Successor Trustee, Jay C. Deputy.").

[654] JX 118 at RDEPUTY_0000100.

[655] Paul Tr. 27:18–28:1.

[656] Paul Tr. 27:20–28:1. At trial, Paul repeatedly used the term "smoking gun" to mean an idle threat, rather than a particularly strong indicator of guilt.

All the same, the April 2013 Letter was concerning enough to Paul to cause him to contact an attorney.[657]

Because Paul was not receiving distributions or statements from the Deputy Trust, he also contacted Fairchild and requested that he provide his non-legal observations about the Deputy Trust and Jay's performance as Trustee.[658] On March 11, 2014, Fairchild provided a summary.[659] He stated, "I [] understand that Jay has inexplicably 'removed you' as a beneficiary of the trust," and "[t]o the best of my knowledge, your mother did not establish any other trust agreements that pertain to this situation."[660] Fairchild did not believe that Jay did not have revocation powers.[661] He told Paul that Jay was likely violating his fiduciary duties and encouraged Paul to contact an attorney.[662]

On August 5, 2014, Paul's legal counsel sent a letter to Jay requesting complete copies of all trust documents for the Trusts, tax returns, and an accounting (the "August 2014 Letter").[663] The August 2014 Letter stated that Paul, as

---

[657] Paul Tr. 29:10–15.

[658] Fairchild Tr. at 310:24–311:1, 313:1–13; JX 62 at AFSI0000648; *accord* JX 120 at RDEPUTY_000047.

[659] JX 62.

[660] JX 62 at AFSI0000648; *accord* JX 120 at RDEPUTY_000047.

[661] JX 62 at AFSI0000648–49; Fairchild Tr. at 274:2–275:1.

[662] JX 62 at AFSI0000648–49; Fairchild Tr. at 274:2–275:1.

[663] PTO ¶ 46; JX 122.

beneficiary, retained counsel to "investigate and, if appropriate, initiate proceedings relating to" the Trusts.[664]   Counsel further informed Jay that Paul would initiate proceedings if Jay did not respond by August 29.[665]

Jay did not provide the documents requested by the August 2014 Letter.[666] Rather, Jay responded by letter dated October 3 (the "October 2014 Letter").[667] Jay, as Trustee of the Deputy Trust, unequivocally informed Paul's counsel that Paul was not entitled to the requested documents because Paul had been removed as a beneficiary of the Trusts:[668]

> Beneficiary revocation for the One Flintlock Trust occurred formally on 21 April 2013 (and informally occurred on 9 April 2009 after a challenge to an agreed upon investment policy change) for which a required letter was mailed by United States mail detailing my actions and authority as trustee towards revocation. Beneficiary revocation for Lillian K. Deputy Charitable Remainder Trust formally began on or about 12 March 2008 when a written challenge from Mr. James Deakine [sic], a Georgetown, Delaware attorney was received at Ameriprise Financial Services' Death and Estates Department in Minneapolis, Minnesota by the end of March, 2008. My mother's death occurred on 5 March 2008.  I was unaware of his letter until on or about 8 December 2008 when I began the trust's administrative work upon returning to Wilmington.[669]

---

[664] JX 122 at JDEPUTY_00344.

[665] JX 122 at JDEPUTY_00345.

[666] PTO ¶ 47; Paul Tr. 32:4–6.

[667] JX 123.

[668] PTO ¶ 81; JX 123 at JDEPUTY_00347–49.

[669] JX 123 at JDEPUTY_00347.

In response, Paul filed this action.[670]

## II.    ANALYSIS

The Trusts are governed by Delaware law.[671]  Paul claims that Jay breached his fiduciary duties to inform, of loyalty, and of care; and that Jay was unjustly enriched as a result of these breaches.  I agree.  But Jay contends that even if Paul prevails on his claims, Paul slumbered on his rights, and as a result, his claims are barred by the doctrine of laches.  While Paul delayed in asserting his claims, I nonetheless find that Jay has failed to prove his laches defense because Jay has not been prejudiced.  Accordingly, Paul must prevail in this action.

### A.    Jay Breached His Fiduciary Duties To Paul.

The preponderance of the evidence demonstrates that Jay breached his fiduciary duties to Paul, who is and always has been a beneficiary of both the One Flintlock Trust and the Deputy Trust.

#### 1.    Jay Breached His Duty To Inform.

Jay breached his duty to inform by failing to keep Paul abreast of his beneficiary status in both Trusts and by failing to furnish Trust information when requested.  A trustee has a duty to furnish information to beneficiaries,[672] including

---

[670] Paul Tr. 32:7–8.

[671] PTO ¶ 82.

[672] *See, e.g.*, *McNeil v. McNeil*, 798 A.2d 503, 509 (Del. 2002).

the existence of the trust, their status as beneficiaries, and any significant change in their beneficiary status; and must keep beneficiaries reasonably informed, especially regarding material information needed to protect their interests.[673] The trustee must furnish such information "upon reasonable request" by the beneficiary.[674] Even if the beneficiary does not request information, "a trustee must communicate essential facts, such as the existence of basic terms of the trust."[675] This Court considers whether an individual is a current beneficiary to be an "essential fact."[676]

Jay breached his duty to inform by failing to communicate essential facts, such as the basic terms of the Trusts and updates on Paul's beneficiary status. Jay admits that Jay's OFT Amendment and Jay's Deputy Trust Amendment, if effective, would have materially changed the parties' rights and obligations because they supposedly authorized revocation.[677] By not informing Paul of those Amendments, which supposedly gave Jay authority to revoke Paul's beneficiary status, Jay deprived Paul of the opportunity to protect his interests. If Paul had known of Jay's Amendments, he would have been able to challenge them sooner.

---

[673] Restatement (Third) of Trusts § 82 (2007).

[674] *In re Tr. FBO DuPont Under Tr. Agreement Dated Aug. 4, 1936*, 2018 WL 4610766, at *14 (Del. Ch. Sept. 25, 2018).

[675] *Id.*

[676] *McNeil*, 798 A.2d at 510.

[677] Jay Tr. 450:10–12; *see also McNeil*, 798 A.2d at 510; *In re Tr. FBO DuPont*, 2018 WL 4610766 at *14.

Further, Jay had a duty to keep Paul informed of his beneficiary status. If Jay had revoked Paul's beneficiary interest in the Trusts, then Jay had a duty to inform Paul of that revocation when it happened. In letters after the fact, Jay stated that Paul's interests had been revoked (whether formally or informally) at specific times, but Jay failed to contemporaneously inform Paul of that revocation, and he waited to do so until provoked at a much later time. Jay fell short of his duty to inform Paul of Jay's Amendments, notwithstanding my conclusion today that Jay's Amendments are invalid. Jay failed to provide Paul with information necessary to protect his interests and to evaluate whether and how his interest in the Trusts had been terminated.

Finally, on numerous occasions, Paul requested information from Jay about both Trusts, and Jay provided half-hearted, incomplete, and sometimes untruthful answers. With respect to the One Flintlock Trust, Jay breached his duty to inform by withholding statements after December 2009, likely in an effort to keep Paul in the dark about the lopsided distributions. When Paul specifically asked about One Flintlock Trust statements, Jay merely responded that he "ha[d] it under control."[678] Similarly, Jay failed to provide Paul with statements from the Deputy Trust. In fact, Jay failed so miserably to keep Paul informed that Paul resorted to contacting Wells Fargo and Ameriprise for information. In Paul's words, "I need to know what's

---

[678] Paul Tr. 96:7; *accord* D.I. 133 at 29.

going on with my mom's trust because I have no idea what is going on."[679] Financial information about the Trusts was material and needed for Paul to protect his interests.

## 2.     Jay Breached His Duty Of Loyalty.

Over his years of service as trustee, Jay breached his duty of loyalty on multiple occasions. For the sake of brevity, I address only those breaches Paul raised:  a) adopting Jay's Amendments and revoking Paul's interests through those impermissible and invalid Amendments; b) failing to make distributions to Paul from both Trusts; c) using the North Circle House for himself without paying rent and granting himself an option at below-market value; d) paying himself a commission for handling Lillian's estate out of the Deputy Trust; and e) forging documents to transfer the AT&T stock out of the Deputy Trust.

A trustee has a duty to administer the trust "solely in the interest of the beneficiar[ies]".[680] "As a part of the duty of loyalty, a trustee must exclude all selfish interest and all consideration of the interests of third persons."[681] The duty of loyalty

---

[679] Paul Tr. 25:6–10.

[680] *Paradee v. Paradee*, 2010 WL 3959604, at *10 (Del. Ch. Oct. 5, 2010) ("A trustee is 'under a duty to [the] trust beneficiary to administer trust property solely in the interests of the beneficiary.'" (alternation in original) (quoting *Walls v. Peck*, 1979 WL 26236, at *4 (Del. Ch. Oct. 24, 1979)); *accord* Restatement (Third) of Trusts § 78.

[681] *Paradee*, 2010 WL 3959604, at *10 (internal quotation marks omitted) (quoting George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees* § 543 (2d ed. 1993)).

110

is implicated where the trustee has a substantial self-interest that is not consistent with the interests of the trust.[682] Under trust law, "self-dealing occurs when the fiduciary has a personal interest in the subject transaction of such a substantial nature that it *might* have affected his judgment in material connection."[683]

> Unlike corporate law, "[u]nder trust law, self-dealing on the part of a trustee is virtually prohibited." Originally under Delaware law "a trustee [was] prohibited absolutely from purchasing the property entrusted to his care." Under current Delaware law: "[a]n interested transaction is not void but is voidable, and a court will uphold such a transaction against a beneficiary challenge only if the trustee can show that the transaction was fair and that the beneficiaries consented to the transaction after receiving full disclosure of its terms."[684]

---

[682] *See* Restatement (Third) of Trusts § 78.

[683] *Stegemeier v. Magness*, 728 A.2d 557, 564 (Del. 1999) (emphasis in original) (internal quotation marks omitted) (quoting *Vredenburgh v. Jones*, 349 A.2d 22, 39 (Del. Ch. 1975)).

[684] *Id.* at 563 (alterations in original) (quoting *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991), and also quoting *Wilm. Tr. Co. v. Carrow*, 125 A. 350, 352 (Del. Ch. 1924)); *see also Hardy*, 2014 WL 3736331, at *8 ("Inherent in the trust relationship is the duty of loyalty, which requires a trustee to administer the trust solely for the interest of the beneficiary and exclude all selfish interests and all consideration of the interests of third persons. Self-interested transactions by fiduciaries are not prohibited altogether, but require the beneficiary's voluntary consent to the transaction after full disclosure. Under Delaware law, when a fiduciary has a close confidential relationship with the beneficiary, such consent requires impartial advice from a competent and disinterested third person, sufficient to allow the beneficiary to make an informed decision. Self-interested transactions involving a fiduciary or one in a confidential relationship with another are presumptively fraudulent and voidable in equity. If the transaction is challenged, the burden of persuasion to justify upholding the transaction is on the fiduciary. That burden is even greater where the transfer of property is made without consideration." (alteration, footnotes, and quotations omitted)).

"In any case, the burden of persuasion to justify the upholding of a transaction by an interested trustee rests on the fiduciary, not the beneficiary."[685]

Jay breached his duty of loyalty to Paul as beneficiary of both Trusts by wrongfully and fraudulently attempting to revoke Paul's beneficiary interests in an effort to take the whole of the Trusts for himself.[686]    According to Jay, he executed Jay's OFT Amendment in September 2004 in his role as co-trustee of the One Flintlock Trust.[687]  Jay did not have amendment authority in that role:  as discussed, Jay's OFT Amendment is invalid because Jay did not have the authority to amend the One Flintlock Trust under Georgene's POA.  Accordingly, he breached his duty of loyalty by wrongfully attempting to change his own powers under the One Flintlock Trust to Paul's detriment, using an invalid and likely fraudulent document. Likewise, Jay's Deputy Trust Amendment is a fraudulent attempt to increase his own powers as trustee to Paul's detriment.

Even assuming that Jay's Amendments are valid, Jay breached his fiduciary duty of loyalty when he revoked Paul's interests because Paul never mounted a "legal challenge" to the Trusts or related documents, as required to revoke under

---

[685] *Stegemeier*, 728 A.2d 557 at 563.

[686] *See id.*

[687] For example, Jay curiously did not exercise his supposed revocation powers when Lillian sued him in 2005.  If Jay genuinely believed he had revocation powers at that time, he would have revoked Lillian's interest in the One Flintlock Trust.  It is likely that Jay drafted Jay's OFT Amendment sometime thereafter so that he could take Paul's interest.

Jay's Amendments. Jay claims that Paul's call to Brady in early 2013 constituted a legal challenge to the One Flintlock Trust. Setting aside that the phone call did not constitute a "legal challenge" to anything, that call did not challenge the One Flintlock Trust documents because Paul contacted Brady to discuss Lillian's estate, not the One Flintlock Trust.

Jay also argues that Deakyne's March 2008 Letter to Ameriprise constitutes a legal challenge to Lillian's estate. It was not. The March 2008 Letter was in response to Ameriprise's communication informing Paul that Lillian's signature may have been forged on beneficiary change forms. These forms changed the owner of the AT&T stock, and did not pertain to the terms or validity of the Deputy Trust itself. The March 2008 Letter does not challenge the Deputy Trust documents. To the contrary, while expressing some concerns about the circumstances of the 2008 Deputy DPA's execution, the letter assumes the 2008 Deputy DPA is valid. Thus, even assuming Jay's Amendments are valid, Jay impermissibly revoked Paul's beneficiary status in an effort to claim the Trusts' assets for himself. In purportedly and unjustifiably revoking Paul's interests, Jay placed his own interests above Paul's, and therefore breached his duty of loyalty.

Jay executed his Amendments secretly, without the knowledge of Georgene, Lillian, or Paul, and with the sole intent of disinheriting Paul. Jay waited for the opportune time to invoke his nonexistent revocation powers and chose to proceed as

113

though he was the sole beneficiary of the Trusts. But Paul is and always has been a beneficiary of the Trusts.

As trustee of the One Flintlock Trust, Jay is required to distribute 24% of all net trust income to Paul at least annually.[688] But Jay proceeded as though he was the sole beneficiary, appropriating nearly all the funds from the Trusts without considering Paul's interest and failing to pay Paul distributions. Beginning in 2010, Jay began transferring funds out of the One Flintlock Trust, despite telling Paul that distributions must stop due to the market crash. Jay used the market as an excuse to mislead Paul. Unbeknownst to Paul, Jay continued to make distributions to himself even after the brothers agreed to cease distributions until the market bounced back. Then, from 2013 on, Jay siphoned off over $133,000 from Paul's OFT Account, transferring those funds into various accounts Jay controlled.[689] By taking distributions for himself and slowly draining Paul's OFT Account for his own personal benefit, Jay breached his duty of loyalty.

Jay pursued a similar course of conduct with respect to the Deputy Trust. Before Paul's interest was allegedly revoked in December 2008, Jay disbursed roughly $12,000 from the Deputy Trust.[690] After the purported revocation, Jay

---

[688] JX 7, § 7(A).

[689] *See* D.I. 130, Ex. A (collecting JXs).

[690] JX 158; D.I. 130, Ex. B (collecting JXs). Jay states that Paul has offered no evidence regarding what those funds were for, and suggests that those funds were allocated for repairs and updates to the North Circle House after Lillian's death, as well as

withdrew nearly $224,023.69 from the Deputy Trust for his own use.[691]  Throughout

2008 and 2009, Jay reassured Paul that he was working on Lillian's estate and could

not yet make distributions.  Likewise, in view of Jay's representations about market

conditions, Paul consented to Jay's suggestion that they defer distributions from the

Deputy Trust.  But Jay was transferring Deputy Trust funds to himself.[692]  He failed

to inform Paul of this fact, but instead repeatedly indicated to Paul that Paul remained

a beneficiary of the Deputy Trust who would receive distributions when Jay

determined it was prudent to do so.  Jay retained all trust income for his own

---

reimbursements for Jay's expenses related to those repairs or other estate expenses.  D.I. 133 at 57.  Jay states that "most checks written on the trust account were for estate expenses or for Ms. Deputy's home."  *Id.* (citing JX 158).  As discussed at length below, Jay used and repaired the North Circle House for his own benefit.  The accounting Jay must perform as a result of this action will resolve this issue.

[691] D.I. 130, Ex. B (collecting JXs).  Jay argues that the total reflected by Exhibit B has been inflated by $2,633.  D.I. 133 at 57 n.67.  That payment was directed to Casey's Fund, Jay's non-profit charitable organization.  Jay contends that Paul has offered no evidence that Casey's Fund is a "sham," impliedly arguing that the $2,633 should not be considered for purposes of the duty of loyalty analysis.  *Id.*  This small dispute does not disturb the larger conclusion that Jay breached his duty of loyalty.  Further, Jay transferred the funds to his own charity and has failed to demonstrate that transfer accords with this duty of loyalty.  He asserts no explanation as to why this transfer was for the benefit of the trusts and its beneficiaries.  *See Stegemeier*, 728 A.2d at 563.  Accordingly, the transfer breached Jay's duty of loyalty, and without any justification for the transfer, his duty of care.  *See* Section II(A)(3), *infra*.

[692] *See generally* JX 158, JX 159, 160, JX 161, JX 162, JX 163, JX 164.

benefit.[693]  And during this litigation, Jay continued to siphon off Deputy Trust funds.[694]  All the while, Paul received nothing.

In addition to simply taking funds, Jay also executed a number of self-interested transactions as Trustee of the Deputy Trust, which Jay has not shown to be fair or approved by Paul.  First, in 2010, Jay gave himself the option to purchase the North Circle House, a Deputy Trust asset, for half of its alleged 2008 value.[695] "A trustee with power to sell trust property is under a duty not to sell to himself either by private sale or at auction, whether the property has a market price or not, and whether or not the trustee makes a profit thereby."[696]  "This principle was established not only to prevent fraud in the management of the sale, but to the broader object of relieving trustees from any possible conflict between duty and self-interest."[697] Aside from the unfairness of the sale, the Court may consider that "the trustee may have obtained important information regarding the value of the property that he has kept to himself."[698]

---

[693] Jay even impermissibly transferred funds between the Trusts.  *See* Jay Tr. 525:23–526:23.

[694] *See generally* JX 165, JX 166, JX 167, JX 168.

[695] JX 99.

[696] *Stegemeier*, 728 A.2d at 564 (quoting Restatement (Second) of Trusts § 170 cmt. b (1959)).

[697] *Id.* (internal quotation marks omitted) (*Downs v. Rickards*, 1872 WL 2123, at *8 (Del. Ch. Jan. 1, 1872)).

[698] *Id.*

Although Jay framed this transaction as an option, the same principles apply. Jay knew that the option was a steal, having previously valued the home far above the option price and knowing that its value would increase once the market bounced back. He had an intimate knowledge of the property and its completed and forthcoming improvements, but he failed to accurately reflect that in the option price. And the terms of the option agreement are plainly self-interested. Under the agreement, Jay gave himself the right to use the North Circle House as if he owned it, as well as the right to be fully reimbursed by the Deputy Trust for renovations. There is no evidence that Jay informed Paul of the option or extended the same terms to Paul, or that Paul approved this transaction or Jay's free use of the North Circle House. As trustee, Jay breached his duty of loyalty by granting himself the 2010 option.

While Jay never exercised the option, he has used the home without paying meaningful rent to the Deputy Trust. Since Lillian's death, he used the property as his "residence," touting it as such as recently as 2017. But he only paid "rent" to the Deputy Trust for one year.[699] Paul has never used the North Circle House.

Further, Jay has enhanced the home for his own comfort using Deputy Trust funds. While Paul was aware that Jay was dealing with the North Circle House while "administering" the Deputy estate, there is no evidence that he consented to the use

[699] *See* Jay Tr. 480:9–18.

117

of Deputy Trust funds to tailor the home to Jay's taste, with the knowledge that his brother would solely occupy and benefit from the property. Thus, to the extent the funds were used for ordinary maintenance for the home, I find Jay did not breach his duties. But to the extent Jay used Deputy Trust funds to renovate or otherwise maintain the North Circle House for his own benefit, rather than to maintain it as a Deputy Trust asset, those allocations were self-interested and a breach of Jay's duty of loyalty. To determine the approximate value of the self-interested improvements to the Deputy home, I order an accounting.

Jay also breached his duty of loyalty when he used Deputy Trust funds to pay himself a large commission for his efforts as executor of Lillian's estate. Jay calculated a commission of $18,126 in 2008, based on his estimated combined value of Lillian's estate and the Deputy Trust of $644,000.[700] He testified that, of that calculated amount, he paid himself approximately $14,000 or $15,000.[701] The Deputy Trust mandates that the trustee serve without compensation.[702] And Jay swore in the Small Estate Affidavit that Lillian's estate was worth less than $30,000.[703] Accordingly, no estate was actually opened. The commission, at

---

[700] Jay Tr. at 477:2–479:2.

[701] Jay Tr. at 477:2–479:2.

[702] JX 39, Art. VII(2).

[703] JX 72.

approximately half the upper limit of a qualifying small estate, was not reasonable.[704]

Even accepting Jay's dubious explanation for the payment as true, Jay breached his duty of loyalty by paying himself such a disproportionate commission for non-Trust related tasks.

Finally, Jay breached his duty of loyalty when he forged forms to transfer the AT&T stock out of the Deputy Trust and into his name individually. The fact that those shares were "ear marked" for Jay does not bear on this analysis, aside from evidencing that Jay would have held a motive to proceed with the forgery. At the time of Lillian's death, she had not executed the change forms necessary to transfer the shares to Jay. Jay executed and forged the forms himself. Although Ameriprise did not investigate the forgery and ultimately transferred the shares, the preponderance of the evidence presented at trial demonstrates that Jay, in fact, forged the documents. Thus, the AT&T shares would have remained Deputy Trust property but for Jay's forgery. Jay's transfer of those shares from the Deputy Trust to himself personally was an entirely self-interested manipulation of the Deputy Trust corpus, to Paul's detriment.

---

[704] *In re Estate of Link*, 2011 WL 2084161, at *1 (Del. Ch. May 5, 2011) ("The administrator of an estate is entitled to compensation for his services. 12 *Del. C.* § 2305 provides that commissions shall be allowed as provided by Rule of this Court. Rule 192 directs this Court in its review of the commission sought by a personal representative. That Rule provides that the amount of any commission must be reasonable, and that this Court may reduce a commission that it finds unreasonable.")

In light of these transactions, Jay failed to administer the Trusts "solely in the interest of the beneficia[ries]."[705] Rather than "exclud[ing] all selfish interest and all consideration of the interests of third persons,"[706] Jay consciously, consistently, and systematically administered the Trusts for his own personal gain. Jay's behaviors exemplify the reasons that, under our law, "self-dealing on the part of a trustee is virtually prohibited."[707] And he has failed to justify his actions in the face of Paul's allegations. Accordingly, Paul is entitled to relief.

### 3. Jay Breached His Duty Of Care.

A trustee "must act as the reasonable and prudent person in managing the trust."[708] Trustees must manage the assets under their care "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use to attain the purposes of the account."[709] "Not only must the trustee deal with trust property with ordinary prudence but he is held to two additional standards: (1) since he is dealing with the property of another for whom he is morally bound to provide, he

---

[705] *Paradee*, 2010 WL 3959604, at *10 (quoting *Walls*, 1979 WL 26236, at *4; *accord* Restatement (Third) of Trusts § 78.

[706] *Id.* (quotation omitted).

[707] *Stegemeier*, 728 A.2d at 563 (quotation omitted).

[708] *McNeil*, 798 A.2d at 509.

[709] 12 *Del. C.* § 3302(a).

must avoid even those risks which he might take with his own property and (2) he must take no risk which endangers the integrity of the trust corpus."[710]

Jay managed the One Flintlock and Deputy Trust assets with the primary disloyal goal of appropriating them for himself. Jay committed a host of disloyal acts that Paul also asserts breached Jay's duty of care: a) adopting Jay's Amendments and revoking Paul's interests through those impermissible and invalid Amendments; b) failing to make distributions to Paul from both Trusts; c) paying himself a commission for handling Lillian's estate out of the Deputy Trust; d) forging documents to transfer the AT&T stock out of the Deputy Trust; and e) using the North Circle House for himself without paying rent, and granting himself an option at below-market value.[711]

As explained, Jay's OFT Amendment is invalid and Jay's Deputy Trusts Amendments are inauthentic and inadmissible. And as explained, these efforts to change the terms of the trust for his own benefit constitute breaches of the duty of loyalty. I need not reach whether these actions also breached the duty of care. It seems to me that actions taken in frustration of the Trusts' dispositive scheme are

---

[710] *DuPont v. Del. Tr. Co.*, 320 A.2d 694, 697 (Del. 1974).

[711] Paul also contends that Jay breached his duty of care by allowing an annuity, which was to pass to both brothers outright via a beneficiary designation, to escheat to the State of Delaware. This annuity was never the property of either Trust, and so its management is not governed by Jay's fiduciary duties as a trustee. Paul eventually retrieved his share. I do not reach Jay's handling of this annuity.

not prudent. But the parties did not tackle this doctrinal issue, and I need not reach it: I stop with my conclusions that Jay's Amendments are ineffective and breached his duty of loyalty.

The other misdeeds Paul identifies are breaches of the duty of care. The commission was improper under the terms of the Deputy Trust and in view of the size of Lillian's estate that otherwise would have been subject to probate. The administration of Lillian's small estate was, by design, outside of the purpose of the Deputy Trust. The commission was not based on any action taken to further the administration of the Deputy Trust, which on its terms precluded a commission to its trustee. And the $18,126 commission was wildly disproportionate to the work involved in administering Lillian's estate, which amounted to filing a small estate affidavit. A prudent, objective trustee would not have paid that commission.

Second, in 2008 and 2009, Jay explained to Paul that it was prudent to withhold distributions from both Trusts due to market conditions. But Jay made distributions to himself during that time. If Jay's reading of the market was accurate, those distributions were not prudent in light of the circumstances.

Third, Jay's handling of the North Circle House fell short of the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use to attain the purposes of the account. Jay as trustee gave away an option to purchase the North Circle House for far below the market

price. Jay as trustee allowed the North Circle House to be used as a residence without collecting meaningful rent,[712] and he allowed the resident to decorate the North Circle House to his liking at the Deputy Trust's expense. Jay as trustee has not taken meaningful measures to sell the North Circle House, having merely told one local realtor he would sell it but to stop short of listing it. A prudent trustee would have utilized or monetized the North Circle House for the benefit of both Deputy Trust beneficiaries.[713]

As for the AT&T stock, the evidence shows that Lillian intended for that stock to pass to Jay outright at the time of her death. But in order to effectuate that intent, Jay engaged in forgery. That is not how a prudent trustee would have handled the issue. Paul has proven that Jay has breached his duty of care.

### B. Jay Has Been Unjustly Enriched By His Misconduct.

To prevail on an unjust enrichment claim, Paul must demonstrate by a preponderance of the evidence (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of

---

[712] As stated, Jay paid "rent" of $500 per month during 2010 to use the North Circle House, but otherwise used the property for many years without paying rent to the Deputy Trust.

[713] Jay had experience renting properties for the benefit of the Deputy Trust. Shortly after the market crash, Jay purchased three Florida properties at low prices: two in the name of the Deputy Trust and one the name of the One Flintlock Trust. Despite the ravaged market, he rented those properties and generated income for the Trusts, knowing that the properties would be worth more once the market rebounded. Jay sold the properties and turned a handsome profit for both Trusts.

justification, and (5) the absence of a remedy provided by law.[714] Paul has prevailed. Jay used his position as trustee of both the One Flintlock and Deputy Trusts to impermissibly oust Paul and take the lion's share for himself. To effectuate this scheme, Jay not only breached his duties to Paul, but also created a fraudulent paper trail in an effort to support his version of the facts. A remedy at law is insufficient: Paul is entitled to the equitable remedies of an inventory and accounting for both Trusts, and to Jay's removal as trustee.

Jay attacks the justification prong, claiming his actions properly flowed from his revocation of Paul's interest, which in turn was justified because Paul violated the Amendments' no-contest clauses. This argument fails because, as discussed at length, Jay did not have the power to effect Jay's September 2004 OFT Amendment, and the differing copies of Jay's Deputy Trust Amendment are unauthenticated and inadmissible. Paul has shown that Jay lacked the power to revoke Paul's interest in the Trusts, and any benefit Jay received as a result of the purported revocations is not justified. Further, Jay has failed to show his self-interested transactions preceding the purported revocations were justified. Thus, Jay's use of his trustee powers of both trusts to his benefit and to the exclusion of his brother constitutes unjust enrichment.

---

[714] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

124

Jay further argues that Paul's unjust enrichment claim is duplicative of his breach of fiduciary duty claim.[715] But Delaware law does not preclude a plaintiff from bringing two equitable claims involving overlapping facts.[716] And if a plaintiff is able to prove the defendant breached his duty of loyalty, then the plaintiff will also be successful in proving unjust enrichment.[717] Paul has demonstrated that Jay breached his fiduciary duty of loyalty in numerous ways. Accordingly, Paul prevails on his unjust enrichment claim. Where the claims seek identical recovery, such as disgorgement of distributions that Jay received from the Trusts, Paul will only be entitled to one recovery.[718]

## C.  The Doctrine of Laches Does Not Bar Paul's Claims.

Jay contends that laches bars Paul's claims. "The equitable doctrine of laches prevents a plaintiff from exercising unreasonable delay in bringing an action when that delay prejudices a defendant's rights."[719] "[T]he laches inquiry is principally whether it is inequitable to permit a claim to be enforced, the touchstone of which is inexcusable delay leading to an adverse change in the condition or relations of the

---

[715] D.I. 133 at 60.

[716] *See Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 & n.58 (Del. Ch. Oct.28, 2011); *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010).

[717] *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010).

[718] *See Dubroff*, 2011 WL 5137175, at *11 & n.58; *MCG Cap. Corp.*, 2010 WL 1782271, at *25 n.147.

[719] *Nationwide Mut. Ins. Co. v. Starr*, 575 A.2d 1083, 1088 (Del. 1990).

property or the parties."[720] "A finding of laches generally requires the presence of three factors: the claimant's knowledge of the claim, unreasonable delay in bringing the claim, and resulting prejudice to the defendant."[721] "Laches bars an action in equity" where these elements are met.[722] The party asserting the laches defense bears the burden of proving each element.[723] "[T]here are no hard and fast rules regarding laches . . . ."[724] "In determining whether an action is barred by laches, a court may consider numerous factors including the plaintiff's knowledge of his rights, the reasons for the delay, and any change of position by the defendant."[725]

I denied the parties' cross-motions for summary judgment so that the record could be developed as to Jay's laches defense.[726] The parties' legal positions remain the same, with the added benefit of a developed record. The parties primarily dispute

---

[720] *Reid v. Spazio*, 970 A.2d 176, 183. (Del. 2009).

[721] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016).

[722] *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009).

[723] *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002) ("The doctrine of laches acts as a bar to an action in equity if the defendant carries the burden of persuasion that two conditions have been satisfied: (1) the plaintiff waited an unreasonable length of time before bringing the suit and (2) the delay unfairly prejudices the defendant. What constitutes unreasonable delay and prejudice are questions of fact that depend upon the totality of the circumstances."); *see also James Julian, Inc. v. Dep't of Transp. of State of Delaware*, 1991 WL 224575, at *14 (Del. Ch. Oct. 29, 1991) ("To prevail on the defense of laches, the defendants have the burden of proving that the plaintiffs delayed unreasonably in bringing the action and that the unreasonable delay resulted in prejudice to the defendants.").

[724] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 787–88 (Del. Ch. 2014).

[725] *Nationwide Mut. Ins. Co.*, 575 A.2d at 1088–89.

[726] *Deputy*, 2019 WL 2452550, at *4.

the moment Paul had knowledge of his claims, balancing the red flags evident from Jay's service as trustee against Paul's faith in Jay and Jay's occasional pacifying statements.

"[A]ctual or constructive knowledge of the claim" can trigger laches' knowledge requirement.[727]

> Actual knowledge is defined as direct and clear knowledge. Constructive knowledge is defined as knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person. A party is also chargeable with such knowledge of a claim as he or she might have obtained upon inquiry .... Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury.[728]

As a result, "laches will foreclose recovery if a plaintiff failed to act when it would have been reasonable for [him] to inquire into the situation, and further inquiry would have uncovered the claim,"[729] assuming the other elements of the defense are met.

---

[727] *All Pro Maids, Inc. v. Layton,* 2004 WL 1878784, at *8 (Del. Ch. Aug. 9, 2004), *aff'd,* 880 A.2d 1047 (Del. *2005*).

[728] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *49 (Del. Ch. Feb. 12, 2018) (quotations omitted), *aff'd in part, rev'd in part on other grounds sub nom. Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482 (Del. 2019).

[729] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *49 (quoting *Whittington*, 991 A.2d at 9); *accord Deutsche Bank Nat. Tr. Co. v. Goldfeder*, 2014 WL 644442, at *2 (Del. 2014) (TABLE).

### 1. Paul Had Knowledge Of His Deputy Trust Claims In 2008 And His One Flintlock Trust Claims in 2011.

Jay's handling of Agnes' estate gives important context to the information Paul received about the Deputy Trust and One Flintlock Trust. Paul stood by Lillian as she confronted and eventually sued Jay for taking Lillian's share of Agnes' estate. Even after Jay and Lillian arrived at a détente in July 2005, Paul remained skeptical about both Agnes' estate and the One Flintlock Trust.[730]

Paul's skepticism carried over to Jay's handling of the Deputy Trust in the days after it was executed, when Jay first wielded his power as Lillian's newly appointed attorney-in-fact in March 2008. Jay's new role was a surprise to Paul, as Lillian had told him she did not have a power of attorney. Paul arrived at the reasonable conclusion that Lillian had appointed him for short-term service surrounding her hospitalization.

Paul suspected Jay's wrongdoing with regard to the Deputy Trust in the days after Lillian's death. When Fairchild told Paul of the changes to Lillian's estate plan, Paul (like Fairchild) immediately concluded they were against her longstanding wish to distribute everything to Jay and Paul equally and outright. Paul said he would

---

[730] *See* JX 58 at 4 (entry dated 7/28/2005 at 9:04 AM) ("Ralph not convinced yet that Jay is genuine.").

consider contesting the estate, but ultimately decided to hold off on making a decision until after the funeral.

After the funeral, Paul began to inquire about Jay's behavior with respect to the Deputy Trust. He had "sufficient knowledge to raise [his] suspicions to the point where [he] commence[d] an investigation."[731] Paul was concerned enough that, on March 7, 2008, he hired Deakyne to review the available Deputy Trust documents. Deakyne also investigated the forged AT&T documents, resulting in the March 2008 Letter. That letter explicitly questions the validity of the Deputy DPA. Even though Paul did not have "direct and clear" knowledge of his claims at that time, he knew enough to consider the possibility that Jay was breaching his duties.[732]

Paul's suspicions solidified upon receipt of the November 2008 Letter, and Paul retained counsel yet again. Paul's counsel sent the December 8, 2008 Letter, telling Jay that "it is clear from your letter that you do not have a firm grasp of your responsibilities as Executor and Trustee," and informed Jay that if he continued that course of action, Paul would be compelled to file suit. In response, by the December 12, 2008 Letter, Jay informed Paul his beneficiary status in the Deputy Trust would be revoked if he failed to respond within five days.

---

[731] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *49.

[732] *See id.*

Thus, in December 2008, Paul had direct knowledge of Jay's intention to revoke him as a beneficiary of the Deputy Trust. Paul did not respond to the December 12, 2008 Letter because he believed it was an empty threat. Even believing Jay did not have revocation power, a reasonable person still would have investigated. And Paul still believed a lawsuit was necessary: Paul waited not because he thought Jay was fulfilling his fiduciary duties, but because Paul "ha[d] a restaurant . . . so [he] couldn't give [his] time to [this dispute] until [he] finally got [himself] together with the restaurant."[733] On these facts, I find that Paul had inquiry notice of his Deputy Trust claims as early as March 2008 and likely had actual knowledge of his claims as early as December 2008.

The parties dispute what effect, if any, Jay's treatment of Paul as a beneficiary from 2009 through at least 2011 has on this analysis. During that period, Jay continued to give Paul only partial updates about the Deputy Trust. Paul received no distributions or statements. Thus, though Jay was calling Paul a beneficiary in an effort to dodge Paul's questions and concerns, he was not treating Paul as a beneficiary. While Jay's half-measures may have reinforced Paul's belief that Jay did not have revocation powers, they were in fact further evidence of Jay's failure

---

[733] Paul Dep. 25:12–18; s*ee also* Paul Tr. 5:1–2; JX 97 at RDEPUTY_000007 ("[T]he restaurant is taking a lot of time these days.").

as a fiduciary. And the fact remains that Paul began inquiring about Jay's suspicious behavior, and even threatened to take action, before this period.

Jay's lip service did not eliminate Paul's concerns. In 2013, Paul explained, "I need to know what's going on with my mom's trust because I have no idea what is going on."[734] Paul sought the assistance of counsel, yet again, to collect and review the Deputy Trust documents and send the August 2014 Letter, threatening suit if Jay did not cooperate. Even accepting Paul's argument that the accumulation of these red flags did not give him "direct and clear knowledge" of his claims until 2014, Paul possessed "sufficient knowledge to raise [his] suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation"[735] starting in the days after Lillian's death in March 2008.

Paul's growing understanding of Jay's misdeeds regarding the Deputy Trust should have colored his evaluation of Jay's handling of the One Flintlock Trust. In 2008, when Paul first suspected wrongdoing in connection with the Deputy Trust, Paul was receiving regular One Flintlock Trust distributions and statements. In the November 2008 Letter, Jay informed Paul that he had "already compromised and jeopardized potentially [his] beneficiary status in the One Flintlock Trust." Paul

---

[734] Paul Tr. 25:6–10.

[735] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *49.

testified that he did not inquire about Jay's statement because Paul was receiving the distributions and statements he expected as a beneficiary.

But on December 8, 2008, Paul's counsel threatened Jay with suit regarding the Deputy Trust due to his failures as executor and trustee. Jay responded by setting a deadline for revocation of Paul's interest in the Deputy Trust. In this context, it was not reasonable for Paul to overlook Jay's posturing with regard to the One Flintlock Trust and conclude Jay was fulfilling his fiduciary duties.

Throughout 2009, Paul inquired about K-1 statements for the One Flintlock Trust. He continued receiving monthly One Flintlock Trust distributions and statements until December 2009, when Jay convinced Paul that it was best to stop distributions until the market rebounded. Paul also stopped receiving One Flintlock Trust statements. "[Paul] figured the stock market's going to be crashing for a long time," so he did not inquire as to whether and when distributions would resume.[736] He did not press Jay for information despite the fact that he stopped receiving trust statements: "we didn't have distributions, I didn't get a statement."[737]

Paul waited until 2011 to ask Jay again about the One Flintlock Trust. Jay advised that the market still had not recovered and so distributions and statements could not resume. Paul did not question this, despite his constant reservations about

---

[736] Paul Tr. 20:18–19.

[737] Paul Tr. 21:2–3.

132

his brother's behavior. And although Paul casually tracked the market on his own, he did not try to verify Jay's claims.

I conclude Paul had inquiry notice of his One Flintlock Trust claims in 2011. "Inquiry notice does not require full knowledge of the material facts."[738] At that juncture, a reasonable person would have inquired further into why Jay had been withholding both distributions and statements for years. If Paul had inquired further, he would have discovered that Jay had been transferring money out of the One Flintlock Trust, but not to Paul,[739] and that Jay had "informally" revoked Paul's beneficiary status in 2009, therefore discovering his claim. Further, by this time, Paul had knowledge of both how Jay had handled Agnes's estate and Paul's Deputy Trust claims, which should have informed his view of how Jay was handling the One Flintlock Trust.

Even after Paul had inquiry notice of his One Flintlock Trust claims in 2011, nearly two more years passed without receiving One Flintlock Trust distributions or statements. Paul continued to ignore these warning signs, stating in early 2013 that he had "no problem with Aunt Gene's trust because I know what's going on."[740] But shortly thereafter, on April 21, 2013, Paul obtained actual notice of his One Flintlock

---

[738] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *49.

[739] *See, e.g.*, JX 107 at WF_007149.

[740] Paul Tr. 25:6–10.

Trust claims when Jay unequivocally informed Paul that his beneficiary status in the One Flintlock Trust had been revoked "effective immediately."[741]  Then, on October 3, 2014, in response to yet another threat from Paul's counsel, Jay issued the October 2014 Letter that addressed revocation from both the One Flintlock and Deputy Trusts.  Even if Paul believed this to be an empty threat, he had direct and clear knowledge, or actual notice, of his claims for both Trusts at that time.

### 2. Paul Unreasonably Delayed In Bringing His Claims.

Paul unreasonably delayed in bringing this action.  "An 'unreasonable delay' for purposes of laches can range from one month to many years.  The length of the delay is less important than the reasons for it."[742]  "While this Court will consider the analogous statute of limitations, such limitations applicable in a court of law do not control a court sitting in equity; a court of equity may also consider concerns of conscience, good faith, and reasonable diligence."[743]  Thus, "the element of

---

[741] JX 118 at RDEPUTY_000099.  According to Jay, "[b]eneficiary revocation for the One Flintlock Trust occurred formally on 21 April 2013 (and informally occurred on 9 April 2009 after a challenge to an agreed upon investment policy change)."  JX 123 at JDEPUTY_00347.

[742] *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 295 (Del. Ch.), *aff'd,* 126 A.3d 1115 (Del. 2015) (internal quotation marks omitted) (quoting *IAC/InterActiveCorp v. O'Brien,* 26 A.3d 174, 177 (Del. 2011)).

[743] *Houseman v. Sagerman*, 2015 WL 7307323, at *8 (Del. Ch. Nov. 19, 2015).

unreasonable delay involves consideration of whether the plaintiff acted with the degree of diligence that fairness and justice require."[744]

Nonetheless, where parties bring equitable claims seeking equitable relief, this Court is not strictly bound by statutes of limitation, but will "give the analogous limitations period great weight in deciding whether the claims are barred by laches."[745] The parties agree that Paul's claims are entirely equitable in nature. As a result, laches applies and the Court looks to the relevant statutes of limitation with great, but not presumptive, weight.[746] The parties do not dispute that 10 *Del. C.* § 8106's three-year statute of limitations applies to the breach of fiduciary duty claims at issue here.[747] Likewise, the three-year statute of limitations applies to Paul's unjust enrichment claim.[748] Accordingly, I look to the three-year statute of

---

[744] *Id.*

[745] *Kraft*, 145 A.3d at 978 (quoting *Whittington*, 991 A.2d at 9 ("Where the plaintiff seeks equitable relief, however, the Court of Chancery applies the statute of limitations by analogy. Absent a tolling of the limitations period, a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches.")).

[746] *Id.*; *Whittington*, 991 A.2d at 9.

[747] D.I. 130 at 48; D.I. 133 at 12. *See Tilden v. Cunningham*, 2018 WL 5307706, at *14 (Del. Ch. Oct. 26, 2018) ("Under 10 *Del. C.* § 8106, a three-year limitations period applies to claims sounding in breach of fiduciary duty." (citing *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007)).

[748] *See, e.g.*, *Vichi*, 62 A.3d at 42. The parties briefly dispute what analogous statute of limitations I should consider for Paul's unjust enrichment claim. Jay contends that Paul's unjust enrichment claim is also subject to the three-year statute of limitations. While Paul concedes that the three-year statute of limitations generally applies to an unjust enrichment claim, Paul pushes further, arguing two alternative positions. First, Paul contends that 12 *Del. C.* § 3585 grants a beneficiary five years to sue for breach of trust, and that because

limitations when determining whether Paul unreasonably delayed in bringing his claims against Jay.[749]

The statute of limitations "begins to run upon accrual of the claim,"[750] or "as soon as the wrongful act occurs."[751] The analogous limitations period for the claims in this case began when Paul had at least inquiry notice of his claims.[752] For the Deputy Trust claims, the analogous period began in 2008, and for the One Flintlock Trust claims, the analogous period began in 2011. Paul initiated this action in 2015,

---

his "claims involve a breach of trust . . . a five-year statute of limitations is more analogous to [his] unjust enrichment claim." D.I. 130 at 53. Paul cites no authority for this position, and I do not adopt it here. Second, Paul argues that Jay executed the Deputy Trust and September 2004 OFT Amendments under seal, and, therefore, his unjust enrichment claim is subject to the twenty-year statute of limitations under *Whittington v. Dragon Group L.L.C.*, 991 A.2d at 11. *See* D.I. 130 at 53. Because Jay's Amendments are inadmissible, that argument bears no weight here.

[749] The parties also quarrel over whether the limitations period for any of Paul's claims were tolled under the doctrines of fraudulent concealment and equitable tolling. The record supports that Jay acted in secret, as explained in analyzing his breaches of the duty to inform. And while Paul may have genuinely relied on Jay's explanations and half-truths, Paul also selectively ignored a litany of warning signs. *See Tilden*, 2018 WL 5307706, at *14 ("While our courts will toll the limitation period under certain circumstances, "[m]ere ignorance of the facts by a plaintiff, where there has been no ... concealment, is no obstacle to operation of the statute [of limitations.]" (alternation in original) (footnotes omitted) (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998)). At bottom, I need not reach those doctrines because, as discussed below, Jay's laches defense fails because he failed to demonstrate prejudice.

[750] *Tilden*, 2018 WL 5307706, at *14.

[751] *Id.* (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *18 (Del. Ch. July 29, 2005)).

[752] *See, e.g.*, *Whittington*, 2008 WL 4419075, at *6 ("[T]he statute of limitations will not run until the plaintiff is on inquiry notice of her claims."); *In re Tyson Foods, Inc.*, 919 A.2d at 594 (finding that analogous statute of limitations period began to run when plaintiffs were on inquiry notice of their claims).

after the analogous limitations period had run for both the One Flintlock Trust and Deputy Trust claims. While Paul's claims are not presumptively barred by the limitations period, I give the three-year statute of limitations great weight in my analysis. Paul's failure to bring his claims within the analogous limitations period supports a finding of unreasonable delay.

In addition to the analogous statute of limitations, I also consider concerns of conscience, good faith, and reasonable diligence.[753] While Jay's indiscretions are extraordinary, they afford Paul little latitude, as Paul was aware of Jay's character and his specific misdeeds.[754] Jay's occasional reassurances did not sufficiently precipitate Paul's delay to excuse it. On more than one occasion, Paul failed to act with reasonable diligence in pursuing his claims; the egregiousness and obviousness of Jay's deception reinforce this conclusion. Paul repeatedly testified that the he relied on Jay's representations.

Paul considered pursuing his claims multiple times, but consciously abandoned that course of action, deciding to focus on his restaurant instead. As early

---

[753] *Houseman*, 2015 WL 7307323, at *8.

[754] *Reid*, 970 A.2d at 183 ("Under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law; but, if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute, the [court] will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it." (alteration in original) (quotation omitted)).

as 2005, Paul was skeptical of Jay's motives, and by 2008, Paul knew that he needed to begin protecting his interests. By 2011, Paul had sufficient knowledge of Jay's indiscretions to justify mounting a claim. But he chose not to do so. Considering the reasons for his delay and the analogous limitations period, I find that Paul unreasonably delayed in bringing his claims.

### 3. Jay Has Failed To Demonstrate That He Has Been Prejudiced By Paul's Delay.

Jay has not demonstrated that that he has been prejudiced by Paul's unreasonable delay. "[L]aches may not bar an action that would be untimely in terms of the analogous statute of limitations if, in terms of equity, the plaintiff's delay has caused no prejudice to the defendant . . . ."[755] The party asserting the laches defense bears the burden of demonstrating he has been prejudiced by petitioner's delay.[756] "Prejudice can be either procedural, such as when a party is unable to call a crucial witness due to the delay and the witness has since become unavailable, or substantive, such as when a party relies to his detriment on the plaintiff's failure to file a claim in a timely manner."[757] Substantive prejudice may occur where the delay caused another to incur expense, to enter into obligations, or suffer some other

---

[755] *O'Brien*, 2009 WL 2490845, at *8.

[756] *See, e.g.*, *Sussex Cty. v. Berzins Enters., Inc.*, 2017 WL 4083131, at *4 (Del. Ch. Sept. 15, 2017), *aff'd,* 197 A.3d 1050 (Del. 2018).

[757] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *50 (quoting *Meer v. Aharoni*, 2010 WL 2573767, at *8 (Del. Ch. June 28, 2010)).

detrimental change of position.[758]  "Some change in position to the disadvantage of another is essential."[759]  Where the respondent is "able to point to nothing else in the way of prejudice," the laches defense must fail.[760]  This is true even if the petitioner has delayed nearly twenty years in bringing the action.[761]

Jay contends Paul's failure to diligently pursue his claims resulted in both procedural and substantive prejudice.  First, Jay contends that Mary Swanson was unavailable to testify because she passed away before Paul sued.  Swanson was Lillian's close friend for many years, and Jay contends she witnessed his signature on JX 46, a purported copy of Jay's Deputy Trust Amendment, as well as JX 112, the "transcripts" of Lillian's purported conversations with Jay.  Unable to point to any other specific sources of procedural prejudice, Jay generally contends that "[t]he

---

[758] *See also In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *50 ("A defendant may be substantively prejudiced where the plaintiff 'sit[s] by inactive and in what amounts to silence . . .until affairs had become so complicated that a restoration of former status was difficult, if not impossible.'" (quoting *Fed. United Corp. v. Havender*, 11 A.2d 331, 344 (1940)).

[759] *Bovay v. H.M. Byllesby & Co.*, 22 A.2d 138, 142 (1941).  The respondent must prove that petitioner's delay lead to "an adverse change in the condition or relations of the property or the parties."  *Houseman*, 2015 WL 7307323, at *9 (quoting *Reid*, 970 A.2d at 183).

[760] *Berzins Enters., Inc.*, 2017 WL 4083131, at *4.

[761] *See Prudential Ins. Co. of Am. v. Deane*, 27 A.2d 365, 368 (1942) ("No prejudice to respondents from the delay of twenty years, nor change of situation during neglectful repose have been demonstrated. Complainant is willing that the insured should have all for which he bargained and paid.  In consequence, the defense of laches must fail." (quotation omitted)).

availability of witnesses and evidence does not necessarily alleviate prejudice since 'such evidence may now be stale' and memories fade."[762] Jay has failed to suggest any procedural prejudice.

The Delaware Supreme Court has stated that the doctrine of laches is founded on "the difficulty of doing entire justice, when the original transactions have become obscure by time, and the evidence may be lost, or depends on the precarious memory of witnesses."[763] No such difficulty is present here. As explained above, the documents Mary Swanson purportedly witnessed have been excluded as inadmissible because Jay has failed to show they are authentic. Her name is misspelled on JX 46, and Jay's testimony about the circumstances under which she purportedly witnessed JX 46 and JX 112 is suspicious and contradicted by more credible testimony. Jay produced two other copies of the Deputy Trust Amendment that were not witnessed by "M. Swason"; both of those are also unauthenticated and inadmissible. Mary Swanson's absence is not the reason Jay has failed to introduce an authentic copy of the Deputy Trust Amendment. And the circumstances surrounding JX 112 are so far-fetched that I cannot conceive of Mary testifying that she actually witnessed those "transcripts."

---

[762] D.I. 133 at 30 (quoting *Houseman*, 2015 WL 7307323, at *10, and then citing *Chaplake Hldgs., LTD. v. Chrysler Corp.*, 766 A.2d 1, 6 (Del. 2001)).

[763] *Hudak*, 806 A.2d at 159.

Mary Swanson is not a "crucial" trial witness: she never witnessed those documents. Furthermore, in light of my belief that Jay created JX 46 and JX 112, among other documents, recently in view of this litigation, it is possible that Jay chose Mary Swanson as his fictional witness for his paper trail because she died in 2013 or 2014.[764] This matter does not depend on Mary Swanson's memory, and even it had, the length of Paul's delay was not so extensive as to be the sole cause of Mary Swanson's unavailability.[765] Jay's more general concerns about faded memories and stale evidence are also unpersuasive, as Jay's testimony and documents are foundationally incredible. If anything, the passage of time has allowed Jay to create more documents and fine-tune his story.

Jay has also failed to demonstrate that he has been substantively prejudiced by Paul's delay. Jay contends that after he revoked Paul's interests in the Trusts, "he administered the trust accordingly,"[766] and that, if both Paul and he were beneficiaries, he would have proceeded differently. Jay argues that Paul "sat silent from 2008-2015, which makes it difficult if not impossible to return to the trust and [Paul] to their 2008 positions because he has not been a beneficiary since 2008."[767]

---

[764] *See* Jay Tr. 401:2–6.

[765] *Hudak*, 806 A.2d at 159–61 (collecting cases in which the delaying party waited far more than three to five years to bring his claim, therefore supporting a finding that unavailability was "attributable exclusively" to the plaintiff's delay).

[766] D.I. 133 at 30.

[767] *Id.* at 31.

He therefore believes he will be substantively prejudiced "if required to provide [Paul] with what he would have received if he remained a beneficiary after he slumbered on his rights for over 5 years."[768]

"A defendant may be substantively prejudiced where the plaintiff 'sit[s] by inactive and in what amounts to silence . . . until affairs had become so complicated that a restoration of former status was difficult, if not impossible.'"[769] But prejudice does not exist where the respondent "could not reasonably have been unaware of the possibility of future claims against them arising out of their dealings" with the petitioner.[770] Jay was well aware of his wrongdoing, and Paul made it clear as early as 2008 that he might bring claims against Jay.[771] The fact that Paul waited to follow through satisfies the first two prongs of the laches analysis, but it did not prejudice Jay.[772]

At bottom, Jay asks the Court to excuse his years of wrongdoing because it went on for so long. Jay contends that if Paul filed this action sooner, Jay would have taken less money. As an initial matter, even after Paul filed this action, Jay

---

[768] *Id.*

[769] *In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *50 (quoting *Havender*, 11 A.2d 331 at 344).

[770] *Stewart*, 112 A.3d at 296.

[771] *See id.*

[772] *Deane*, 27 A.2d at 368.

misappropriated enormous sums from the One Flintlock and Deputy Trusts; he presumably would have done the same if Paul had filed sooner.[773] And, more fundamentally, Jay complains it will be harder to right his wrongs because he committed more wrongs as time went on. That is justice, not prejudice.

Because Jay has failed to show that he has suffered an "essential"[774] disadvantage from Paul's delay and is "able to point to nothing else in the way of prejudice," his laches defense must fail.[775]

### D. Jay Is Removed As Trustee And Paul Is Appointed Trustee; Jay's Self-Interested Transactions Are Voidable; And Jay Shall Provide Inventories, Accountings, And Other Information.

Jay has breached his duties of care, of loyalty, and to inform. He has done so through fifteen years of obfuscation, deceit, and forgery. He obtained control over the assets that his aunt and mother desired to leave to others in his family, and he systematically created extensive schemes to justify appropriating those assets for

---

[773] *See* D.I. 130, Ex. A; D.I. 130, Ex. B (quantifying from the various JXs the total amount Jay withdrew from the Trusts from 2013 through 2018). Between 2013 and 2018, Jay siphoned off roughly $133,613.95 from the One Flintlock Trust, with his largest withdrawal of $87,392.13 occurring in 2018. *See* D.I. 130, Ex. A (citing JX 169, JX 170, JX 171, JX 172, JX 173, JX 174). Between 2008 and 2018, Jay siphoned off roughly $224,023.69 from the Deputy Trust, with his largest withdrawal of $77,568.24 occurring in 2013, and his withdrawals ranging from roughly $8,000 to over $12,000 occurring between 2015 and 2018. *See* D.I. 130, Ex. B (citing JX 158, JX 159, JX 160, JX 161, JX 162, JX 162, JX 164, JX 165, JX 166, JX 167, JX 168). The ultimate amount of Jay's wrongful distributions and withdrawals will later be determined through a Court-ordered accounting.

[774] *Bovay*, 22 A.2d at 142 (1941).

[775] *Berzins Enters., Inc.*, 2017 WL 4083131, at *4.

himself. He did so as his brother relied on him as fiduciary and as the more knowledgeable of the two. Paul is entitled to relief.

"The Court of Chancery has exercised its power for the removal of trustees appointed by will or deed very sparingly. The principle maintained is, that there must be a clear necessity for its interference, in order to secure the trust fund against loss or misapplication."[776] Such interference is necessary here. Even while this litigation has been pending, Jay has continued to loot the Trusts. At trial, Jay showed no potential for remorse or reflection; my impression was that he anticipated that he would also deceive the Court. Jay is removed as trustee effective immediately, and he is replaced with Paul.

Paul is also entitled to an inventory and an accounting of both Trusts under Jay's tenure as trustee.

> As fiduciaries, trustees have a duty to account to beneficiaries for their disposition of trust assets and bear the burden of proving that a disposition was proper. Included within the duty to account is a duty to maintain records that will discharge the fiduciaries' burden, and that if that duty is not observed, every presumption will be made against the fiduciaries.[777]

Jay shall file the inventories and accountings within ninety days and shall provide Paul with copies of all supporting documentation.

---

[776] *Massey v. Stout*, 1871 WL 2090, at *4 (Del. Ch. Sept. 1, 1871).

[777] *Hardy*, 2014 WL 3736331, at *12 (internal quotations and alterations omitted).

Jay's numerous self-interested transactions are voidable at Paul's behest.[778] "[A] court will uphold such a transaction against a beneficiary challenge only if the trustee can show that the transaction was fair and that the beneficiaries consented to the transaction after receiving full disclosure of its terms."[779] In particular, the rights Jay granted himself with regard to the North Circle House, namely the option, right of residence, and right to use Deputy Trust funds to furnish it to his liking, are self-interested, and Jay has not shown they are fair or that Paul knowingly consented. This transaction may be readily unwound, and so it is voidable.[780] I conclude this transaction cannot be upheld.

Paul, as trustee of the Deputy Trust, may grant Jay such rights of residence in the North Circle House as may be appropriate and equitable. He may take measures to secure the North Circle House, including by changing the locks. Its furnishings are presumed to be trust property subject to an accounting; Jay shall not remove them from the premises until that presumption is addressed.

Jay's self-interested payment of his commission, and all self-interested payments from Paul's interest that he made under the guise of having revoked Paul's interest, are also voidable. After reviewing the inventories and accountings, Paul is

---

[778] *Stegemeier*, 728 A.2d at 563.

[779] *Id.*

[780] *See id.* at 565.

invited to quantify his requested relief for unjust enrichment, income payments under the Trusts, and disgorgement or voiding of Jay's self-interested payments.[781] Jay is invited to respond.

Finally, Jay's transfer of the AT&T stock from the Deputy Trust to Jay is voidable. Paul shall also submit the specific relief he seeks with regard to this stock, and Jay is invited to respond.

As a consequence of Jay's extensive and meaningful breaches of his duty to inform, Paul has requested and shall receive additional equitable relief. Within thirty days, Jay shall identify any other trust that, to Jay's knowledge, ever existed or purported to exist relating to Lillian K. Deputy or Georgene E. Castor and for which Jay was ever trustee or co-trustee, and for which Paul was ever a beneficiary. He shall also provide copies of all such trust agreements. Within ninety days, Jay shall provide an inventory and accounting of all such trusts.

### E. Paul Is Entitled To Reasonable Attorneys' Fees; Jay Is Not.

Delaware courts generally follow the American Rule, which holds litigants responsible for their own costs and fees.[782] "Under the American Rule and Delaware

---

[781] *E.g.*, PTO ¶¶ 150, 151 (seeking income payments owed under the One Flintlock and Deputy Trusts); *id.* ¶ 153 (seeking an order requiring Jay to "bear all attendant losses incurred by the Trusts); *id.* ¶ 155 (requesting disgorgement of all improper Trust distributions).

[782] *See, e.g., Tandycrafts, Inc. v. Initio P'rs,* 562 A.2d 1162, 1164 (Del. 1989).

law, litigants are normally responsible for paying their own litigation costs."[783] The

Court recognizes an exception to this rule where a party has acted in bad faith.

> The party invoking the bad faith exception bears the stringent evidentiary burden of producing clear evidence of bad-faith conduct by the opposing party. The standard is arduous: situations in which a party acted vexatiously, wantonly, or for oppressive reasons.[784]

"Delaware courts have previously awarded attorneys' fees where (for example) parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[785] "Ultimately, the bad faith exception is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[786] A lesser breach of fiduciary duty alone will not merit departing from the American Rule.[787]

Further, in a judicial proceeding involving a trust, "the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of

---

[783] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[784] *Marra v. Brandywine Sch. Dist.*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012) (quotations omitted); *see also Estate of Carpenter v. Dinneen,* 2008 WL 859309, at *17 (Del.Ch. Mar.6, 2008) ("The American Rule recognizes an exception 'where the pre-litigation conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages.'"); *see Arbitrium (Cayman Is.) Handels AG v. Johnston,* 705 A.2d 225, 231 (Del.Ch.1997), *aff'd,* 720 A.2d 542 (Del.1998).

[785] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (internal quotation marks omitted) (quoting *Johnston*, 720 A.2d at 546).

[786] *Nichols v. Chrysler Gp., LLC*, 2010 WL 5549048, at * 3 (Del. Ch. Dec. 29, 2010).

[787] *See HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 124-25 (Del. Ch. 1999).

the controversy."[788] "Whether to award attorneys' fees falls within the discretion of this Court."[789]

Justice and equity require that Jay personally pay Paul's fees in this case. Jay's behavior falls well within the ambit of the bad faith exception to the American Rule. Jay has falsified a number of records to use for his advantage in this litigation, and has continued to siphon off Trust funds while this matter remained pending. As a result, Jay has almost entirely depleted the One Flintlock and Deputy Trusts. In this case, a fee award is necessary to deter Jay's abusive litigation tactics and protect the integrity of the judicial process.[790] And because of the extent of Jay's abuse and of Paul's financial detriment, Jay is required to bear Paul's costs personally.

Based on the foregoing, Jay is not entitled to fees.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in Paul's favor on all counts. Jay is removed as trustee of the One Flintlock Trust and the Deputy Trust, and Paul is appointed trustee effective immediately; Jay shall provide an inventory and accounting of both trusts, and supporting documentation, within ninety days; and Paul and Jay shall work towards quantifying what Jay has taken from Paul. Jay shall

---

[788] 12 *Del. C.* § 3584.

[789] *Paradee*, 2010 WL 3959604, at *15 (citing *McNeil,* 798 A.2d at 514).

[790] *Nichols*, 2010 WL 5549048, at * 3.

pay Paul's attorneys' fees and bear his own.  The parties shall submit a stipulated implementing order within twenty days.